February 10, 2026

Michael Williams
Suite 1524
50-58 Macleay Street
Elizabeth Bay NSW 2011
Australia
Michael.Williams@glexia.com
+1 701 484 1337

# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### PHILADELPHIA DIVISION

| | |
|---|---|
| **Michael Williams**, an individual residing in New South Wales, Australia,<br><br>Plaintiff,<br><br>v.<br><br>**Connectify, Inc. (d/b/a Speedify)**, a Delaware corporation with its principal place of business in Philadelphia, Pennsylvania<br><br>**Alexander C. Gizis**, an individual residing in Philadelphia, Pennsylvania<br><br>Defendants. | Civil Action No. 2:26-cv-00818-GJP<br><br>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S EMERGENCY**

**MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY**

**INJUNCTION**

# Table of Contents

*TABLE OF AUTHORITIES* ....................................................................................... *3*

*I. INTRODUCTION* ............................................................................................ *5*

*II. STATEMENT OF FACTS* ................................................................................ *8*

   **A. The Parties, the Router, and the Speedify Service** ................................... 8

   **B. Plaintiff Expressly Rejected Cancellation** ............................................... 10

   **C. Defendants' Wrongful Termination and False "Cancellation Request"** ....... 11

   **D. Escalation: Replacement Account Termination and Device Blacklisting** ....... 12

   **E. Defendant Gizis's Refusal and Contemptuous Conduct** ............................ 13

   **F. Ongoing and Irreparable Harm** ............................................................ 14

*III. LEGAL STANDARD* ................................................................................... *16*

*IV. ARGUMENT* ............................................................................................. *18*

   **A. Plaintiff Is Likely to Succeed on the Merits** ........................................... 18
       1. Breach of Contract (Count 1) ........................................................... 18
       2. Trespass to Chattels and Conversion (Counts 3 and 10) ....................... 21
       3. Fraud and Intentional Misrepresentation (Count 4) ............................. 23
       4. Pennsylvania Unfair Trade Practices and Consumer Protection Law (Count 5) ... 26
       5. California Consumer Protection Claims (Counts 6–8) ............................ 27
       6. Remaining Claims .......................................................................... 28

   **B. Plaintiff Will Suffer Irreparable Harm Absent Relief** .............................. 30

   **C. The Balance of Hardships Strongly Favors Plaintiff** ............................... 33

   **D. The Public Interest Favors Relief** ...................................................... 34

   **E. The Relief Sought Restores the Status Quo Ante and Is Primarily Prohibitory** ... 36

   **F. Security Under Rule 65(c)** .............................................................. 38

*V. CONCLUSION* .......................................................................................... *40*

# TABLE OF AUTHORITIES

**CASES**

**Cases**

Acierno v. New Castle County, 40 F.3d 645 (3d Cir. 1994) .................................17, 18, 37

Campbell Soup Co. v. ConAgra, Inc., 977 F.2d 86 (3d Cir. 1992) ...................................17, 35

Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co., 20 Cal. 4th 163 (1999) .........................28

Chatlos Sys., Inc. v. Nat'l Cash Register Corp., 670 F.2d 1304 (3d Cir. 1982).....................29

CompuServe Inc. v. Cyber Promotions, Inc., 962 F. Supp. 1015 (S.D. Ohio 1997)...............21

CoreStates Bank, N.A. v. Cutillo, 723 A.2d 1053 (Pa. Super. Ct. 1999) ...............................19

eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388 (2006)....................................................31

ECRI v. McGraw-Hill, Inc., 809 F.2d 223 (3d Cir. 1987).....................................................31

Elliott v. Kiesewetter, 98 F.3d 47 (3d Cir. 1996) ...........................................................39, 40

Erickson v. Pardus, 551 U.S. 89 (2007)..............................................................................18

Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp., 847 F.2d 100 (3d Cir. 1988) ...............40

Gibbs v. Ernst, 647 A.2d 882 (Pa. 1994) ............................................................................24

Haines v. Kerner, 404 U.S. 519 (1972)................................................................................18

Hope v. Warden York Cnty. Prison, 972 F.3d 310 (3d Cir. 2020) ........................................39

Impression Prods., Inc. v. Lexmark Int'l, Inc., 581 U.S. 360 (2017) ....................................36

In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410 (3d Cir. 1997) ..............................24

Instant Air Freight Co. v. C.F. Air Freight, Inc., 882 F.2d 797 (3d Cir. 1989) .....30, 31, 32, 33

Intel Corp. v. Hamidi, 30 Cal. 4th 1342 (2003)...................................................................22

Kasky v. Nike, Inc., 27 Cal. 4th 939 (2002) ........................................................................28

Kos Pharms., Inc. v. Andrx Corp., 369 F.3d 700 (3d Cir. 2004)......................................17, 37

Lum v. Bank of Am., 361 F.3d 217 (3d Cir. 2004) ...............................................................24

Meyer v. Sprint Spectrum L.P., 45 Cal. 4th 634 (2009).......................................................28

Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139 (2010).............................................35

Opticians Ass'n of Am. v. Indep. Opticians of Am., 920 F.2d 187 (3d Cir. 1990)...........34, 35

Punnett v. Carter, 621 F.2d 578 (3d Cir. 1980) ..........................................................17, 37, 38

Reilly v. City of Harrisburg, 858 F.3d 173 (3d Cir. 2017) ..........................................passim

Salley v. Option One Mortgage Corp., 925 A.2d 115 (Pa. 2007)....................................20, 29

Somers v. Somers, 613 A.2d 1211 (Pa. Super. Ct. 1992)......................................................21

Temple Univ. v. White, 941 F.2d 201 (3d Cir. 1991)............................................................40

Tom Doherty Assocs., Inc. v. Saban Entm't, Inc., 60 F.3d 27 (2d Cir. 1995) .......................38

U.S. Healthcare, Inc. v. Blue Cross of Greater Phila., 898 F.2d 914 (3d Cir. 1990)..............26

Ware v. Rodale Press, Inc., 322 F.3d 218 (3d Cir. 2003).....................................................19

Weinberg v. Sun Co., 777 A.2d 442 (Pa. 2001) ...................................................................26

Williams v Connectify, Inc. [2026] NSWSC 30................................................................7, 14

Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7 (2008) .............................8, 17

**STATUTES**

**Statutes**

13 Pa.C.S. § 2316(b)..........................................................................................................29

28 U.S.C. § 1746.................................................................................................................8

28 U.S.C. § 2201................................................................................................................29

73 P.S. § 201-1 et seq...........................................................................................26
73 P.S. § 201-2(4)(ix) ...........................................................................................27
73 P.S. § 201-2(4)(v) ............................................................................................27
73 P.S. § 201-2(4)(vii) ..........................................................................................27
73 P.S. § 201-2(4)(xxi) ....................................................................................26, 27
73 P.S. § 201-3......................................................................................................26
73 P.S. § 201-9.2(a) .........................................................................................26, 28
Cal. Bus. & Prof. Code § 17200 et seq. ...............................................................28
Cal. Bus. & Prof. Code § 17204 ...........................................................................28
Cal. Bus. & Prof. Code § 17500 et seq. ...............................................................28
Cal. Civ. Code § 1750 et seq.................................................................................28
Cal. Civ. Code § 1782(a) .................................................................................14, 28

## RULES

**Other Authorities**

Fed. R. Civ. P. 65............................................................................................5, 17
Fed. R. Civ. P. 65(b) .............................................................................................17
Fed. R. Civ. P. 65(b)(1)(A) ..............................................................................17, 42
Fed. R. Civ. P. 65(c) ......................................................................................4, 39, 42
Fed. R. Civ. P. 9(b) ...............................................................................................24

## OTHER AUTHORITIES

**Treatises**

Restatement (Second) of Contracts § 19(1) ..........................................................19
Restatement (Second) of Contracts § 195(1) ........................................................30
Restatement (Second) of Contracts § 344.............................................................35
Restatement (Second) of Torts § 217....................................................................21
Restatement (Second) of Torts § 218..............................................................21, 22, 23
Restatement (Second) of Torts § 222A.................................................................23

# I. INTRODUCTION

Plaintiff Michael Williams ("Plaintiff") respectfully moves this Court for a temporary restraining order ("TRO") and preliminary injunction pursuant to Federal Rule of Civil Procedure 65. Plaintiff seeks narrowly tailored, restorative relief: an order requiring Defendants Connectify, Inc. ("Connectify") and Alexander C. Gizis ("Gizis") (collectively, "Defendants") to restore Plaintiff's access to the paid Speedify services that are required for Plaintiff's "Powered by Speedify" router to function as marketed, and to refrain from blacklisting or otherwise disabling Plaintiff's router at the device level. *See* Verified Complaint ("Compl.") ¶¶ 110–122; Declaration of Michael Williams ("Williams Decl.") ¶¶ 1–3. This relief can be accomplished through a simple administrative reactivation in Defendants' systems, which are the same systems that Defendants used to deactivate Plaintiff's service in the first place. Compl. ¶¶ 115, 122; Williams Decl. ¶¶ 57, 60.

This case arises from Defendants' abrupt, wrongful, and retaliatory termination of Plaintiff's paid Speedify services, premised on a demonstrably fabricated "cancellation request" that Plaintiff never made, and Defendants' subsequent device-level blacklisting of Plaintiff's specialized AUD $2,725.82 router, all while Plaintiff was traveling internationally and critically dependent on the router for continuity-essential connectivity, secure network administration, and time-sensitive business communications supporting Plaintiff's California business operations and his Australian telecommunications carrier operations serving Commonwealth and State government clients. Compl. ¶¶ 1–7, 21–22, 44, 106–108; Williams Decl. ¶¶ 2–4, 14–19.

The undisputed documentary record establishes the following sequence. On January 25, 2026, Plaintiff expressly and unequivocally rejected cancellation in writing through

Defendants' own support system, stating: "Ok no I will keep the router license then thank you. I didn't know it would stop working." Compl. ¶¶ 67–68, 78; Williams Decl. ¶ 25. On January 26, 2026, Defendant Gizis personally intervened in the support thread and presented Plaintiff with a binary ultimatum: either "continue troubleshooting" in a "professiional manner" [*sic*] or accept "a full refund." Compl. ¶ 66; Williams Decl. ¶ 25. Plaintiff responded by declining the refund and stating he would "remain available to troubleshoot the issue." Compl. ¶ 66. The very next day, on January 27, 2026, at 14:39:55 UTC, Defendants deactivated Plaintiff's Router Plan, and one second later at 14:39:56 UTC processed an unrequested refund, falsely claiming the deactivation occurred "as a follow up to your cancellation request." Compl. ¶¶ 70–78; Williams Decl. ¶¶ 27–28. Fifteen minutes later, Defendants deactivated Plaintiff's separately purchased Families Plan (at 14:54:40 UTC) with an identical false "cancellation request" characterization. Compl. ¶ 70; Williams Decl. ¶¶ 27–28. All four deactivation and refund emails were sent by "Alex from Speedify", namely Defendant Gizis, confirming his personal direction of the termination. Compl. ¶¶ 3, 70; Williams Decl. ¶¶ 27–28.

Defendants then escalated by terminating a separately purchased replacement account (created by Plaintiff's partner on a new account) within approximately 48 hours, and by implementing device-level blacklisting that prevents Plaintiff's router from functioning through *any* paid Speedify subscription, regardless of which account attempts activation. Compl. ¶¶ 83–87; Williams Decl. ¶¶ 31–32. The router manufacturer's Chief Technology Officer, Ryan Brenneman, has warned in three successive communications that Defendants can make the router's serial number "dead" in their systems and "unable to ever be activated again," and confirmed that "the product is solely designed to work with Speedify, it really has no other function." Compl. ¶¶ 31–33; Williams Decl. ¶ 9.

Defendant Gizis personally directed the termination, refused reinstatement, asserted a purported "$100" liability cap, told Plaintiff not to contact Defendants again, and, in a message

relayed to Plaintiff, stated words to the effect that the Court should "go f--- itself." Compl. ¶¶ 91, 94, 99; Williams Decl. ¶¶ 34, 35. Despite receiving approximately forty (40) written communications demanding restoration of service and advising of imminent legal proceedings, including service of emergency proceedings from the Supreme Court of New South Wales, Australia, which was constituted on an emergency basis on January 30, 2026, *Williams v Connectify, Inc.* [2026] NSWSC 30, Defendants have refused to restore service, refused to engage with Plaintiff's grievances, refused to identify legal counsel, and refused to acknowledge or respond to court filings from another sovereign nation. Compl. ¶¶ 92–99; Williams Decl. ¶¶ 38–42.

The urgency of relief is underscored by the scope of Plaintiff's dependence on the service. Defendants' own automated weekly usage reports confirm that in the single week ending February 1, 2026, the week immediately following termination, Plaintiff's accounts recorded a combined 44 GB of data transferred, 85.3 hours of connected time, 88 failover events where Speedify prevented outages, and 339 streaming interventions across 6 streams or calls. Compl. ¶ 100; Williams Decl. ¶ 45. Moreover, Plaintiff's secure management network, which serves government clients including the Australian Department of Foreign Affairs and Trade and South Australia Police through Plaintiff's telecommunications carrier (Carrier Licence No. 554), is configured to accept remote-management connections *only* from Speedify's network, creating an access lockout that cannot be resolved without physically returning to Sydney, Australia. Compl. ¶¶ 22, 34–38; Williams Decl. ¶¶ 15–18.

This is not a case about technical difficulties or service quality disputes. This is a case about a service provider that fabricated a cancellation request its own records disprove, terminated paid services over a customer's express and documented written objection, blacklisted the customer's equipment at the device level to prevent restoration through any means, and now refuses to restore service while threatening to permanently disable the

customer's $2,725.82 property investment, all in apparent retaliation for the customer's assertion of his consumer and intellectual property rights. Compl. ¶¶ 88–91, 96; Williams Decl. ¶¶ 34, 35. As the Supreme Court has recognized, "[i]njunctive relief is an extraordinary remedy never awarded as of right." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008). The extraordinary facts of this case demand such relief. Plaintiff satisfies each of the four *Reilly* factors and respectfully urges this Court to act promptly to prevent the permanent destruction of his property and the continued deprivation of his paid services. The Declaration of James Foerst ("Foerst Decl."), submitted herewith, further confirms the cascading and irreparable nature of the harm: Defendants' conduct has impaired Plaintiff's ability to fulfill a pre-litigation advisory and expert witness engagement, exposing a third party's significant cryptocurrency holdings to losses that are "uniquely difficult, and potentially impossible, to quantify." Foerst Decl. ¶¶ 6–8, 12.

## II. STATEMENT OF FACTS

The relevant facts are set forth in detail in the Declaration of Michael Williams and the Verified Complaint, and are summarized here. All factual assertions are supported by sworn testimony under 28 U.S.C. § 1746 and contemporaneous documentary evidence.

### A. The Parties, the Router, and the Speedify Service

Plaintiff Michael Williams is an Australian citizen and the Managing Director of Glexia Pty Ltd, an Australian telecommunications carrier. Compl. ¶¶ 21–22; Williams Decl. ¶¶ 4, 7. Through Glexia, Plaintiff holds Australian Carrier Licence No. 554 issued by the Australian Communications and Media Authority ("ACMA"), and provides secure telecommunications services to Australian Commonwealth and State government clients including the Department of Foreign Affairs and Trade ("DFAT") and South Australia Police. Compl. ¶ 22; Williams

Decl. ¶¶ 4–6. Defendant Connectify, Inc. is a Delaware corporation with its principal place of business at 601 Spring Garden Street, 3rd Floor, Philadelphia, Pennsylvania 19123. Compl. ¶¶ 23–24. Defendant Alexander C. Gizis ("Gizis") is Connectify's co-founder and Chief Executive Officer, residing at 430 Pine Street, Philadelphia, Pennsylvania. Compl. ¶ 25.

Defendants market and sell Speedify as a bonding VPN service described as "the only VPN that seamlessly combines all of your connections, including WiFi, 4G, 5G, Ethernet, and Starlink, into one unbreakable connection." Compl. ¶ 52. Defendants advertise "Flawless Failover" that "seamlessly transfers live video streams and other online traffic to another working . . . connection so you won't drop a frame" and a "Redundant Mode" that "sends duplicate packets across multiple links so that even if a single path fails mid-transmission, your application doesn't miss a beat." Compl. ¶¶ 52–53; Williams Decl. ¶ 9A. These are specific, verifiable, and empirically testable technical claims, not puffery. Compl. ¶¶ 52–54, 147.

On December 4, 2025, Plaintiff purchased a Miri X510 dual-SIM router marketed as "Powered by Speedify" from Corsair Solutions Pty Ltd, an Australian retailer authorized to distribute Speedify-compatible routers, for approximately AUD $2,725.82. Compl. ¶ 39; Williams Decl. ¶ 8. This price represents a substantial premium over commodity single-WAN routers costing under $30, reflecting the router's specialized multi-WAN bonding and failover capability that only the integrated Speedify software service can provide. Compl. ¶¶ 27–33, 188; Williams Decl. ¶¶ 8–9. As Miri Technologies' CTO Ryan Brenneman subsequently confirmed in three successive communications: "the product is solely designed to work with Speedify, it really has no other function"; "Without Speedify enabled the router will not function properly"; and "[t]he sole purpose of the router is to run Speedify for bonding." Compl. ¶¶ 31–33; Williams Decl. ¶ 9.

On January 25, 2026, Plaintiff purchased a "Speedify Pro Router Yearly 3000GB Subscription" for USD $450.00 (Invoice #502472). Compl. ¶ 42; Williams Decl. ¶ 11. Plaintiff

also held a separate "Speedify Families Unlimited Three Year Subscription" purchased December 2, 2025, for AUD $251.11 (Invoice #494648). Compl. ¶ 41. Plaintiff's combined investment in the Speedify ecosystem, including the router, Router Plan, and Families Plan, totaled approximately AUD $3,900 (USD ~$2,450). Compl. ¶¶ 39, 41–42.

Plaintiff purchased the Router Plan specifically to ensure reliable bonded connectivity during scheduled international travel on ANA Business Class (Sydney–Tokyo–Mexico City–Sydney, total cost AUD $7,981.06 in non-refundable airfare). Compl. ¶¶ 44, 104; Williams Decl. ¶¶ 2–4, 12. The purchase also supported Plaintiff's time-critical business communications for Glexia's California operations and Plaintiff's secure remote management of telecommunications infrastructure serving government clients. Compl. ¶¶ 21–22, 44, 106–108; Williams Decl. ¶¶ 4–7, 12.

## B. Plaintiff Expressly Rejected Cancellation

On January 25, 2026, the same day Plaintiff purchased the Router Plan, Plaintiff opened support Ticket No. 676251 regarding technical issues with the Speedify service, specifically tunnel-reset and bonding failures in Redundant Mode inconsistent with Defendants' marketing representations of "Flawless Failover" and "secure, uninterrupted" redundancy. Compl. ¶¶ 55–64; Williams Decl. ¶ 24. During the support exchange, Defendants' support representative offered cancellation as an option. Compl. ¶ 65; Williams Decl. ¶ 25. Plaintiff expressly and unequivocally declined, stating in writing through Defendants' own support system: "Ok no I will keep the router license then thank you. I didn't know it would stop working." Compl. ¶¶ 67–68, 78; Williams Decl. ¶ 25. This instruction was clear, contemporaneous, documented within Defendants' own ticketing system, and left no ambiguity whatsoever as to Plaintiff's intent to retain, not cancel, his service. Compl. ¶¶ 68, 78.

On January 26, 2026, Defendant Gizis personally intervened in the support thread, replacing the assigned support engineer, and presented Plaintiff with a binary ultimatum: either "continue troubleshooting" in a "professiional manner" [*sic*] or accept "a full refund." Compl. ¶ 66; Williams Decl. ¶ 25. Gizis did not acknowledge Plaintiff's right to continue using the paid service while pursuing legitimate complaints. Compl. ¶ 156. Plaintiff responded by expressly declining the refund and stating he would "remain available to troubleshoot the issue." In doing so, he declined cancellation for the second time while reserving all rights. Compl. ¶ 66. The sequence of events is critical: at no point did Plaintiff ever request cancellation; Plaintiff rejected cancellation on January 25 and again on January 26. Compl. ¶¶ 65–68, 78; Williams Decl. ¶ 25.

## C. Defendants' Wrongful Termination and False "Cancellation Request"

On January 27, 2026, Defendants deactivated Plaintiff's Router Plan at 14:39:55 UTC and, one second later at 14:39:56 UTC, processed a refund. Compl. ¶ 70; Williams Decl. ¶¶ 27–28. At 14:54:40 UTC, Defendants deactivated Plaintiff's Families Plan, processing another refund one second later at 14:54:41 UTC. Compl. ¶ 70; Williams Decl. ¶¶ 27–28. All four deactivation and refund emails were sent by "Alex from Speedify", namely Defendant Gizis, confirming his personal direction of the termination. Compl. ¶¶ 3, 70; Williams Decl. ¶¶ 27–28.

Each deactivation email falsely stated the deactivation occurred "as a follow up to your cancellation request." Compl. ¶¶ 70–71; Williams Decl. ¶¶ 27–28. This statement was demonstrably false: Plaintiff had made no cancellation request: not through the support ticket system, not through the Subscription Management Portal, not through any cancellation link, and not via email to support@speedify.com. Compl. ¶¶ 73–78, 153; Williams Decl. ¶ 25. To

the contrary, Plaintiff had expressly rejected cancellation in writing just two days earlier, doing so twice. Compl. ¶¶ 65–68, 78; Williams Decl. ¶ 25. Plaintiff has repeatedly demanded that Defendants identify the purported "cancellation request"; Defendants have never produced, identified, or even described any such record, despite being the sole custodians of the electronic records that would evidence any such request. Compl. ¶¶ 74, 154.

## D. Escalation: Replacement Account Termination and Device Blacklisting

Plaintiff attempted to mitigate by having his partner create an entirely new Speedify account, under a different name and email address, and purchase a replacement subscription. Compl. ¶¶ 83–86; Williams Decl. ¶¶ 30–31. Defendants terminated that account as well, within approximately 48 hours. Compl. ¶¶ 83–86; Williams Decl. ¶¶ 30–31. The rapidity and precision of this second termination, which targeted a new account created by a different person, demonstrates that Defendants tracked Plaintiff's router by serial number (00A601241115008) and/or device identifiers and took affirmative device-level actions designed to prevent Speedify from operating on Plaintiff's router regardless of which paying account attempted activation. Compl. ¶¶ 85, 87; Williams Decl. ¶¶ 31–32.

This escalation to device-level blacklisting occurred within approximately 48 hours of Defendants' initial termination, and closely followed Plaintiff's filing of an intellectual property challenge on January 27, 2026, suggesting retaliatory motivation. Compl. ¶¶ 88–91, 156. Miri Technologies' CTO Ryan Brenneman confirmed in three successive communications on January 27–28, 2026 that: (a) "the product is solely designed to work with Speedify, it really has no other function"; (b) "Without Speedify enabled the router will not function properly"; (c) "The sole purpose of the router is to run Speedify for bonding"; and (d) Defendants can make the serial number "dead" and "unable to ever be activated again." Compl. ¶¶ 31–33;

Williams Decl. ¶ 9. Brenneman further offered to reimburse the full cost of the router if returned, confirming that even the manufacturer considered the device to be without meaningful value absent Speedify service. Compl. ¶ 33; Williams Decl. ¶ 9.

## E. Defendant Gizis's Refusal and Contemptuous Conduct

On January 27, 2026, the same day as the termination, Defendant Gizis personally emailed Plaintiff stating that Defendants had "terminated the relationship," that Defendants would not reinstate service, and that Defendants' "liability is limited to the amount you paid us, or $100 whichever is higher." Compl. ¶ 94; Williams Decl. ¶ 34. Gizis asserted this refund was "the end of the legal matter" and directed Plaintiff not to contact Defendants again. This statement reflected Gizis's belief that a unilateral refund could extinguish all claims, including for the impaired AUD $2,725.82 router investment. Compl. ¶ 94; Williams Decl. ¶ 34. In his email, Gizis revealed the true motive for the termination: he was personally angered that Plaintiff had contacted Connectify employees directly and had asserted his rights, and he sought to punish Plaintiff by destroying his connectivity infrastructure while Plaintiff was traveling internationally. Compl. ¶ 156; Williams Decl. ¶ 34.

Gizis's contempt for Plaintiff's legal rights escalated further. In a message relayed to Plaintiff, Gizis stated words to the effect that the Court should "go f--- itself." Compl. ¶ 99; Williams Decl. ¶ 35. On February 1, 2026, at 10:41 p.m. UTC, Plaintiff emailed Defendants referencing this statement: "Given your nonresponse and Mr Gizis' message to tell the Court to go 'f--- itself', we are in the process of submitting an emergency motion to the US District Court for the E.D. of PA." Compl. ¶ 99; Williams Decl. ¶ 35. Defendants did not deny or repudiate this statement. Compl. ¶ 99.

Plaintiff sent over forty (40) written communications between January 25 and February 5, 2026, demanding restoration of service and advising of imminent legal proceedings. Compl.

¶¶ 92–99; Williams Decl. ¶¶ 38–42. Defendants were served with emergency proceedings from the Supreme Court of New South Wales, Australia, which was constituted on an emergency basis on January 30, 2026, *Williams v Connectify, Inc.* [2026] NSWSC 30. Compl. ¶ 99; Williams Decl. ¶ 42. On February 5, 2026, Plaintiff also sent Defendants a formal pre-suit notice under the California Consumers Legal Remedies Act, Cal. Civ. Code § 1782(a), demanding corrective action within 30 days. Compl. ¶ 179. Despite service of court proceedings from another sovereign nation, over forty demand communications, a CLRA notice, and ample opportunity to resolve this dispute, Defendants have refused to restore service, refused to engage with Plaintiff's grievances, refused to identify legal counsel, and refused to acknowledge or respond to any filing. Compl. ¶ 99; Williams Decl. ¶ 42.

## F. Ongoing and Irreparable Harm

Plaintiff is presently traveling internationally, located in Puerto Escondido, Oaxaca, Mexico, a remote coastal town approximately seven hours from the nearest international airport. Compl. ¶ 100; Williams Decl. ¶ 4. Plaintiff's secure management network, which serves government clients and functions as critical telecommunications infrastructure under Australian Carrier Licence No. 554, is configured to accept remote-management connections *only* from Speedify's network (a Speedify-only allowlist). Compl. ¶¶ 34–38; Williams Decl. ¶¶ 15–18. When Defendants disabled Speedify access, Plaintiff was instantaneously locked out of the only approved remote-management path to administer his own secure network, including infrastructure serving the Australian Department of Foreign Affairs and Trade and South Australia Police. Compl. ¶¶ 22, 35–37; Williams Decl. ¶¶ 15–17.

Reconfiguring this network to accept connections from an alternative VPN provider would require Plaintiff to physically return to Sydney, Australia, a round trip of approximately 25,000 kilometers, because the management interface is protected by hardware authentication

tokens (FIDO2 security keys) in Plaintiff's sole physical possession at his Sydney premises. Compl. ¶¶ 37–38; Williams Decl. ¶¶ 17–18. This creates a catch-22: Plaintiff cannot switch to an alternative VPN without first accessing the network management interface, but he cannot access that interface without Speedify. Compl. ¶ 36; Williams Decl. ¶ 16.

Defendants' own automated weekly usage reports, generated and sent by Defendants themselves, confirm the extraordinary extent of Plaintiff's reliance on Speedify: in the single week ending February 1, 2026 (the week immediately following termination), Plaintiff's accounts recorded a combined 44 GB of data transferred, 85.3 hours of connected time, 88 failover events where Speedify prevented outages, and 339 streaming interventions across 6 streams or calls. Compl. ¶ 100; Williams Decl. ¶ 45. These figures demonstrate that Speedify was not an optional convenience; it was the backbone of Plaintiff's connectivity infrastructure during critical international travel. Compl. ¶¶ 100, 106; Williams Decl. ¶ 45.

Replacement multi-WAN bonding equipment is not available on an emergency timetable in Puerto Escondido, Mexico, and even if obtainable, would cost approximately USD $56,151 to $98,370 over ten years compared to Speedify's $450 annual cost. Compl. ¶¶ 103, 119; Williams Decl. ¶¶ 51–52. Moreover, replacement equipment would still not resolve the Speedify-only network access lockout without Plaintiff physically returning to Sydney. Compl. ¶¶ 36–38; Williams Decl. ¶¶ 16–18. Plaintiff has been unable to mitigate the harm caused by Defendants' conduct, and the harm compounds daily. Williams Decl. ¶¶ 50–52.

Defendants' conduct has also impaired Plaintiff's ability to fulfill professional engagements. James Foerst, an independent cryptocurrency investor residing in Raleigh, North Carolina, retained Plaintiff on or about January 20, 2026, to provide pre-litigation advisory and consulting services, including prospective expert testimony, in connection with contemplated cryptocurrency litigation involving significant digital asset holdings. Declaration of James Foerst ("Foerst Decl.") ¶¶ 4–6. Mr. Foerst's engagement requires Plaintiff to access his secure

communications and data analysis environment to conduct cryptocurrency analysis, prepare preliminary assessments, and communicate securely regarding privileged and confidential pre-litigation matters. Foerst Decl. ¶ 6. That environment is accessible only through the Speedify-dependent network path that Defendants have disabled. *Id.* As a result, Plaintiff has been unable to provide the full scope of advisory services that the engagement requires, and Mr. Foerst has been unable to identify a suitable replacement professional with Plaintiff's specific intersection of telecommunications carrier-level infrastructure expertise, government agency experience, and cryptocurrency technical knowledge. Foerst Decl. ¶ 7. The harm to Plaintiff's professional reputation and consulting income compounds with each passing day.

## III. LEGAL STANDARD

A temporary restraining order and preliminary injunction are governed by Federal Rule of Civil Procedure 65. Under Rule 65(b), a court may issue a TRO without written or oral notice to the adverse party only if "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard." Fed. R. Civ. P. 65(b)(1)(A). Here, although Plaintiff has provided actual and constructive notice to Defendants through over forty communications and service of court proceedings, the urgency of the threatened harm, particularly permanent serial-number blacklisting, and Defendants' refusal to engage or identify legal counsel justify expedited consideration. Compl. ¶¶ 92–99; Williams Decl. ¶¶ 38–42.

In the Third Circuit, a movant seeking a TRO or preliminary injunction must demonstrate: "(1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." *Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017) (quoting *Kos Pharms., Inc. v. Andrx Corp.*,

369 F.3d 700, 708 (3d Cir. 2004)). *See also Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008) ("[a] plaintiff seeking a preliminary injunction must establish" all four factors).

The first two factors, likelihood of success and irreparable harm, are "most critical." *Reilly*, 858 F.3d at 179. "If these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* The movant must demonstrate a "significant," and not merely possible, threat of irreparable harm. *Id.; see also Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 191–92 (3d Cir. 1990) (articulating the flexible balancing approach); *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992) (same). As demonstrated below, Plaintiff satisfies each factor decisively.

Where a requested injunction is characterized as "mandatory" because it requires an affirmative act, courts apply heightened scrutiny and grant such relief "only in rare circumstances." *Punnett v. Carter*, 621 F.2d 578, 582 (3d Cir. 1980). However, the critical inquiry is whether the injunction restores the *status quo ante*, that is, "the last peaceable, noncontested status between the parties." *Acierno v. New Castle County*, 40 F.3d 645, 647 (3d Cir. 1994). Here, the *status quo ante* is Plaintiff having access to Speedify under his paid subscription, the state that existed as of January 26, 2026, the day before Defendants' unauthorized unilateral termination. Compl. ¶¶ 42–43, 122; Williams Decl. ¶ 3. Restoring service is not an act of judicial imposition; it is a return to the last undisturbed state before Defendants' wrongful unilateral action, accomplished through the same administrative systems that Defendants used to effectuate the termination. *See Acierno*, 40 F.3d at 647; Compl. ¶¶ 112, 115, 122.

Moreover, this Court should be mindful that Plaintiff is a *pro se* litigant. Courts in this District "hold *pro se* pleadings to a less stringent standard than formal pleadings drafted by

attorneys." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *Haines v. Kerner*, 404 U.S. 519, 520 (1972). Plaintiff's verified filings and sworn declaration, while prepared without assistance of counsel, contain detailed factual allegations supported by contemporaneous documentary evidence. Williams Decl. ¶ 1.

# IV. ARGUMENT

## A. Plaintiff Is Likely to Succeed on the Merits

Plaintiff has a strong probability of success on multiple independent claims. Any one of these claims, standing alone, is sufficient to satisfy the first *Reilly* factor. *See Reilly*, 858 F.3d at 179 (requiring only "a likelihood of success on the merits").

### 1. Breach of Contract (Count 1)

Under Pennsylvania law, a breach of contract claim requires: "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages." *Ware v. Rodale Press, Inc.*, 322 F.3d 218, 225 (3d Cir. 2003) (applying Pennsylvania law); *see also CoreStates Bank, N.A. v. Cutillo*, 723 A.2d 1053, 1058 (Pa. Super. Ct. 1999) (same elements). All elements are met here.

*Contract formation.* A binding contract exists between Plaintiff and Connectify. Plaintiff paid USD $450.00 for the Router Plan (Invoice #502472), and Defendants accepted payment and activated the plan on Plaintiff's account. Compl. ¶¶ 42–43; Williams Decl. ¶ 3. Plaintiff also maintained a Families Plan subscription (Invoice #494648, AUD $251.11). Compl. ¶ 41. Defendants' acceptance of Plaintiff's payment and activation of the service created a binding contractual obligation to provide the subscribed services for the paid term, regardless of whether the Court characterizes the contract as express or implied-in-fact. *See*

Restatement (Second) of Contracts § 19(1) (mutual assent may be manifested by parties' conduct and performance); Compl. ¶ 124. The subscription purchase confirmations, invoices, Defendants' acceptance of payment, and the parties' course of dealing all evidence the existence of an enforceable agreement. Compl. ¶¶ 42–43, 124.

*Unconscionability of Terms of Service*. To the extent Defendants invoke their Terms of Service, which purport to permit termination "at any time for any reason" (Compl. ¶ 16), these provisions are unconscionable and unenforceable under Pennsylvania law. Under *Salley v. Option One Mortgage Corp.*, 925 A.2d 115, 127–29 (Pa. 2007), unconscionability requires both procedural and substantive elements, though a strong showing of one may compensate for a lesser showing of the other. Procedurally, the Terms of Service are a standard-form adhesion contract on a scrollable webpage, not negotiated, not separately acknowledged by Plaintiff, and not conspicuously presented at the point of purchase. Compl. ¶¶ 16–17. Substantively, a blanket termination clause that permits Defendants to destroy a customer's AUD $2,725.82 router investment by unilaterally withdrawing the licensing required for the device to function is grossly disproportionate, shocks the conscience, and unreasonably favors Defendants. Compl. ¶¶ 16–17, 183, 198. While the Pennsylvania Supreme Court in *Salley* ultimately found insufficient evidence of unconscionability in the mortgage-lending context before it, Plaintiff's case is materially distinguishable: unlike the borrower in *Salley*, who had the opportunity to review and compare competitive loan terms, Plaintiff had no meaningful ability to negotiate the scrollable online Terms of Service, and the substantive term at issue, a unilateral right to permanently disable a $2,725.82 hardware investment without cause, is far more extreme than the lending provisions at issue in that case. *See Salley*, 925 A.2d at 127–29 (reaffirming that a strong showing on the substantive prong may compensate for a lesser showing on the procedural prong).

*Breach.* Defendants breached the contract in at least four independent respects: (a) deactivating Plaintiff's paid Router Plan on January 27, 2026, without Plaintiff's authorization or consent, Compl. ¶¶ 70, 126; Williams Decl. ¶¶ 27–28; (b) falsely claiming the deactivation occurred "as a follow up to your cancellation request" despite Plaintiff's express written rejection of cancellation on January 25 and 26, 2026, Compl. ¶¶ 70–78, 126; Williams Decl. ¶¶ 25, 27–28; (c) refusing to reinstate service after Plaintiff immediately and repeatedly objected, Compl. ¶¶ 92–99; Williams Decl. ¶ 34; and (d) escalating to device-level blacklisting that prevents Plaintiff from using Speedify on the router through *any* paid account, Compl. ¶¶ 83–87, 126; Williams Decl. ¶¶ 31–32. Even if the Terms of Service were enforceable, Defendants did not follow their own stated procedures and fabricated a pretext (the false "cancellation request") for the termination. Compl. ¶¶ 73–78.

*Damages.* Plaintiff has suffered and continues to suffer damages including: loss of paid services for the entirety of the remaining annual subscription term, loss of the benefit of his bargain, impairment and threatened permanent destruction of the AUD $2,725.82 router, consequential business losses exceeding $75,000, lockout from critical telecommunications infrastructure serving government clients, non-refundable airfare at risk (AUD $7,981.06), lost professional consulting income from the inability to fulfill client engagements, including a pre-litigation advisory and expert witness engagement that Plaintiff cannot fully perform due to Defendants' disabling of his secure infrastructure (Foerst Decl. ¶¶ 6–7), and the substantial cost of alternative equipment (USD $56,151 to $98,370 over ten years). Compl. ¶¶ 100–105, 127–128, 163; Williams Decl. ¶¶ 45, 51–52.

Moreover, Pennsylvania law imposes an implied covenant of good faith and fair dealing in every contract, requiring "that neither party do anything that will injure the right of the other to receive the benefits of the agreement." *Somers v. Somers*, 613 A.2d 1211, 1213 (Pa. Super. Ct. 1992). Fabricating a cancellation request that was never made, using it to terminate service

over the customer's express and documented written objection, and then escalating to device-level blacklisting to prevent the customer from obtaining service through any means, all while threatening to permanently disable the customer's property, constitutes a textbook violation of this duty. Compl. ¶¶ 129–133; Williams Decl. ¶¶ 25, 27–28, 31–32. Gizis's personal direction of the termination and his retaliatory motive further evidence bad faith. Compl. ¶¶ 3, 70, 94, 156; Williams Decl. ¶ 34.

## 2. Trespass to Chattels and Conversion (Counts 3 and 10)

Under the Restatement (Second) of Torts § 217, "[a] trespass to chattel may be committed by intentionally . . . using or intermeddling with a chattel in the possession of another." Liability attaches where the interference "impair[s] its condition, quality, or value" or results in "deprivation of use for a substantial time." Restatement (Second) of Torts § 218; *see CompuServe Inc. v. Cyber Promotions, Inc.*, 962 F. Supp. 1015, 1022 (S.D. Ohio 1997) (applying §§ 217–218 to electronic interference with property).

Plaintiff owns the router. It is his personal property, purchased with his own funds. Compl. ¶¶ 39, 135; Williams Decl. ¶ 8. The router depends *entirely* on Speedify licensing and authentication to perform its primary function: "[t]he product is solely designed to work with Speedify, it really has no other function." Compl. ¶¶ 27–33, 135; Williams Decl. ¶¶ 8, 9. By remotely revoking that licensing and implementing device-level blacklisting (tied to the router's serial number 00A601241115008), Defendants have rendered Plaintiff's router unable to perform its primary function, namely the bonding and failover capability for which Plaintiff paid the AUD $2,725.82 premium. Compl. ¶¶ 136–137, 186–187; Williams Decl. ¶¶ 31–32. While the router retains basic single-WAN fallback capability, this is functionality available in commodity routers costing under $30 and is not the function for which Plaintiff purchased a specialized bonding device. Compl. ¶ 188.

Defendants' interference is not a mere withdrawal of optional software services. It constitutes an affirmative, targeted act of interference with Plaintiff's physical property, analogous to remotely disabling the engine of a car through an electronic kill-switch while the owner is in the middle of a cross-country trip. Courts have recognized trespass to chattels claims in analogous contexts involving electronic interference with technology. In *CompuServe Inc. v. Cyber Promotions, Inc.*, 962 F. Supp. 1015, 1022–23 (S.D. Ohio 1997), the court held that electronic interference with computer systems constitutes actionable trespass to chattels where it impairs system functionality, applying Restatement (Second) of Torts § 218(d). This case presents an even stronger claim than *CompuServe*: whereas that case involved unauthorized electronic signals that impaired system performance, here Defendants affirmatively disabled a specific physical device owned by Plaintiff by blacklisting its serial number in their authentication systems. Compl. ¶¶ 85, 87, 136, 187.

The instant case is readily distinguishable from *Intel Corp. v. Hamidi*, 30 Cal. 4th 1342, 1347 (2003), where the California Supreme Court found no trespass because the electronic contact caused no damage to the recipient's system. Here, by contrast, Defendants' actions have *actually impaired* the condition, quality, and value of Plaintiff's router and deprived Plaintiff of its use for its intended purpose for a substantial time, and threaten to do so permanently. Compl. ¶¶ 136, 187; Williams Decl. ¶¶ 31–32, 45. Under Restatement (Second) of Torts § 218, trespass to chattels liability attaches where the interference results in "dispossession," "impairment of condition, quality, or value," or "deprivation of use for a substantial time." All three conditions are satisfied here.

Where the interference is sufficiently serious and permanent, the claim rises to **conversion**. Under Restatement (Second) of Torts § 222A, conversion requires "an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the

chattel." Defendants' device-level blacklisting threatens to permanently render Plaintiff's AUD $2,725.82 router "dead" and "unable to ever be activated again." Compl. ¶¶ 31–33, 185–189; Williams Decl. ¶ 9. The manufacturer's own CTO offered to reimburse the full cost of the router if returned, acknowledging that the device is worthless without Speedify service. Compl. ¶ 33; Williams Decl. ¶ 9. This is precisely the level of interference that justifies an award of the full value of the chattel. *See* Restatement (Second) of Torts § 222A cmt. c (factors include "extent and duration of exercise of dominion or control," "the actor's intent to assert a right . . . inconsistent with the other's right of control," and "the extent and duration of the resulting interference with the other's right of control").

## 3. Fraud and Intentional Misrepresentation (Count 4)

Under Pennsylvania law, a fraud claim requires: "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." *Gibbs v. Ernst*, 647 A.2d 882, 889 (Pa. 1994). Under Federal Rule of Civil Procedure 9(b), fraud must be pleaded with particularity, specifically "the who, what, when, where, and how." *Lum v. Bank of Am.*, 361 F.3d 217, 224 (3d Cir. 2004); *see also In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1422 (3d Cir. 1997).

Plaintiff's Complaint pleads the "who, what, when, where, and how" with exceptional specificity. The *who*: Defendant Gizis personally, acting as CEO and through Defendants' billing and support systems, including the account of "Alex from Speedify." Compl. ¶¶ 3, 70, 141. The *what*: (i) the affirmative misrepresentation that Plaintiff requested cancellation ("as a follow up to your cancellation request"), and (ii) pre-purchase performance representations that Speedify provides "Flawless Failover," "secure, uninterrupted" redundancy, and "seamless"

failover through duplicate packet transmission. Compl. ¶¶ 52–54, 70–71, 144, 152. The *when*: January 27, 2026, at precisely 14:39:55 UTC and 14:54:40 UTC (to the second). Compl. ¶ 70. The *where*: emails sent through Defendants' automated billing systems from support@speedify.com to Michael.Williams@glexia.com. Compl. ¶¶ 70, 143. The *how*: by falsely attributing the deactivation to a "cancellation request" that Plaintiff had expressly rejected in writing in Defendants' own support system two days earlier, then processing unrequested refunds within one second of each deactivation. Compl. ¶¶ 70–78, 152–155; Williams Decl. ¶¶ 25, 27–28.

*Materiality and scienter.* The fraudulent "cancellation request" statement was material because it purported to justify the unauthorized termination and was designed to induce Plaintiff to accept the refund as a voluntary, customer-initiated transaction, and to deter Plaintiff from demanding reinstatement or seeking legal relief. Compl. ¶¶ 71, 155. Defendants knew the statement was false, or acted with reckless disregard for its truth, because: (i) their own support-ticket system (Ticket No. 676251) contained Plaintiff's express written rejection of cancellation; (ii) their systems contained no customer-initiated cancellation request through any channel: not the portal, not a cancellation link, not an email; and (iii) Defendants are the sole custodians of the electronic records that would evidence any such request, yet have never produced, identified, or even described any purported cancellation request when repeatedly demanded to do so. Compl. ¶¶ 74, 78, 153–154; Williams Decl. ¶¶ 25, 27–28.

*Retaliatory scheme.* The evidence establishes that the fabricated "cancellation request" was part of a deliberate scheme to punish Plaintiff for asserting his rights. Gizis reinforced this scheme by (i) refusing reinstatement, (ii) asserting that the refund was "the end of the legal matter," (iii) claiming Defendants' liability was limited to "$100," and (iv) directing Plaintiff not to contact Defendants again. Compl. ¶¶ 94, 155; Williams Decl. ¶ 34. The simultaneous filing of Plaintiff's IP challenge on January 27, 2026, further inflamed Gizis, who thereafter

directed device-level blacklisting to ensure Plaintiff could never restore Speedify service on his router through any means. Compl. ¶ 156; Williams Decl. ¶ 34.

*Fraudulent concealment.* In addition to affirmative misrepresentation, Defendants are liable for fraudulent concealment of material facts within their exclusive knowledge and control. Before and at the time of purchase, Defendants failed to disclose: (a) that instability on a single WAN link could precipitate a bonding-tunnel reset that drops all connections, the precise opposite of "Flawless Failover"; (b) that Defendants could remotely blacklist a specific router by serial number, permanently preventing activation; and (c) that Defendants' internal practice when failures are reported is to treat refund/cancellation as the default response rather than providing a timely fix. Compl. ¶¶ 157–158; Williams Decl. ¶¶ 4, 22. Defendants had a duty to disclose because they made partial affirmative representations about performance while omitting these material limitations, and because the omitted facts were within Defendants' exclusive control and not reasonably discoverable by Plaintiff. Compl. ¶¶ 158–159.

*Not puffery.* Defendants' pre-purchase marketing representations, including "Flawless Failover," "secure, uninterrupted" redundancy, duplicate packet transmission, and up to 95% combined-throughput efficiency, are not mere puffery. They are "the sort of empirically verifiable statement[s]" that can be "affirmatively disproven." *U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 922 (3d Cir. 1990) (establishing the puffery standard in the Third Circuit). Specific, verifiable technical claims about software capabilities, such as duplicate packet transmission, quantified throughput efficiency, and "seamless" session continuity, are not subjective opinions but objective representations of functionality. Compl. ¶¶ 52–54, 147–149; Williams Decl. ¶¶ 4, 22.

## 4. Pennsylvania Unfair Trade Practices and Consumer Protection Law (Count 5)

The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. § 201-1 *et seq.*, prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." 73 P.S. § 201-3. A plaintiff bringing a private action under the UTPCPL must demonstrate: (1) a deceptive or unfair act or practice; (2) justifiable reliance on the deceptive conduct; (3) an ascertainable loss; and (4) that the loss was proximately caused by the deceptive practice. *Weinberg v. Sun Co.*, 777 A.2d 442, 446 (Pa. 2001). Under the catch-all provision, 73 P.S. § 201-2(4)(xxi), deceptive conduct is assessed objectively: a plaintiff must show that the defendant's conduct "has the capacity or tendency to deceive." *Gregg v. Ameriprise Fin., Inc.*, 245 A.3d 637, 650–51 (Pa. 2021). Although justifiable reliance remains an element of a private UTPCPL claim, the catch-all provision does not require proof of the defendant's intent to deceive or of actual deception. The UTPCPL authorizes treble damages for knowing violations. 73 P.S. § 201-9.2(a).

Defendants' conduct constitutes unfair and deceptive acts under multiple subsections of the UTPCPL, including: (a) "[r]epresenting that goods or services have . . . characteristics . . . that they do not have" (73 P.S. § 201-2(4)(v)), specifically the "Flawless Failover" and "seamless" redundancy representations; (b) "[r]epresenting that goods or services are of a particular standard, quality, or grade" when they are of another (73 P.S. § 201-2(4)(vii)); (c) "[a]dvertising goods or services with intent not to sell them as advertised" (73 P.S. § 201-2(4)(ix)). Defendants marketed continuity-dependent services while retaining and exercising a device-level kill switch; and (d) the catch-all provision, 73 P.S. § 201-2(4)(xxi)), any "other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." Compl. ¶¶ 161–164.

Under the catch-all provision, deceptive conduct is assessed objectively: a plaintiff must show that the defendant's conduct "has the capacity or tendency to deceive." *Gregg v.*

*Ameriprise Fin., Inc.*, 245 A.3d 637, 650–51 (Pa. 2021). Neither the defendant's intent to deceive nor actual deception must be proven; however, justifiable reliance and causation of an ascertainable loss remain required elements. *Id.* Fabricating a "cancellation request" that never existed plainly has the "capacity or tendency to deceive"—it was designed to make both the customer and any subsequent reviewer believe the termination was customer-initiated. Compl. ¶¶ 70–78, 155.

Plaintiff's ascertainable losses include: (a) the impaired router value (AUD $2,725.82, rendered effectively worthless by device-level blacklisting); (b) subscription fees (USD $450.00 Router Plan; AUD $251.11 Families Plan); (c) alternative equipment costs (no less than AUD $3,500.00); (d) Australian court filing and service costs; and (e) consequential business losses exceeding $75,000. Compl. ¶ 163; Williams Decl. ¶¶ 45, 51–52. Given Defendants' knowing and willful violations, including fabricating a cancellation request with full knowledge of Plaintiff's express written rejection and implementing retaliatory device-level blacklisting, Plaintiff is entitled to treble damages under 73 P.S. § 201-9.2(a). Compl. ¶ 164.

5. California Consumer Protection Claims (Counts 6–8)

To the extent California law applies, Defendants' conduct also violates: (a) the Unfair Competition Law (Cal. Bus. & Prof. Code § 17200 *et seq.*), which prohibits "unlawful, unfair, and fraudulent" business acts, *see Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999); (b) the False Advertising Law (Cal. Bus. & Prof. Code § 17500 *et seq.*), which prohibits statements that are "untrue or misleading," *see Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 951 (2002); and (c) the Consumers Legal Remedies Act (Cal. Civ. Code § 1750 *et seq.*), which prohibits unfair or deceptive acts in consumer transactions, *see Meyer v. Sprint Spectrum L.P.*, 45 Cal. 4th 634, 643 (2009). Compl. ¶¶ 165–180.

Plaintiff has standing under the UCL because he has "lost money or property as a result of" Defendants' unfair practices. Cal. Bus. & Prof. Code § 17204; *see Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 322–23 (2011) (consumers have standing even when receiving a functioning product if it was not as advertised). Compl. ¶¶ 170, 175, 180. Plaintiff sent the required CLRA § 1782(a) pre-suit notice on February 5, 2026, to six recipients including Gizis, Connectify's legal department, support, and outside counsel. Compl. ¶ 179. Plaintiff presently seeks injunctive relief under the CLRA and will seek leave to amend to pursue damages after expiration of the thirty-day cure period if Defendants fail to provide corrective action. Compl. ¶ 179.

## 6. Remaining Claims

Plaintiff also asserts claims for: (a) breach of implied warranty of fitness for a particular purpose (Count 12). Plaintiff communicated his particular purpose (continuity-dependent travel connectivity on a "Powered by Speedify" router) to Defendants through Ticket No. 676251, and the service was not fit for that purpose, Compl. ¶¶ 195–199; (b) breach of implied warranty of merchantability (Count 13). The Speedify service failed in its primary bonding function for which such services are ordinarily used, *see Chatlos Sys., Inc. v. Nat'l Cash Register Corp.*, 670 F.2d 1304, 1306–08 (3d Cir. 1982) (applying UCC warranty provisions to computer system sales, a principle that extends to the integrated hardware-plus-software router package at issue here, where Plaintiff purchased a tangible good with embedded software functionality), Compl. ¶¶ 200–204; (c) unjust enrichment in the alternative (Count 11). Defendants retained the economic benefit of Plaintiff's router investment while rendering the device useless through blacklisting, Compl. ¶¶ 190–194; (d) declaratory relief under 28 U.S.C. § 2201 (Count 9), seeking a declaration that the termination was wrongful, that device-level blacklisting is unlawful, and that the "$100" liability cap is unenforceable, Compl. ¶¶ 181–184; and (e) violation of the Australian Consumer Law (Count 14), specifically sections 18

(misleading or deceptive conduct), 29 (false representations), and consumer guarantees of acceptable quality (s. 54), fitness (s. 55), and correspondence with description (s. 56), which are mandatory and unexcludable under ACL sections 64–64A, Compl. ¶¶ 205–212.

*Unenforceability of exculpatory terms.* To the extent Defendants invoke their Terms of Service, the challenged provisions are unenforceable on multiple independent grounds. *First*, warranty disclaimers that are not conspicuous fail under 13 Pa.C.S. § 2316(b), which requires that a disclaimer of merchantability be conspicuous and specifically mention "merchantability." Compl. ¶¶ 198, 201. *Second*, the blanket termination clause ("at any time for any reason") combined with the device-level kill-switch grants Defendants unilateral power to permanently destroy a consumer's AUD $2,725.82 property investment with zero accountability. This provision shocks the conscience and is substantively unconscionable under *Salley*, 925 A.2d at 127–29. *Third*, the "$100" liability cap is unenforceable because a limitation-of-liability clause cannot shield a party from liability for intentional torts, fraud, or statutory violations. *See* Restatement (Second) of Contracts § 195(1) ("[a] term exempting a party from tort liability for harm caused intentionally or recklessly is unenforceable on grounds of public policy"). This principle that applies with equal force to contractual damage caps that purport to limit recovery for such torts. Because Plaintiff's claims for trespass to chattels, conversion, and fraud all arise from Defendants' intentional conduct, the "$100" cap is unenforceable as to those claims regardless of its validity for breach-of-contract damages. Compl. ¶¶ 16–17, 183. *Fourth*, under the Australian Consumer Law (ACL ss. 64–64A), consumer guarantees are mandatory and cannot be excluded or limited by any contractual term, rendering Defendants' disclaimer provisions void to the extent they apply to Plaintiff as an Australian consumer. Compl. ¶¶ 207, 211.

## B. Plaintiff Will Suffer Irreparable Harm Absent Relief

"Irreparable injury" is "potential harm which cannot be redressed by a legal or an equitable remedy following trial." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989). The injury "must be of a peculiar nature, so that compensation in money alone cannot atone for it." *Id.; see also Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91–92 (3d Cir. 1992) (irreparable harm requires showing "significant risk that the plaintiff will experience harm that cannot adequately be compensated after the fact by money damages").

Plaintiff faces multiple independent forms of irreparable harm, each of which independently satisfies this element:

*First, threatened permanent destruction of property.* Defendants have implemented device-level blacklisting of Plaintiff's router (serial number 00A601241115008), and the router manufacturer's CTO has warned that Defendants can make the serial number "dead" and "unable to ever be activated again." Compl. ¶¶ 31–33, 87; Williams Decl. ¶ 9. No amount of money damages after trial can "unbrick" a permanently disabled device. The damage, once done, is irreversible. *Cf. eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (irreparable harm exists where legal remedies are inadequate). The threatened permanent destruction of a $2,725.82 property investment, an investment that cannot be replicated through any substitute device, because the router functions exclusively with Speedify, is precisely the type of injury that equity was designed to prevent: irreversible, unquantifiable in monetary terms, and escalating with each passing day that Defendants retain the ability to execute the permanent kill-switch. *See Instant Air Freight*, 882 F.2d at 801; *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987) (harm must be of "a peculiar nature, so that compensation in money alone cannot atone for it").

*Second, lockout from critical telecommunications infrastructure.* Plaintiff's secure management network, which serves Australian Commonwealth and State government clients including DFAT and South Australia Police through Carrier Licence No. 554, is configured to accept remote-management connections *only* from Speedify's network. Compl. ¶¶ 22, 34–38; Williams Decl. ¶¶ 15–18. When Defendants disabled Speedify access, Plaintiff was instantaneously locked out of the only approved remote-management path to his own critical infrastructure. Compl. ¶¶ 35–36; Williams Decl. ¶¶ 15–16. This creates an inescapable catch-22: Plaintiff cannot switch to an alternative VPN provider because doing so would first require accessing the network management interface through the very Speedify path that Defendants have disabled; and reconfiguring the network requires physical access to hardware authentication tokens (FIDO2 security keys) at Plaintiff's Sydney premises, approximately 25,000 kilometers from his current location. Compl. ¶¶ 36–38; Williams Decl. ¶¶ 16–18. Loss of access to one's own critical infrastructure, particularly infrastructure serving government clients under a regulated telecommunications carrier licence, constitutes irreparable harm that money damages cannot remedy after the fact.

*Third, ongoing travel harm.* Plaintiff's international travel was ongoing at the time of termination and continues. Compl. ¶ 100; Williams Decl. ¶ 4. Plaintiff purchased the router and subscription specifically to provide reliable bonded connectivity during this travel, with non-refundable ANA Business Class airfare totaling AUD $7,981.06. Compl. ¶¶ 44, 104; Williams Decl. ¶¶ 2–4, 12. Defendants' own automated usage reports confirm that in the week ending February 1, 2026, Plaintiff's accounts recorded 85.3 hours of connected time, 88 failover events, and 339 streaming interventions, demonstrating that Speedify was not optional but was the backbone of Plaintiff's connectivity. Compl. ¶ 100; Williams Decl. ¶ 45. The loss of continuity-dependent connectivity during active international travel cannot be remedied by monetary damages after the fact; each day of lost connectivity represents a distinct,

compounding, and irreversible harm, including missed business communications, disrupted client relationships, and endangered compliance obligations, that no damages award can retroactively cure. *See Instant Air Freight*, 882 F.2d at 801.

*Fourth, inability to mitigate.* Defendants may argue that Plaintiff can mitigate by purchasing alternative equipment. But this dispute is not about obtaining generic internet access. Rather, it is about maintaining access to Plaintiff's Speedify-dependent secure routing infrastructure. Compl. ¶ 119; Williams Decl. ¶¶ 15–18, 51–52. Replacement multi-WAN bonding equipment is not available on an emergency timetable in Puerto Escondido, Mexico, a remote coastal town, and even if obtainable would cost between USD $56,151 and $98,370 over ten years compared to Speedify's $450 annual cost. Compl. ¶¶ 103, 119; Williams Decl. ¶¶ 51–52. Critically, even complete replacement equipment would not resolve the Speedify-only network access lockout without Plaintiff physically returning to Sydney, Australia. Compl. ¶¶ 36–38; Williams Decl. ¶¶ 16–18. The practical impossibility of mitigation, created entirely by Defendants' own unilateral act, underscores that the harm is irreparable and demands equitable intervention.

*Fifth, loss of professional income and third-party harm.* Defendants' conduct has deprived Plaintiff of the ability to fulfill professional engagements that depend on access to his secure infrastructure. James Foerst, an independent cryptocurrency investor, retained Plaintiff on or about January 20, 2026, to provide pre-litigation advisory and consulting services, including prospective expert testimony, in connection with contemplated cryptocurrency litigation involving significant digital asset holdings. Foerst Decl. ¶¶ 4–6. Mr. Foerst attests that Defendants' termination of Plaintiff's Speedify service has "materially impaired" Plaintiff's ability to perform the consulting work the engagement requires, because Plaintiff's secure communications and data analysis environment is accessible only through the Speedify-dependent network path that Defendants have disabled. Foerst Decl. ¶ 6. The harm extends

beyond Plaintiff personally: Mr. Foerst's cryptocurrency holdings, which require ongoing expert analysis, are exposed to a category of harm that is "uniquely difficult, and potentially impossible, to quantify." Foerst Decl. ¶ 8. Cryptocurrency markets operate continuously, twenty-four hours a day, without the circuit breakers or trading halts that characterize traditional securities markets; prices can fluctuate by ten percent or more within a single day; and the inability to access expert guidance during this period results in "catastrophic and irreversible financial losses." Foerst Decl. ¶ 9. As Mr. Foerst explains, "every additional day that Mr. Williams is prevented from performing his consulting engagement compounds the harm to my digital asset holdings in ways that monetary damages at a later date cannot adequately remedy." Foerst Decl. ¶ 12. The loss of professional income, reputational harm, and cascading third-party consequences are precisely the type of injuries that "compensation in money alone cannot atone for." *Instant Air Freight*, 882 F.2d at 801.

## C. The Balance of Hardships Strongly Favors Plaintiff

The balance of harms "assesses the potential for harm to others if the relief is granted." *Reilly*, 858 F.3d at 176. "[T]he district court should take into account, when relevant, the possibility that the nonmoving party will suffer irreparable harm if the injunction is granted." *Opticians Ass'n*, 920 F.2d at 196.

The asymmetry here is stark and one-sided. The requested relief imposes a *minimal* burden on Defendants: restoring a single customer's paid subscription through the same administrative systems Defendants used to deactivate it, and refraining from blacklisting that customer's device during a brief 14-day TRO period. Compl. ¶¶ 115, 122; Williams Decl. ¶¶ 57, 60. Defendants will continue to receive subscription revenue from a willing, paying customer. Plaintiff has repeatedly stated he is "willing and able to pay for Speedify service." Compl. ¶ 105; Williams Decl. ¶ 60. Restoration does not require Defendants to ship equipment,

redesign their product, develop new features, or take any action beyond a routine account reactivation and removal of a device-level block. Compl. ¶ 122.

By contrast, absent relief, Plaintiff faces: (a) the permanent destruction of an AUD $2,725.82 specialized router through serial-number blacklisting, damage that is physically and technologically irreversible; (b) continued lockout from critical telecommunications infrastructure serving government clients; (c) ongoing inability to conduct time-sensitive business communications during international travel; (d) consequential business losses exceeding $75,000; (e) non-refundable ANA Business Class airfare (AUD $7,981.06) placed at risk by the loss of connectivity; and (f) lost professional consulting income and impairment of Plaintiff's ability to fulfill client engagements, including a pre-litigation advisory and expert witness engagement for which Plaintiff's secure infrastructure is essential (Foerst Decl. ¶¶ 6–7, 14). Compl. ¶¶ 100–105, 163; Williams Decl. ¶¶ 45, 51–52.

In sum, Defendants face no cognizable harm from providing paid service to a paying customer for 14 days, while Plaintiff faces potentially permanent and irreversible harm from continued denial of service. The balance decisively and overwhelmingly favors Plaintiff. *See Campbell Soup*, 977 F.2d at 92 (courts must weigh the "relative hardships" to the parties); *Opticians Ass'n*, 920 F.2d at 196 (considering possibility of irreparable harm to nonmoving party (here, there is none)).

## D. The Public Interest Favors Relief

The final *Reilly* factor requires the Court to consider whether granting the injunction serves the public interest. *Reilly*, 858 F.3d at 176; *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157 (2010). Multiple strands of public interest converge in this case, each independently weighing in Plaintiff's favor.

**First, contract enforcement.** The public interest is served by holding technology companies to the terms of their agreements with consumers. The enforcement of valid contractual obligations is a cornerstone of commercial order and serves the public interest by protecting the expectation interests of contracting parties. *See* Restatement (Second) of Contracts § 344 cmt. a (the law of contract remedies is designed to protect the expectation interest created by a promise). Defendants sold Plaintiff prepaid multi-year and annual subscriptions, and then unilaterally terminated those plans based on a fabricated cancellation request that Plaintiff demonstrably rejected. Compl. ¶¶ 41–42, 67–75; Williams Decl. ¶¶ 10–11, 25, 27–28. Permitting such conduct would undermine the sanctity of prepaid service commitments across the technology sector.

**Second, preventing remote bricking of consumer property.** There is a substantial and growing public interest in ensuring that technology companies cannot unilaterally "brick" consumer devices through software-based serial-number blacklisting, particularly where the consumer has paid for both the device (AUD $2,725.82) and the associated service. Compl. ¶¶ 116, 122. The Miri X510 router is rendered a "$2,725 paperweight" without Speedify service. This is precisely the kind of vendor lock-in and remote disabling that consumer protection laws were enacted to address. Williams Decl. ¶¶ 8–9. Courts have recognized the public interest in preventing companies from disabling devices through after-sale software manipulation. *Cf. Impression Prods., Inc. v. Lexmark Int'l, Inc.*, 581 U.S. 360, 370 (2017) (holding, in the patent exhaustion context, that a patentee's decision to sell a product exhausts all patent rights in that item, limiting post-sale restrictions on use of purchased goods).

**Third, deterring retaliatory conduct.** The public interest is served by discouraging retaliatory conduct by service providers against consumers who exercise their legal rights. Compl. ¶¶ 88–91. Defendants' CEO, Alexander Gizis, responded to Plaintiff's assertion of his legal rights and the filing of emergency proceedings in the Supreme Court of New South Wales

by stating, in substance, that the Court should "go f--- itself." Compl. ¶ 99; Williams Decl. ¶ 35. This brazen contempt for consumer protection processes underscores the need for injunctive relief. If technology companies can escalate retaliation in response to legitimate legal process, including stripping a telecommunications carrier of essential infrastructure, without judicial intervention, it would chill the exercise of statutory consumer rights.

**Fourth, protecting critical telecommunications infrastructure.** Plaintiff holds Australian Carrier Licence No. 554 issued by the Australian Communications and Media Authority and processes sensitive data for government clients and the South Australia Police. Compl. ¶¶ 6, 107–108; Williams Decl. ¶¶ 4–6. The arbitrary disabling of Plaintiff's bonded-connectivity infrastructure implicates public interests beyond private commercial harm: it disrupts government-contracted telecommunications operations and compromises the continuity of services relied upon by public safety agencies. Compl. ¶¶ 107–108, 127–128.

In sum, the public interest strongly favors granting a narrowly tailored TRO that preserves the *status quo ante* pending a prompt hearing. *See Reilly*, 858 F.3d at 179 (all four factors weigh in preliminary injunction analysis). No countervailing public interest weighs against requiring a software company to continue honoring its contractual obligations to a paying customer for 14 days.

## E. The Relief Sought Restores the Status Quo Ante and Is Primarily Prohibitory

The Third Circuit distinguishes between prohibitory injunctions, which maintain the status quo, and mandatory injunctions, which alter it, applying heightened scrutiny only to the latter. *Acierno*, 40 F.3d at 647; *Punnett v. Carter*, 621 F.2d 578, 582 (3d Cir. 1980). The status quo is defined as "the last peaceable, noncontested status between the parties." *Kos Pharms.*, 369 F.3d at 708 (quoting *Acierno*, 40 F.3d at 647). This definition focuses on the parties'

relationship before the controversy arose, not the present arrangement unilaterally imposed by one party's wrongful conduct. *Id.*

Here, the *status quo ante* is unambiguous: Plaintiff holding an active, paid Speedify subscription with full connectivity and router functionality, the state that persisted from December 2, 2025 through January 26, 2026. Compl. ¶¶ 39, 41–43; Williams Decl. ¶¶ 10–11, 25. Defendants' own automated usage reports confirm the extent of Plaintiff's reliance: in the single week ending February 1, 2026, Plaintiff's accounts recorded 85.3 hours of connected time and 44 GB of data transferred through his Miri X510 router. Williams Decl. ¶ 45. Defendants disrupted that peaceable status on approximately January 27, 2026, by fabricating a "cancellation request" that Plaintiff had expressly rejected the day before and by initiating serial-number blacklisting of Plaintiff's router. Compl. ¶¶ 67–75; Williams Decl. ¶¶ 25, 27–28.

The relief Plaintiff seeks is *primarily prohibitory*: an order directing Defendants to *cease* their ongoing interference with Plaintiff's paid service and property. Compl. ¶ 112; Williams Decl. ¶ 57. Plaintiff asks Defendants to: (1) *stop* blacklisting the router's serial number (00A601241115008); (2) *stop* blocking Plaintiff's account; and (3) *stop* interfering with Plaintiff's contractual right to use the service he purchased. The restorative aspects, namely restoring account access and removing the device block, are "the natural and necessary consequence of ceasing that interference," as Defendants' own automated systems will restore service once Defendants cease actively blocking Plaintiff's router. Compl. ¶ 112.

Even if the Court were to characterize the injunction as mandatory in any respect, the circumstances warrant such relief under the *Punnett* standard. *Punnett*, 621 F.2d at 582 (mandatory injunction appropriate where right is clear and evidence compelling); *see also Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 35 (2d Cir. 1995) (affirming mandatory preliminary injunction in breach of contract action requiring defendant to offer contractual

rights where plaintiff demonstrated clear likelihood of success on the merits). The evidence of Defendants' wrongful conduct is overwhelming and largely uncontested: Plaintiff possesses documentary proof that he rejected cancellation on January 26, 2026; Defendants' own support records confirm the rejection; and Defendants have offered no legitimate explanation for the fabricated "cancellation request" characterization. Compl. ¶¶ 67–78; Williams Decl. ¶¶ 25, 27–28.

Moreover, Defendants' contemptuous refusal to engage makes voluntary compliance impossible absent judicial intervention. In a message relayed to Plaintiff, Defendant Gizis stated, in substance, that the Court should "go f--- itself," and refused to comply with any order that would allow Plaintiff to remain a customer. Compl. ¶ 99; Williams Decl. ¶ 35. These statements confirm that absent a court order, Defendants will not voluntarily restore the *status quo ante*. Because Plaintiff seeks mandatory relief, Plaintiff bears a "particularly heavy burden" and must show that the right to relief is "indisputably clear." *Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 320 (3d Cir. 2020). As demonstrated above, that burden is met here: Defendants unilaterally seized control of Plaintiff's paid services and hardware through retaliatory device-level blacklisting, and the right to continued service under the parties' agreements is clear.

## F. Security Under Rule 65(c)

Rule 65(c) provides that a court may issue a TRO or preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined." Fed. R. Civ. P. 65(c). The Third Circuit has long held that the amount of security lies within the sound discretion of the district court, and courts may waive or set nominal security where the circumstances warrant. *Temple Univ. v. White*, 941 F.2d 201, 219–20 (3d Cir. 1991) (affirming district court's

discretion in setting bond amount); *Elliott v. Kiesewetter*, 98 F.3d 47, 60 (3d Cir. 1996); *Frank's GMC Truck Ctr., Inc. v. Gen. Motors Corp.*, 847 F.2d 100, 103 (3d Cir. 1988) ("[T]he amount of security required is a matter for the discretion of the trial court.").

A nominal bond or waiver of security is appropriate here for several independent reasons. **First,** the potential harm to Defendants from a 14-day TRO is negligible: at most, they are required to provide service to one customer for two weeks in exchange for subscription revenue that Plaintiff is willing to pay. Compl. ¶ 117; Williams Decl. ¶ 60. Defendants would incur no out-of-pocket costs, no infrastructure expenditures, and no operational disruption from continuing to serve a single subscriber. **Second,** Plaintiff is a *pro se* individual litigant of limited means residing approximately 25,000 kilometers from this Court in remote coastal Australia. Compl. ¶¶ 1, 117; Williams Decl. ¶¶ 1, 60. Courts routinely exercise discretion to reduce or waive bonds for individual and *pro se* litigants. *See Elliott v. Kiesewetter*, 98 F.3d 47, 59 (3d Cir. 1996) (court must consider "possible loss to the enjoined party together with the hardship that a bond requirement would impose on the moving party"); *Temple Univ. v. White*, 941 F.2d 201, 220 (3d Cir. 1991) (nominal bond appropriate where risk of harm to enjoined party is remote).

**Third,** the merits are strong and largely uncontested. Where the movant demonstrates a high likelihood of success, the need for a substantial bond is diminished because the risk of a wrongful injunction is low. *Temple Univ.*, 941 F.2d at 220. Here, Plaintiff possesses documentary proof that he rejected cancellation, paid for his subscription, and had his service unilaterally terminated based on a fabrication. Defendants have offered no legitimate justification for their conduct. **Fourth,** Miri Technologies' CTO, Ryan Brenneman, offered to reimburse the full cost of the router if returned, confirming that even the manufacturer considers the device valueless without Speedify service and that Defendants' potential exposure from a wrongful injunction is negligible. Compl. ¶ 33; Williams Decl. ¶ 9.

Plaintiff respectfully requests that the Court set a nominal bond of $100, approximately the equivalent of one month of Speedify subscription fees, or waive security entirely. Compl. ¶ 117; Williams Decl. ¶ 60. In the alternative, Plaintiff is willing to post a cash bond in an amount set by the Court and to immediately repay any refunded subscription amounts as a condition of reinstatement. *Id.* Any bond amount should be proportional to Defendants' actual potential loss from being wrongfully enjoined, which, for 14 days of providing software service to a single subscriber, is minimal to nonexistent. *See Frank's GMC*, 847 F.2d at 103 (holding that the amount of security is committed to the trial court's discretion and must be calibrated to the nonmovant's actual potential loss). Unlike *Frank's GMC*, where the Third Circuit reversed a preliminary injunction in part because the movant was a commercial franchisee that failed to post any bond despite having the financial capacity to do so, here the requested bond is proportional to the negligible risk of harm to Defendants from a 14-day TRO. *Id.* Defendants' only cognizable loss from a wrongful injunction would be the marginal cost of serving one additional subscriber for 14 days, a de minimis expense for a software company, and Plaintiff affirmatively offers to repay any refunded amounts as a condition of restoration. Compl. ¶ 117; Williams Decl. ¶ 60.

# V. CONCLUSION

For the foregoing reasons, Plaintiff Michael Williams has demonstrated that he satisfies all four factors of the Third Circuit's preliminary injunction analysis under *Reilly v. City of Harrisburg*, 858 F.3d 173 (3d Cir. 2017): (1) a likelihood of success on the merits of his claims for breach of contract, trespass to chattels, conversion, fraud, and violations of the Pennsylvania UTPCPL and California consumer protection statutes; (2) irreparable harm in the form of property destruction, ongoing business losses, loss of critical telecommunications infrastructure, impairment of professional engagements causing cascading third-party harm

(Foerst Decl. ¶¶ 6–8, 12–14), and imminent travel disruption totaling tens of thousands of dollars; (3) a decisive balance of hardships, where Defendants face no cognizable harm from providing paid service to a paying customer while Plaintiff faces permanent, irreversible harm; and (4) a public interest served by enforcing contracts, preventing remote bricking of consumer devices, and deterring retaliatory conduct against consumers who exercise their statutory rights.

Plaintiff further demonstrates that the requested relief is primarily prohibitory in nature, restoring the *status quo ante* of uninterrupted service, and that a nominal bond or waiver of security is appropriate given the negligible potential harm to Defendants. The circumstances also warrant *ex parte* issuance of the TRO under Rule 65(b)(1), as Defendants' CEO has expressly threatened non-compliance with any court order that would allow Plaintiff to remain a customer, creating a concrete risk that advance notice would precipitate further retaliatory action. Compl. ¶ 99; Williams Decl. ¶ 35.

Plaintiff Michael Williams respectfully requests that this Court:

(1) Grant Plaintiff's Emergency Motion for a Temporary Restraining Order;

(2) Enter the proposed Temporary Restraining Order requiring Defendants to: (a) immediately restore Plaintiff's Speedify service under his existing subscription; (b) remove any serial-number blacklisting or device-level block affecting Plaintiff's Miri X510 dual-SIM router (SN: 00A601241115008); and (c) refrain from further termination, suspension, degradation, or interference with Plaintiff's service during the pendency of this action;

(3) Schedule an expedited hearing on the Motion for Preliminary Injunction;

(4) Set a nominal bond of $100 under Rule 65(c), or waive security entirely; and

(5) Grant such other and further relief as this Court deems just and proper.

February 10, 2026

A proposed form of Order is submitted herewith in accordance with Local Rule of Civil Procedure 7.1(a).

Respectfully submitted,

Dated: February 10, 2026

February 10, 2026

## <u>CERTIFICATE OF SERVICE</u>

I, Michael Williams, hereby certify that on February 10, 2026, a true and correct copy of the foregoing Memorandum of Law was served upon all parties of record by email at the following addresses:

**Connectify, Inc.**

Attn: Alexander C. Gizis, Chief Executive Officer

601 Spring Garden Street, 3rd Floor

Philadelphia, PA 19123

cbiemiller@tlgattorneys.com, dscott@stradley.com, skats@stradley.com,

pkingsley@stradley.com, pforet@stradley.com, kcasey@stradley.com,

uspto@connectify.me, kamran.emdadi@gmail.com, support@speedify.com,

agizis@connectify.me, AsheryESQ@gmail.com, lashery@connectify.me

**Alexander C. Gizis**

430 Pine Street

Philadelphia, PA 19106

agizis@connectify.me

MICHAEL WILLIAMS, Pro Se
Suite 1524, 50-58 Macleay Street
Elizabeth Bay NSW 2011
Australia
Telephone: +1 701 484 1337
Email: Michael.Williams@glexia.com

/s/*Michael Williams*

Michael Williams