February 10, 2026

Michael Williams
Suite 1524
50-58 Macleay Street
Elizabeth Bay NSW 2011
Australia
Michael.Williams@glexia.com
+1 701 484 1337

# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

## PHILADELPHIA DIVISION

| | |
|---|---|
| **Michael Williams**, an individual residing in New South Wales, Australia,<br><br>Plaintiff,<br><br>v.<br><br>**Connectify, Inc. (d/b/a Speedify)**, a Delaware corporation with its principal place of business in Philadelphia, Pennsylvania<br><br>**Alexander C. Gizis**, an individual residing in Philadelphia, Pennsylvania<br><br>Defendants. | Civil Action No. <u>2:26-cv-00818-GJP</u><br><br>**DECLARATION OF MICHAEL WILLIAMS IN SUPPORT OF EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

## <u>DECLARATION OF MICHAEL WILLIAMS IN SUPPORT OF EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION</u>

## Table of Contents

*I. Introduction and Purpose* ................................................................................ *3*

*II. Background, Qualifications, and Router Purchase* .......................................... *4*

*III. Speedify Dependency and Threatened Permanent Device Destruction* ......... *9*

*IV. The Speedify-Only Allowlist, Remote-Management Lockout, and Regulatory Exposure* ................................................................................................................ *11*

*V. Support Ticket, Express Rejection of Cancellation, and Defendant Gizis's Ultimatum* ... *16*

*VI. Unauthorized Deactivation and False "Cancellation Request" Pretext* ........................ *18*

*VII. Termination of Replacement Account, Device-Level Blacklisting, and Demonstrated Escalation* ...................................................................................... *20*

*VIII. Defendant Gizis's Retaliatory Conduct and Contempt for Judicial Authority* ............. *22*

*IX. Extensive Notice, Demands for Restoration, and Defendants' Bad-Faith Non-Engagement* ............................................................................................................. *26*

*X. Prior Emergency Proceedings in the Supreme Court of New South Wales* ..................... *32*

*XI. Irreparable Harm: Ongoing, Continuous, and Not Remediable by Monetary Damages* *34*

    A.  Loss of Bonding, Failover, and Connectivity Functionality .......................................34

    B.  Lockout from Secure Management Plane and Critical Infrastructure ...................35

    C.  Threatened Permanent Destruction of the Router ("Bricking").........................35

    D.  Travel Plans Extended Indefinitely ......................................................................36

    E.  Inability to Obtain Replacement Equipment or Services While in Mexico ...........38

    F.  Business Losses, Carrier Obligations, and Time-Critical Commitments ...............39

    G.  Inadequacy of Monetary Damages.......................................................................40

    H.  This Harm Is Qualitatively Distinguished from Mere Deprivation of a Service.......................42

    I.  Personal Hardship and Human Impact.................................................................43

*XII. Balance of Equities and Minimal Burden on Defendants*.............................................. *44*

*XIII. Public Interest*.............................................................................................................. *46*

*XIV. Nature of Relief Sought, Status Quo, and Anticipated Defenses* ............................... *48*

*XV. Specific Relief Requested* ............................................................................................. *53*

*XVI. Notice to Defendants*.................................................................................................... *54*

*XVII. Security and Bond* ....................................................................................................... *55*

*XVIII. Exhibits* ...................................................................................................................... *56*

I, Michael Williams, declare as follows pursuant to 28 U.S.C. § 1746:

Williams' Decl.        - Page 2 of 59 -       Case No. 2:26-cv-00818-GJP

# I. Introduction and Purpose

1. I am the Plaintiff in the above-captioned action, *Williams v. Connectify, Inc. et al.* I am a self-represented (pro se) litigant. I am not an attorney and have no formal legal training. I submit this Declaration in support of my Emergency Motion for a Temporary Restraining Order ("TRO") and Preliminary Injunction to the best of my ability and understanding of the legal requirements. Unless otherwise stated, I have personal knowledge of the facts set forth below and, if called as a witness, could and would testify competently to them.

2. **The emergency is this:** Defendants have unilaterally terminated my paid subscriptions to their Speedify service based on a documented false pretext, locked me out of my own critical telecommunications infrastructure, and threatened to permanently destroy my AUD $2,725.82 specialized travel router by making its serial number "dead" in their systems. I am approximately 13,000 kilometers from my Sydney infrastructure in Puerto Escondido, Mexico, carrying the Router with me for use as a portable bonded-connectivity gateway back to my network, but unable to access or reconfigure that infrastructure due to a structural catch-22 that only Defendants can break. Defendants have refused to respond to approximately forty (40) written communications, have ignored court proceedings in two sovereign jurisdictions, and have demonstrated an escalating pattern of device-level targeting. **If this Court does not act before Defendants permanently disable my Router's serial number, the destruction will be irreversible and the central object of this litigation will be rendered moot.**

3. The facts set forth in the Verified Complaint, filed on February 6, 2026, are true and correct to the best of my knowledge and are incorporated herein by reference. This Declaration provides additional sworn testimony from my personal knowledge to support the entry of emergency injunctive relief. Unless otherwise stated, every factual assertion in this Declaration is based on my personal knowledge. Where statements are made "on

information and belief," I have identified them as such and have stated the factual basis for my information and belief. Where this Declaration describes communications, I personally sent or received those communications. Where this Declaration references documents, I have personal custody of those documents, and true and correct copies are attached as exhibits. I personally collected, reviewed, and verified each exhibit attached hereto. No exhibit has been altered, redacted (except where noted for security purposes), or taken out of context. I am prepared to produce originals for the Court's inspection upon request.

## II. Background, Qualifications, and Router Purchase

4. I reside at Suite 1524, 50–58 Macleay Street, Elizabeth Bay NSW 2011, Australia. I am the Managing Director and sole director of Glexia Pty Ltd ("Glexia"), an Australian telecommunications carrier holding Carrier Licence No. 554 issued by the Australian Communications and Media Authority ("ACMA"). Glexia owns and operates critical telecommunications infrastructure in Australia, including telecommunications networks, systems, and related assets that constitute critical telecommunications assets under the *Security of Critical Infrastructure Act 2018* (Cth) ("SOCI Act").

5. As a licensed Australian telecommunications carrier, Glexia is subject to ongoing regulatory obligations that require active network management and monitoring. These obligations include, but are not limited to: (a) compliance with carrier licence conditions imposed by ACMA under the *Telecommunications Act 1997* (Cth), including obligations to maintain network integrity and to report to ACMA; (b) obligations under the *Telecommunications (Interception and Access) Act 1979* (Cth) to maintain lawful interception capability and to respond to lawful interception requests within specified timeframes; (c) obligations under the SOCI Act to maintain a critical infrastructure risk management program and to report

cyber security incidents to the Australian Signals Directorate within specified timeframes; and (d) obligations to cooperate with the Australian Government's Telecommunications Sector Security Reforms. **I cannot fulfill these obligations if I am locked out of remote management access to Glexia's network infrastructure.** Each day of lockout represents a day of potential non-compliance with these statutory requirements.

6. Glexia provides telecommunications and secure connectivity services to Commonwealth and State government agencies, including the Department of Foreign Affairs and Trade (DFAT), South Australia Police, and agencies of the New South Wales Government. I and my business rely on secure, stable connectivity for operational and compliance functions, including lawful interception assistance and other regulated carrier activities.

7. I am also the founder and principal of a business with its United States headquarters in California ("My California Business"). My California Business leverages the Router and Speedify services for continuity-dependent communications and remote operations. My closest nexus to the United States is California. My California Business is the operational hub through which I conduct U.S. business activities, including continuity-dependent communications and remote management of my telecommunications infrastructure. The contractual obligations disrupted by Defendants' termination included obligations to California-based counterparties that were to be performed through my California Business operations. I am aware that Defendants specifically market Speedify to U.S. consumers through their interactive website and online subscription platform, targeting Starlink users, a demographic concentrated in rural areas of California and other western states, and that Defendants knowingly market, solicit, and fulfill subscriptions from California consumers.

7A. Defendant Connectify, Inc. ("Connectify") is a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania. Defendant Alexander C. Gizis ("Gizis")

is Connectify's co-founder and Chief Executive Officer. Upon information and belief, Gizis holds a controlling equity interest in Connectify and exercises complete control over Connectify's business decisions, including decisions about customer entitlements, refunds, and account deactivation. As described below, Gizis personally authored and sent communications regarding the termination of my service, personally intervened in my support ticket, personally directed the deactivation and refund of both of my subscription plans, and personally asserted a purported liability cap, demonstrating that the challenged conduct was not routine or automated but was personally directed by Gizis acting in his capacity as the company's controlling principal.

7B.  I am cognitively challenged and have a number of diagnosed neurodevelopmental and psychological conditions, including Asperger's syndrome (autism spectrum disorder), attention deficit hyperactivity disorder (ADHD), post-traumatic stress disorder (PTSD), anxiety, and panic attack disorder, among other conditions. I have also been assessed as having low cognitive intelligence/ability. These conditions affect my cognitive functioning and my ability to cope with stress, sudden change, and complex administrative tasks. The abrupt and repeated termination of the Speedify service, and my resulting inability to access my secure network through my Router, is having a significant and disproportionate adverse impact on me, including by exacerbating symptoms of PTSD, anxiety and panic attacks, and materially impairing my ability to work and function during a time-critical period. In my case, the same loss of connectivity affects me more severely than it would a person without these conditions.

8.  On December 4, 2025, I purchased a multi-WAN bonding router marketed as "Powered by Speedify," specifically a Miri X510 dual-SIM router (serial number 00A601241115008), from Corsair Solutions Pty Ltd, an authorized Australian reseller, for AUD $2,725.82 including GST and delivery. The purchase price of the Router included a bundled 90-day

Speedify subscription (the "Included Subscription"), which formed part of the Router's purchase consideration and was inseparable from the hardware cost. The Router was invoiced under Corsair Solutions Pty Ltd Invoice VR8MTKX8-0001. A true and correct copy of the purchase receipt is attached hereto as **Exhibit A**.

9. The Router was marketed and sold on the express basis that Speedify service and a Speedify router license/subscription were required for the Router's bonding functionality. Accordingly, the Router's purchase price included a 90-day Speedify subscription (the Included Subscription) to ensure that the Router would function out of the box for its intended bonding purpose. The Router's core value proposition is the ability to bond and fail over between multiple internet connections using Speedify. Without an active Speedify Router license/subscription and ongoing Speedify authentication/server access, the Router cannot deliver the bonding outcomes for which it was acquired.

9A. **I reviewed Defendants' marketing pages on Speedify.com before purchasing the Router and Router Plan, and I relied on the specific representations made therein.** These included: (i) at speedify.com/features/internet-failover-protection/, that Speedify would "seamlessly failover to your other working Internet connection(s) without skipping a beat" and "seamlessly transfers live video streams and other online traffic to another working 4G, 5G, Satellite, Wi-Fi, or Wired Internet broadband connection so you won't drop a frame"; (ii) at speedify.com/features/fix-packet-loss-redundant-internet-mode/, that "Optional Redundant Mode sends duplicate packets across multiple links so that even if a single path fails mid-transmission, your application doesn't miss a beat"; (iii) at speedify.com/features/, that Speedify is "the only VPN that seamlessly combines all of your connections, including WiFi, 4G, 5G, Ethernet, and Starlink, into one unbreakable connection"; and (iv) at speedify.com/for-routers/, that Speedify for Routers enables multi-WAN/Starlink deployments with bonded connectivity. **These were specific, technical,**

**and operational claims, not mere sales puffery, about defined mechanisms and defined outcomes that are empirically verifiable through network testing.** I relied on these representations when purchasing the Router and the Router Plan, when configuring my secure remote-management network to accept connections only from Speedify's network, and when planning critical international travel contingent on bonded connectivity.

9B.  Defendants also sent me operational onboarding emails that constituted instructions for configuring and using the service, not aspirational marketing. On December 2, 2025, at 14:56 UTC, Defendants sent an email titled "Getting started with your Speedify for Families account" from support@speedify.com, which instructed me to "combine Starlink, 4G/5G, Wi-Fi, Ethernet, or satellite for faster, more stable internet." On January 25, 2026, at 05:48 UTC, Defendants sent another email titled "Getting started with your Speedify for Routers plan," containing the same instruction. These onboarding emails were sent as part of the transactional relationship specifically to guide my configuration and use of the Service. I followed these operational instructions and configured my Router and network accordingly.

10.   On December 2, 2025, I purchased a "Speedify Families Unlimited Three Year Subscription" for AUD $251.11 (Invoice #494648), with a term from December 2, 2025 to December 2, 2028.

11.  On January 25, 2026, I purchased and paid for a "Speedify Pro Router Yearly 3000GB Subscription" (the "Router Plan") for USD $450.00 (Invoice #502472) through PayPal. The Router Plan was purchased as an extension and upgrade beyond the 90-day Included Subscription that was bundled with the Router's purchase price. The Router Plan had a

---

Williams' Decl.                    - Page 8 of 59 -              Case No. 2:26-cv-00818-GJP

stated term from January 25, 2026 to January 25, 2027. A true and correct copy of the PayPal transaction receipt is attached as **Exhibit B**.

12. I purchased the Router Plan specifically to ensure reliable bonded connectivity during international travel that had already commenced. My overall travel itinerary included business class flights with a total value of approximately AUD $13,805.30 across multiple carriers and legs, including ANA Business Class return flights valued at AUD $7,981.06 (Exhibit L). The successful completion of this itinerary was contingent on my having reliable bonded connectivity during travel.

13. **The Router is a portable travel router that I carry with me to provide bonded connectivity back to my network infrastructure in Sydney, Australia.** I departed Sydney on January 22, 2026, and I am currently located in Puerto Escondido, Oaxaca, Mexico, approximately 13,000 kilometers from my Sydney network infrastructure. The Router is with me in Mexico; it is the portable gateway through which I access my secure management plane and Sydney network remotely via the Speedify bonded connection. With Speedify disabled, the Router is physically in my possession but functionally inert for its intended bonding purpose, and I have no way to connect through it to the network infrastructure in Sydney.

## III. Speedify Dependency and Threatened Permanent Device Destruction

14. The Router is entirely dependent on Defendants' Speedify service for its core bonding and redundancy function. On January 27 and 28, 2026, I exchanged email correspondence with Ryan Brenneman, Chief Technology Officer of Miri Technologies (the Router's manufacturer), who confirmed the following:

(a) The Router "lockup was likely to a Speedify termination based on communication with them" and "When Speedify was turned off remotely the router had an issue" (January 27, 2026, 10:55 AM ET);

(b) "The product is solely designed to work with Speedify, it really has no other function," and that after speaking directly with Defendants' personnel, "it appears that the S/N will be dead in their system and unable to ever be activated again" (January 27, 2026, 11:15 AM ET). Mr. Brenneman relayed this information in the course of a contemporaneous business communication between a manufacturer and its exclusive software partner, and I understand from context that Mr. Brenneman was paraphrasing what Defendants' representative told him directly;

(c) "Without Speedify enabled the router will not function properly" and "The sole purpose of the router is to run Speedify for bonding" (January 28, 2026, 7:33 PM ET). True and correct copies of these communications are attached as **Exhibit F**. Mr. Brenneman clarified in our correspondence that his statements regarding the serial number being made "dead" reflected what Defendants' personnel had directly communicated to him regarding their technical capability and intention. The fact that Defendants communicated to the Router's own manufacturer that they intended to permanently disable my Router's serial number in their systems demonstrates not only the technical capability for permanent device destruction, but Defendants' deliberate intent to exercise that capability.

15. Defendants possess both the technical capability and the demonstrated intent to permanently render my AUD $2,725.82 Router useless by making its serial number "dead" in their systems. On January 27–28, 2026, Defendants communicated this intent directly to the Router's manufacturer, whose CTO relayed that "it appears that the S/N will be dead in their system and unable to ever be activated again" (Exhibit F). **No internal deadline,**

**grace period, notice requirement, or procedural safeguard constrains the timing of this permanent destruction.** Defendants can execute serial-number deactivation at any time, without prior notice, through a unilateral administrative action in their systems, the same type of instantaneous administrative action they used to deactivate both of my accounts within one second of each other on January 27, 2026 (¶ 27). Given that Defendants have declared they "will not be responding to any further communications" (¶ 34) and have ignored legal proceedings across two sovereign jurisdictions, **the only remaining constraint on Defendants' executing this irreversible step is an order of this Court.** This threatened permanent destruction of my property is not remediable by monetary damages because: (a) no amount of money can restore the Router's functionality once Defendants make the serial number permanently unactivatable; (b) the Router contains specific secure configuration, device identity, routing, and access-control policies that took substantial time and expertise to provision and that cannot be replicated on replacement hardware without physical access to my Sydney network; (c) my regulatory obligations as an Australian telecommunications carrier require specific, authorized hardware configurations that cannot be casually replaced; and (d) Defendants have already demonstrated both the **capability** and the **willingness** to engage in device-level targeting, by terminating not only my account but also an independent third-party's paid account solely because it was associated with my Router's serial number (as detailed in Paragraphs 31–34 below).

# IV. The Speedify-Only Allowlist, Remote-Management Lockout, and Regulatory Exposure

16. My secure management network and communications uplink in Sydney is configured so that remote management access is accepted **only** if the connection originates from Defendants' Speedify network and/or Speedify-managed egress endpoints (a "Speedify-

only allowlist"). All other remote-management ingress is blocked by firewall and access-control rules as a security measure. This configuration is intentional and security-driven: it reduces attack surface and ensures that only a known, vetted origination path can reach my management plane.

17. When Defendants disabled my Speedify licensing/authentication and terminated my paid accounts, I was not merely deprived of an internet optimization feature. I was **locked out of the only approved remote-management path to my own secure network and critical telecommunications infrastructure**. This lockout persists as of the date of this Declaration.

18. I cannot safely modify the Speedify-only access policy from my current location because the configuration interface and management plane in Sydney are reachable only via the Speedify bonded connection provided through my Router (which is with me in Mexico). Defendants' disablement creates an inescapable catch-22: I cannot switch to a different provider because the act of switching would first require remote access through the very Speedify path that Defendants have disabled.

19. This creates a circular dependency that I will describe step by step to illustrate why it is inescapable. **Step 1:** My firewall's access-control lists ("ACLs") restrict remote management access (SSH) to connections originating *only* from IP address ranges associated with Defendants' Speedify network egress points. This is a standard network security practice called "whitelisting" that reduces attack surface. **Step 2:** To modify this whitelist (for example, to add a non-Speedify IP address so I could connect through a different service), I must authenticate to the firewall via SSH. **Step 3:** But SSH access is itself gated by the same whitelist I need to modify. **The result: I cannot change the whitelist without SSH access, and I cannot get SSH access without the whitelist**

**already permitting my connection. The only way to change the whitelist is to use SSH through the whitelist. This is a self-referential lock.** I have personally considered and investigated every alternative: (a) a remote hard reset of the firewall using out-of-band management protocols is not available on my model; (b) I contacted my firewall vendor to inquire whether they could reset customer-configured ACLs remotely, and they confirmed they cannot; (c) my ISP has no access to the firewall, which is customer-premises equipment behind the ISP gateway; (d) I cannot delegate the task to a trusted third party in Sydney because SSH authentication requires my FIDO2 hardware security keys, which must be physically inserted and which I alone possess (¶ 21); and (e) I asked Defendants to make a one-time exception to permit SSH from an alternative network, but Defendants have refused all engagement. **The only practicable paths to resolution are: (a) Defendants restore my Speedify access (a simple administrative reactivation), or (b) I physically travel to Sydney and perform in-person reconfiguration.** I acknowledge that in-person reconfiguration in Sydney is theoretically possible, but it is not a practicable alternative: it would require approximately 30+ hours of international travel from Puerto Escondido, Mexico, cost thousands of dollars, further disrupt my already-impaired business operations, and, critically, would not address the ongoing threat of permanent device destruction or the loss of the Router's bonding and failover functionality. Even upon arrival, I would still need Defendants' cooperation to restore the Speedify service that my Router requires for its bonding function; physical access alone cannot restore what Defendants have disabled in their systems. A TRO requiring Defendants to perform a simple administrative reactivation is plainly the less burdensome and more proportionate remedy.

20. I have considered and exhausted all reasonable alternatives to injunctive relief. Since January 27, 2026, I have spent significant time researching potential solutions online,

making telephone calls to sellers and resellers of alternative multi-WAN bonding hardware (including Peplink devices), and investigating whether any alternative VPN or bonding service could restore either my management plane access or my bonded connectivity. None of these efforts have produced a workable solution. I cannot delegate the required firewall reconfiguration to any third party in Sydney because the management plane is protected by multi-factor authentication requiring physical hardware security tokens (FIDO2 keys) that I alone possess; there are no duplicates, and they cannot be cloned, backed up, or remotely proxied. No commercially available remote service can break the circular ACL dependency. No alternative bonding VPN provider can substitute for Speedify's specific network endpoints in my firewall configuration without in-person reconfiguration.

21. The FIDO2 hardware security keys I reference are cryptographically bound to my infrastructure through device-specific key pairs, require physical insertion into the device being authenticated, and cannot be used remotely. Shipping them from Mexico to Sydney would take 5–7+ business days (plus customs), create unacceptable security risk while in transit, and leave me without authentication capability. Even if delivered to a trusted third party in Sydney, that person would still need my credentials, my multi-factor enrollment, and my specific technical knowledge of the network, none of which can be delegated.

22. This remote-management lockout directly and concretely jeopardizes my ability to comply with time-critical statutory obligations. As a carrier licensed under the *Telecommunications Act 1997* (Cth), I am required to be able to respond to lawful interception requests and to maintain interception capability. Under the SOCI Act, I am required to report cyber security incidents to the Australian Signals Directorate within specified timeframes and to maintain a critical infrastructure risk management program. Under ACMA's carrier licence conditions, I am required to maintain network integrity and to report material changes affecting my ability to provide carriage services. **Since January**

**27, 2026, I have been unable to access, monitor, or administer the network infrastructure through which these obligations are fulfilled.** As a concrete baseline: on or about January 26, 2026, the last day before Defendants' deactivation, I successfully accessed my network management portal via the Speedify bonded connection and confirmed the operational status of all monitoring systems, interception-readiness configurations, and incident-reporting channels. Since January 27, 2026, I have been unable to access that same management portal. My carrier obligations are continuous and non-discretionary; they do not pause because I am locked out of my network. Each day of lockout is a day in which I cannot verify compliance, cannot respond to potential incidents, and cannot fulfill requests that may arise from regulatory authorities or law enforcement agencies. If a lawful interception request, a cyber security incident, or an ACMA compliance inquiry has been received or arises during this lockout period, and such requests arise in the ordinary course of carrier operations, I have no way of knowing it and would be unable to respond within the statutory timeframes, not due to any fault or negligence on my part, but solely because Defendants have disabled the only remote access path to my network. **This regulatory exposure is not speculative; it is a present and continuing risk that accrues daily and cannot be retroactively cured by a monetary award.** By way of concrete example: during this lockout period, I have been unable to verify whether any lawful interception requests, cyber security incident notifications, or ACMA compliance inquiries have been received through the monitoring channels accessible only via my secure management plane. Under the *Telecommunications (Interception and Access) Act 1979* (Cth), response timeframes for interception requests are measured in hours, not weeks. Because I cannot access the network infrastructure through which such requests would be received and fulfilled, I cannot confirm that no such obligation has arisen, nor can I respond to any that may have arisen. A state of enforced

ignorance that itself constitutes a concrete and present compliance failure, not a speculative future risk. Each day that passes without restoration deepens this exposure. The harm is actual, ongoing, and accruing now, not contingent on a hypothetical future event.

23. This remote-management lockout is qualitatively different from a mere loss of internet optimization. It means that since January 27, 2026, I have been unable to administer, monitor, or maintain critical telecommunications infrastructure that serves government clients and that is subject to the regulatory obligations described above. No monetary award after trial can retroactively restore the management access I have been denied during this period, nor can it undo the compliance exposure that has resulted and continues to result from my inability to respond to regulatory requests or perform carrier obligations while locked out.

## V. Support Ticket, Express Rejection of Cancellation, and Defendant Gizis's Ultimatum

24. On January 25, 2026, after experiencing serious bonding and redundancy problems with the Router, I opened Speedify support Ticket #676251. I provided logs, timestamps, and comparative testing data demonstrating that the failures were attributable to Defendants' Speedify service and not to my hardware or network conditions. **Specifically, when instability appeared on a single WAN link, such as brief interruptions or link 'flapping,' Speedify would reset or terminate its bonding tunnel, causing connectivity to drop across ALL WAN links simultaneously, even those that remained stable and fully operational.** This behavior is the opposite of the "Flawless Failover" and "secure, uninterrupted connectivity" that Defendants advertised. I tested the Router with three (3) different Starlink dishes and ten (10) different Starlink terminals, confirming that these tunnel-reset failures occurred in every configuration, while my Peplink bonding router and

other third-party bonding solutions achieved throughput exceeding 1 Gbps on the identical WAN links without experiencing any comparable failures. This comparison conclusively established that the failures were specific to Defendants' Speedify service, not to my hardware or network conditions. A true and correct copy of the support ticket communications, including the diagnostic logs and timestamps I provided, is attached as **Exhibit C**.

25. During the support exchange on January 25, 2026, while the router license structure was still unclear to me, I initially inquired about a refund for the Router Plan at approximately 12:13 p.m. EST. After Defendants' support representative (Vojislav H.) explained the distinction between the router license and other Speedify subscriptions, I expressly retracted that inquiry and confirmed my intent to retain the service. **No cancellation request was pending at the time of Defendants' January 27 deactivation.** Specifically, at 3:14 p.m. EST on January 25, 2026, I replied via the support ticket system: **"Ok no I will keep the router license then thank you. I didn't know it would stop working."** This unambiguous retraction, expressing my clear intent to retain the router license after the initial confusion was resolved, was made in writing through Defendants' own support system and is preserved in the permanent support ticket record at my.speedify.com. Defendants possess the identical support ticket record. After my 3:14 p.m. retraction, I did not send any subsequent email, support ticket message, or other communication requesting cancellation. I did not cancel via the Subscription Management Portal and did not click any cancellation link in any fulfillment email. The only communications I sent between January 25 and January 27, 2026 were technical troubleshooting inquiries and my response to Gizis's ultimatum, in which I declined cancellation (¶ 26). When I repeatedly demanded that Defendants identify the purported "cancellation request" that they cited as the basis for their January 27 deactivation and produce any record of it, Defendants have never

identified, produced, or acknowledged any such record. To be clear: while I did briefly inquire about a refund at 12:13 p.m. on January 25 before the router license structure was explained to me, I expressly retracted that inquiry at 3:14 p.m. the same day. No cancellation request was pending at the time Defendants deactivated my accounts two days later.

26. On January 26, 2026, at 2:13 p.m. EST, one day after I retracted my initial refund inquiry and confirmed in writing my intent to retain the service (¶ 25), Defendant Alexander C. Gizis, CEO of Connectify, personally intervened in the support thread and presented me with a binary ultimatum: either "continue troubleshooting" in a "professiional manner" [sic] or accept "a refund." Gizis invoked Defendants' "30 day money-back guarantee," promising "a full refund" if the product did not meet my needs, and stated that "Our support team does its best work through collaborative, solution-focused communication, and that's the only way that we can make real progress." I responded at 3:31 p.m. EST on the same day, stating that I would "remain available to troubleshoot the issue" but that "the product just does not work, it's always slower on the network, is not fit for purpose and generally completely unsatisfactory." By choosing to continue troubleshooting, I thereby declined the refund/cancellation alternative while reserving my legal rights. Despite my clear written refusal, Gizis unilaterally deactivated my accounts the very next day.

# VI. Unauthorized Deactivation and False "Cancellation Request" Pretext

27. On January 27, 2026, rather than continuing to address the technical issues, Defendants unilaterally deactivated both of my paid Speedify subscriptions in rapid succession. At 14:39:55 UTC, Defendants deactivated my Router Plan (Invoice #502472, USD $450.00) and one second later at 14:39:56 UTC processed a refund (Refund Invoice #502864). At

14:54:40 UTC, Defendants processed a refund for my Families Plan (Refund Invoice #502873) and one second later at 14:54:41 UTC deactivated the Families Plan (Invoice #494648, AUD $251.11). All four emails were sent by "Alex from Speedify," Defendant Gizis, confirming his personal direction of the termination. In addition to the two separately purchased subscriptions, Defendants' deactivation also extinguished the 90-day Included Subscription that was bundled with the Router's AUD $2,725.82 purchase price (¶ 8). Defendants did not refund and have no mechanism to refund the Included Subscription, as that consideration was paid to the Router's reseller, not to Defendants. True and correct copies of these emails are attached as **Exhibit D**.

28. The deactivation emails falsely stated that the deactivation occurred "as a follow up to your cancellation request." **That statement was false.** No cancellation request was pending at the time of the deactivation. While I had briefly inquired about a refund earlier on January 25 before the router license structure was explained to me, I expressly retracted that inquiry at 3:14 p.m. EST the same day, confirming in writing that I wished to retain the service (¶ 25). Despite being repeatedly demanded to identify the purported "cancellation request," Defendants have never identified, produced, or acknowledged any such record. **Critically, Defendants' own published Terms of Service expressly provide: "If an account is terminated for violation of these Terms, no refund will be issued."** Yet Defendants issued full refunds to both of my accounts simultaneously with the deactivations. Under Defendants' own contractual framework, this provision creates only two possible outcomes when an account is terminated: either a refund is issued (indicating no Terms violation) or no refund is issued (indicating a Terms violation). Defendants issued full refunds. **Defendants cannot simultaneously claim that the termination was for cause while issuing full refunds that their own Terms reserve exclusively for non-violation terminations.** The refunds are Defendants' own

contemporaneous admission, codified in their contractual structure, that the termination was not for cause. Moreover, while Defendants refunded the separately purchased Router Plan (USD $450.00) and Families Plan (AUD $251.11), they did not and could not refund the 90-day Included Subscription that was bundled with the Router's AUD $2,725.82 purchase price (¶ 8), because that subscription formed part of the hardware purchase consideration paid to the Router's reseller, not to Defendants. Defendants' termination therefore extinguished a subscription entitlement for which I received no refund whatsoever and for which Defendants have no mechanism to provide one, as the consideration was paid to a third-party reseller as part of the Router's purchase price.

29. Immediately after the deactivation, Speedify stopped functioning on my Router. I lost the Router's bonding and redundancy capabilities and suffered degraded connectivity and disruption. The Router crashed or locked up as a direct result of the remote termination. I personally captured screenshots and logs from the Router's administrative interface on January 27–28, 2026, showing tunnel-reset failures and inability to establish Speedify connections, with timestamps that correspond directly to the deactivation emails described above.

# VII. Termination of Replacement Account, Device-Level Blacklisting, and Demonstrated Escalation

30. After my accounts were terminated, my partner created a new Speedify account and purchased a replacement subscription so I could continue using Speedify on the Router during my critical travel period (the "Replacement Account"). Defendants' own system generated a verification code for the new account at 15:27:23 UTC on January 27, 2026, less than one hour after Defendants' deactivation of my accounts.

31. On or about January 28, 2026, within approximately 48 hours of the Replacement Account's creation and before my partner had used it for more than minimal testing, Defendants also terminated the Replacement Account without notice, cause, or stated reason, further preventing me from using Speedify on the Router even through a completely separate paid account. **Defendants' ability to identify and disable the Replacement Account within approximately 48 hours strongly indicates that Defendants tracked and targeted my Router by its serial number and/or device identifiers, rather than responding to account-level violations.** The speed and precision of this targeting demonstrates device-level blacklisting specifically directed at my Router. This pattern of conduct, terminating not just my account but also an independent third-party's paid account associated with my Router, is uniquely within Defendants' knowledge and control. On information and belief, based on the timing, targeting specificity, and the manufacturer CTO's confirmation that Defendants can make a serial number 'dead' in their systems, Defendant Gizis directed or authorized technical measures (including deploying code specific to my Router's serial number) to specifically target and blacklist my Router.

32. The Miri Technologies CTO's confirmation that Defendants can make my Router's serial number "dead" in their systems, combined with Defendants' demonstrated willingness to terminate any account associated with my Router, demonstrates that permanent device destruction is not merely a future possibility. It is being actively advanced through a documented sequence of escalating measures that Defendants have been executing step by step since January 27, 2026.

33. **Defendants' conduct demonstrates not merely the technical capability for permanent device destruction, but the demonstrated willingness and deliberate intent to escalate device-level measures against my Router.** The progression is as follows: (a) on January

27, 2026, Defendants deactivated my personal accounts at the account level; (b) on January 28, 2026, after I had objected and demanded restoration, Defendants escalated to terminating a third-party's independently purchased account solely because it was associated with my Router's serial number; (c) Defendant Gizis declared that Defendants had "terminated the relationship" and directed me never to contact Defendants again; and (d) Defendants have refused to engage with any subsequent communication, legal proceeding, or court order across two jurisdictions. This pattern of deliberate escalation, from account-level to device-level targeting, from individual to third-party accounts, from non-engagement to active contempt for judicial process, establishes that permanent "bricking" is not speculative; it is the culmination of a documented escalation that Defendants have been actively executing step by step. Defendants have already completed every prerequisite step: they terminated my accounts (Step 1), they terminated a third party's account linked to my serial number (Step 2), and they communicated to the manufacturer their intention to make the serial number permanently "dead" (Step 3). The only step that remains is the execution of the permanent serial-number deactivation itself. No internal process, no notice period, and no external constraint stands between Defendants and that final irreversible act.

## VIII. Defendant Gizis's Retaliatory Conduct and Contempt for Judicial Authority

34. On January 27, 2026, at 11:06 a.m. EST, Defendant Gizis personally emailed me through the Speedify support system stating that Defendants had issued refunds, that "this is the end of the legal matter," and that "Your decision to contact company employees on their unlisted personal phones and threatening liens against their homes has ended our relationship." Gizis further stated "do not contact us again" and "We will not be responding to any further communications." **Defendant Gizis's statement that "this is the end of**

**the legal matter", issued unilaterally and without any judicial or contractual basis, demonstrates Defendants' belief that they can terminate a customer's service, permanently disable their hardware, and refuse all further engagement, without consequence and without regard for any court's authority.** Defendants' position is, in substance, that they are not answerable to any court, any regulator, or any legal process. True and correct copies of these communications are attached as **Exhibit E**.

34A.   **In the same January 27, 2026 email, Defendant Gizis unilaterally asserted that Defendants' "our liability is limited to the amount you paid us, or $100 whichever is higher."** This assertion was not accompanied by any citation to a specific contractual provision, and it was made after Gizis had already directed the deactivation and refund of both my subscription plans. The assertion reveals Defendants' intent to minimize their exposure for intentional conduct that they knew was causing severe and continuing harm. To the extent this assertion references Defendants' Terms of Service liability cap, I submit that such a cap cannot lawfully limit liability for intentional misconduct, fraud, or statutory violations, legal arguments that will be fully addressed in the accompanying Memorandum of Law.

35.   Defendants' systematic refusal to engage with legal process across two sovereign jurisdictions is not an isolated omission. It is a deliberate and consistent pattern of conduct. Between January 27 and February 7, 2026, I sent approximately forty (40) separate written communications by email, SMS, WhatsApp, formal legal notices, support tickets, and court filings. Defendants have not responded to any of them. Defendants were served with emergency proceedings in the Supreme Court of New South Wales and did not appear, respond, or acknowledge receipt. Defendants were served with the filed Verified Complaint and notice of emergency motion in this Court and have not responded. Defendants were served with a USPTO Petition for Cancellation and did not respond. **This**

**wholesale, multi-jurisdictional refusal to engage with any form of legal process. Not a single acknowledgment across approximately forty communications, two court proceedings, one federal administrative petition, and one statutory pre-suit notice, provides concrete and documented evidence that Defendants regard themselves as beyond the reach of judicial authority.** Additionally, on information and belief, Defendant Gizis directed a middle-finger emoji toward me in correspondence, a gesture that is self-evidently contemptuous and hostile, and, in substance, sent me a message instructing me to tell the Court to "go f--- itself." On February 1, 2026, at 10:41 p.m. UTC, I emailed Defendants directly referencing Mr. Gizis's message to tell the Court to go "f--- itself." **Defendants did not deny, dispute, or correct this characterization** despite receiving this email and approximately forty subsequent written communications in which they could have corrected the record. I note that on February 1, 2026, I expressly put Defendants on notice of this characterization by writing: "Given your nonresponse and Mr Gizis' message to tell the Court to go 'f— itself'." Defendants did not deny, correct, or qualify this characterization in any of their subsequent communications. Whether or not Defendant Gizis's communications were intended to convey this precise meaning, the factual record of Defendants' conduct, including unilateral termination, device-level targeting, refusal to engage with any court proceeding, and declared intention never to respond, speaks for itself.

36. The retaliatory nature of Defendants' conduct is further evidenced by the temporal nexus between my assertion of intellectual property rights and the escalation of Defendants' punitive actions. On January 27, 2026, the same day Defendants deactivated my accounts, I sent Defendants a formal Notice of Intent to File USPTO Proceedings to Cancel Trademark Registrations and Challenge Patent Applications, identifying four Connectify/Speedify trademark registrations and over seventy (70) patent assets.

37. Defendants' contempt for judicial authority is not limited to Defendant Gizis's message to tell the Court to go "f--- itself" (¶ 35). It is demonstrated by a systematic pattern of non-engagement with legal process across multiple jurisdictions: (a) Defendants were served with all filings in the Supreme Court of New South Wales proceedings (Case No. 2026/00043842) and did not respond, appear, or acknowledge receipt; (b) Defendants were served with the published decision *Williams v. Connectify, Inc.* [2026] NSWSC 30 and did not respond; (c) Defendants were served with the USPTO Petition for Cancellation (ESTTA1494742) and did not respond; (d) Defendants were served with the formal Pre-Suit Notice under the California Consumers Legal Remedies Act and did not respond; (e) Defendants were served with the filed Verified Complaint in this action and have not responded; and (f) Defendants have ignored approximately forty (40) written communications across multiple channels including email, SMS, WhatsApp, formal legal notices, and court filings. This wholesale refusal to engage with any form of legal process confirms that no measure short of a court order will halt the ongoing harm or prevent Defendants from completing the final irreversible step of permanent serial-number deactivation. I do not claim that Defendants are presently in contempt of any court order, but their demonstrated pattern of ignoring judicial proceedings across two sovereign jurisdictions, combined with their documented escalation from account-level to device-level targeting (¶¶ 32–33) and the absence of any internal constraint on executing permanent bricking (¶ 15), establishes that only a direct order of this Court, entered promptly, can halt the ongoing deprivation and preserve the property at the center of this litigation.

# IX. Extensive Notice, Demands for Restoration, and Defendants' Bad-Faith Non-Engagement

38. Between January 25, 2026 and the date of this Declaration (February 10, 2026), I have sent Defendants and their counsel approximately forty (40) separate written communications demanding restoration of service, warning of imminent and ongoing harm, and advising that I would seek emergency injunctive relief if Defendants refused. These communications were sent via email, SMS, WhatsApp, formal legal notices, support tickets, and court filings. I personally compiled a complete summary log of these communications from my email records, SMS/WhatsApp message logs, support ticket records, and court filing records. Each entry in the log corresponds to a communication I personally sent or received and is based on my personal knowledge. This summary log is attached as **Exhibit K**.

38A. The following chronological summary, compiled from emails in my possession, illustrates the scope and intensity of the notice provided to Defendants and their complete failure to engage. Each email referenced below is available in the record and should be included in the applicable exhibit as indicated:

(a) **January 25, 2026** — Speedify sent me a purchase confirmation for the Pro Router Yearly 3000GB Subscription (Invoice #502472, USD $450.00), together with a "Getting started with your Speedify for Routers plan" onboarding email. These emails confirm the existence and activation of the subscription that Defendants later unilaterally terminated. *(See Exhibit B.)*

(b) **January 26, 2026** — I sent Defendants a detailed eleven-section "FORMAL NOTICE OF DISPUTE" referencing Invoice #502472, Support Ticket #676251, providing notice of intended proceedings in Australia, and demanding preservation of evidence.

This notice was sent to support@speedify.com, sales@speedify.com, and privacy@speedify.com. On the same date, I sent an email questioning why the Router account was treated differently from the Families account. *(See Exhibit K.)*

(c) **January 27, 2026** — Defendants deactivated both my Pro Router Yearly 3000GB Subscription plan and my Families Unlimited Three Year Subscription plan, issuing automated deactivation emails falsely characterizing these as follow-ups to a "cancellation request" that I never made. A refund was unilaterally processed. On the same date, I explicitly protested the cancellation, writing: "We didn't request to cancel the subscription. In fact I explicitly said do not cancel it." Also on this date, Defendant Gizis sent the ultimatum email declaring the relationship "ended" and that Defendants "will not be responding to any further communications." I also sent a formal Litigation Hold / Spoliation Notice and Notice of Anticipated U.S. District Court Litigation. *(See Exhibits D and E.)*

(d) **January 29, 2026** — I reported to Defendants that I was unable to log into my account and that it appeared to have been deleted without notice, further demonstrating the escalating nature of Defendants' retaliatory conduct. *(See Exhibit K.)*

(e) **January 30, 2026** — I sent a "FORMAL PRE-ACTION NOTICE (14-DAY NOTICE)" advising of intended proceedings in the United Kingdom, Switzerland, and Estonia. This was sent to agizis@connectify.me, support@speedify.com, uspto@connectify.me, and kamran.emdadi@gmail.com. On the same date, I commenced emergency proceedings in the Supreme Court of New South Wales, filing a Statement of Claim, Notice of Motion, Affidavit, and submissions. I served all NSW filings on Defendants by email. Defendants did not respond to or acknowledge any of these communications. *(See Exhibits J and K.)*

(f) **January 31, 2026** — I made the first of four separate attempts to serve the NSW Supreme Court proceedings and interlocutory application on Defendants' identified counsel, Mr. Ashery (AsheryESQ@gmail.com), requesting confirmation of whether he could accept service for Connectify and Mr. Gizis. Mr. Ashery did not respond. *(See Exhibit K.)*

(g) **February 1, 2026** — I sent an "URGENT LEGAL NOTICE: Restore Speedify router access within 2 hours (E.D. Pa. TRO filing imminent)" email to six Defendant addresses including both counsel addresses (AsheryESQ@gmail.com and lashery@connectify.me). This email expressly referenced Mr. Gizis's message to tell the Court to go "f— itself." Defendants did not respond or deny this characterization. *(See Exhibit K.)*

(h) **February 2, 2026** — I sent three separate communications: (i) a follow-up urgent demand "RESPONSE REQUIRED IN NEXT TWO (2) HOURS" stating "This remains unresolved" and warning of imminent legal action; (ii) an email providing the NSW Supreme Court case information (Case No. 2026/00043842) to all Defendant addresses noting that "Given that you refused to participate, the matter will continue in your absence"; and (iii) a "FINAL DEMAND AND NOTICE OF BAD-FAITH NON-ENGAGEMENT" sent to six addresses including both counsel addresses, setting a deadline of Wednesday, February 4, 2026 at 5:00 PM CST. Defendants did not respond to any of these communications. *(See Exhibit K.)*

(i) **February 3, 2026** — I sent a second service email to Mr. Ashery (counsel) and a follow-up to all Defendants requesting "the contact information for your Australian legal representatives so we can coordinate ahead of the upcoming hearing." Neither Mr. Ashery nor any Defendant responded. *(See Exhibit K.)*

---

Williams' Decl.        - Page 28 of 59 -        Case No. 2:26-cv-00818-GJP

(j) **February 4, 2026** — I served Defendants with the published decision of the Supreme Court of New South Wales, *Williams v. Connectify, Inc.* [2026] NSWSC 30, sending the link to the published judgment to all six Defendant addresses. This was the same date as the deadline set in the Final Demand. Defendants did not respond. *(See Exhibits J and K.)*

(k) **February 5, 2026** — I sent two communications: (i) a third service email to Mr. Ashery (counsel) again requesting acknowledgment of the NSW proceedings; and (ii) a forward of the Emergency Filing / Common Law List (Injunction) documents to six attorneys at Stradley Ronon Stevens & Young LLP and TLG Attorneys, ensuring that Defendants' former and associated counsel were placed on notice. I also served the Pre-Suit Notice pursuant to California Civil Code § 1782(a). None of these communications received any response. *(See Exhibits I and K.)*

(l) **February 6, 2026** — I sent a "Notice of Intended Proceedings in the United Kingdom" to twelve (12) recipients, including: agizis@connectify.me, support@speedify.com, uspto@connectify.me, kamran.emdadi@gmail.com, AsheryESQ@gmail.com, lashery@connectify.me, and six attorneys at Stradley Ronon Stevens & Young LLP (dscott@stradley.com, skats@stradley.com, pkingsley@stradley.com, pforet@stradley.com, kcasey@stradley.com) and TLG Attorneys (cbiemiller@tlgattorneys.com). This notice placed both Defendants and two separate law firms on record notice of multi-jurisdictional proceedings. No recipient responded. *(See Exhibit K.)*

(m) **February 9, 2026** — I sent a fourth service email to Mr. Ashery (counsel), writing: "I am writing again as I have not yet received any response regarding the service of the Supreme Court of NSW proceedings and interlocutory application." Mr. Ashery did

not respond, bringing the total number of unanswered service attempts to Defendants' own counsel to four over a ten-day period. *(See Exhibit K.)*

39. On January 29, 2026, I sent Defendants an urgent written demand via six (6) separate channels (email to agizis@connectify.me, support@speedify.com, uspto@connectify.me, kamran.emdadi@gmail.com, SMS and WhatsApp to +1 215 776 1321), advising that I faced substantial and ongoing consequential business losses of up to USD $200,000 over the next 48 hours and requesting restoration within two hours. My email tracking software indicates this demand was opened and/or read at least sixteen (16) times by recipients. True and correct copies of the email tracking data showing these read receipts are attached as **Exhibit P**. A true and correct copy of the urgent demand letter is attached as **Exhibit H**.

40. I attempted to engage Defendants' outside counsel Stradley Ronon Stevens & Young, LLP, who is the attorney of record for Defendants in a separate proceeding in this District (*Bounts Technologies Ltd. v. Connectify, Inc.*, Case No. 2:23-cv-00890). Counsel read my emails at least 30 times and have not responded. Despite further requests, defendants have not identified replacement counsel or provided any channel through which I could engage in meet-and-confer discussions.

40A. On February 5, 2026, I sent Defendants a formal Pre-Suit Notice pursuant to California Civil Code § 1782(a) of the California Consumers Legal Remedies Act, accompanied by a copy of the Verified Complaint. On February 6, 2026, I served the filed Verified Complaint on Defendants and all identified counsel by email. On the same date, I sent Defendants notice of intended proceedings in the United Kingdom. **Despite all of these communications, spanning email, SMS, WhatsApp, formal legal notices, support tickets, court filings, and certified correspondence to multiple recipients including**

**Defendants' CEO, support department, legal department, outside counsel, and Chief Counsel, Defendants have not provided a single substantive response to any demand for restoration,** have not engaged in any meet-and-confer discussions, have not provided contact information for legal representatives despite repeated requests, and have not acknowledged or responded to the Supreme Court of NSW proceedings, the USPTO Petition for Cancellation, or my Final Demand. The sole substantive communication from Defendants since January 27, 2026 has been the Gizis email described above declaring the matter "ended."

40B. **The depth and breadth of non-engagement by Defendants' own counsel is particularly notable.** Between January 31 and February 9, 2026, I sent four (4) separate emails to Mr. Ashery at AsheryESQ@gmail.com, Defendants' identified counsel, attempting to serve the Supreme Court of NSW proceedings and requesting confirmation of whether he could accept service. Each email was addressed directly to Mr. Ashery and requested a response at his earliest convenience. Mr. Ashery did not respond to any of these four emails. Additionally, on February 5, 2026, I forwarded the Emergency Filing / Common Law List (Injunction) documents directly to six attorneys at two separate law firms: five attorneys at Stradley Ronon Stevens & Young LLP (dscott@stradley.com, skats@stradley.com, pkingsley@stradley.com, pforet@stradley.com, kcasey@stradley.com) and one attorney at TLG Attorneys (cbiemiller@tlgattorneys.com). On February 6, 2026, the Notice of Intended UK Proceedings was again sent to all twelve recipients, including every attorney previously contacted. Not a single attorney, whether at Stradley Ronon, TLG Attorneys, or Mr. Ashery, responded to any of these communications. This wall of silence from multiple legal professionals associated with Defendants reinforces the conclusion that Defendants' non-engagement is a deliberate and coordinated strategy, not an inadvertent failure to respond.

# X. Prior Emergency Proceedings in the Supreme Court of New South Wales

41. On January 30, 2026, I commenced emergency proceedings in the Supreme Court of New South Wales, Australia (Case No. 2026/00043842), filing a Statement of Claim, Notice of Motion, Affidavit, and submissions seeking urgent injunctive relief. The Supreme Court was constituted on an emergency basis, including outside normal court hours.

42. The Supreme Court issued a published decision: *Williams v. Connectify, Inc.* [2026] NSWSC 30. While the NSW court ultimately determined that it could not exercise personal jurisdiction over a Delaware corporation with no Australian presence, the Court's published reasons for judgment confirmed the urgency of the dispute and the emergency circumstances prompting the application. The fact that the Supreme Court of a major Australian jurisdiction was constituted on an emergency basis, including outside normal court hours, to hear my application is itself indicative of the gravity with which the court regarded the matter. The published decision is a matter of public record and is attached as **Exhibit J**. Defendants were served with all NSW Supreme Court filings and the published decision but did not respond, appear, or acknowledge receipt.

43. I am now pursuing relief in Defendants' home forum, the Eastern District of Pennsylvania, to ensure prompt service and enforceability, after the NSW court's published decision confirmed that relief could not be granted in Australia. I note that I first sought emergency relief in New South Wales because that is where I reside and where my infrastructure is located; the shift to this Court was not a matter of forum selection but of jurisdictional necessity, compelled by the NSW court's own ruling that it lacked personal jurisdiction over Defendants. **I have pursued every available avenue of redress with maximum diligence and without any period of delay or acquiescence:** (a) January 27, 2026 (Day 0, same day as deactivation): immediate written demands for restoration sent via multiple

channels; (b) January 28, 2026 (Day 1): continued correspondence, discovery of Replacement Account termination, engagement with Router manufacturer CTO; (c) January 29, 2026 (Day 2): formal urgent demand letter sent via six (6) separate channels, warning of imminent harm; (d) January 30, 2026 (Day 3): emergency proceedings commenced in the Supreme Court of New South Wales, including outside normal court hours; (e) January 31–February 5, 2026 (Days 4–10): continuous correspondence, NSW court decision received, CLRA pre-suit notice served, complaint drafted and verified; (f) February 6, 2026 (Day 10): Verified Complaint filed in this Court, all parties served; (g) February 7–10, 2026 (Days 11–14): preparation and filing of this Emergency Motion for Temporary Restraining Order and supporting declarations. At no point during this period did I acquiesce in Defendants' conduct, delay in seeking relief, or cease pursuing restoration. As a self-represented litigant without legal training, I have done my best to pursue every remedy as quickly as possible, but each step (drafting demands, preparing NSW court filings, researching US federal procedure, preparing and verifying the Complaint, and preparing this TRO Motion) has required considerably more time and effort than it would for a trained attorney. The fourteen-day interval between deactivation and this filing represents continuous, uninterrupted pursuit of relief by a pro se litigant operating across multiple time zones and jurisdictions, not delay. Throughout this period, Defendants have made their contempt for judicial authority unambiguously clear through their systematic refusal to acknowledge or respond to any court proceeding across two sovereign jurisdictions, any of approximately forty (40) written communications, and any form of legal process whatsoever (¶¶ 35, 37), which further underscores the urgency of the relief I now seek.

# XI. Irreparable Harm: Ongoing, Continuous, and Not Remediable by Monetary Damages

44. **The specific facts set forth below clearly show that I am suffering immediate and irreparable injury, loss, and damage that will continue and worsen absent emergency relief.** The harm I am suffering is not a discrete past event; it is ongoing, continuous, and worsening with each day that passes without restoration of service. As of the date of this Declaration, fourteen (14) days after Defendants' initial deactivation on January 27, 2026, I remain completely locked out of Speedify service. The Router's bonding and failover functions remain disabled. My secure management network remains inaccessible. The threat of permanent device destruction persists. No aspect of my situation has improved since the initial deactivation. The injuries described below are concrete, particularized, and presently occurring, not speculative or contingent on future events. **Defendants' wrongful conduct is not a single completed act; it is a continuing deprivation.** Each day that Defendants maintain the service termination, refuse to restore access, and continue to hold my Router's serial number hostage to the threat of permanent deactivation constitutes a separate and distinct interference with my property and my contractual rights. The harm compounds daily: each day adds another day of unmonitored infrastructure, another day of unmet regulatory obligations, another day of impaired business operations, and another day closer to the point at which Defendants execute the irreversible step of permanently bricking my Router, a step for which they have completed every prerequisite (¶¶ 32–33).

## A. Loss of Bonding, Failover, and Connectivity Functionality

45. Since January 27, 2026, I have been deprived of the Router's bonding and redundancy capabilities. The extent of my reliance on these capabilities is demonstrated by Defendants' own automated weekly usage reports. In the week ending February 1, 2026, the week immediately following Defendants' termination, my accounts recorded a

combined 44 GB of data transferred (99.96–99.97% bonded), 85.3 hours of total connected time, 88 failover saves, and 339 stream saves. These Defendants-generated metrics confirm that I was an exceptionally heavy, active, and continuous user of Speedify services and that the termination caused immediate, measurable disruption to my real-world connectivity. True and correct copies of these usage reports are attached as **Exhibit G**.

## B. Lockout from Secure Management Plane and Critical Infrastructure

46. As described in Paragraphs 16–23 above, I am locked out of the only approved remote-management path to my secure network and critical telecommunications infrastructure in Sydney. This lockout has persisted without interruption since January 27, 2026. Because of the Speedify-only allowlist configuration, the circular ACL dependency, and the hardware authentication token requirement, I cannot remedy this lockout from my current location in Mexico. No monetary award can retroactively restore management access to critical infrastructure during the period of lockout, nor can it undo the regulatory compliance exposure that has accrued and continues to accrue daily.

## C. Threatened Permanent Destruction of the Router ("Bricking")

47. **The threat of permanent device destruction is not hypothetical; it is supported by direct evidence of both capability and intent, and the risk is imminent.** The imminence of this threat is established by three independently sufficient indicia: **(1) Intentionality:** Defendants' interference with my property was deliberate and personally directed by Defendant Gizis, who authored the termination emails, personally intervened in the support ticket, and declared the matter "ended" (¶¶ 27, 34); **(2) Active escalation:** Defendants have already progressed from account-level termination (January 27) to device-level targeting of a third party's separate account (January 28) to communicating intent to permanently make the serial number "dead" to the Router's manufacturer (same

day), each step more aggressive than the last, with permanent serial-number deactivation the logical next step in this documented trajectory (¶ 33); and **(3) Absence of constraint:** Defendants have refused to engage with any legal process across two sovereign jurisdictions, have not appeared in or acknowledged any court proceeding, and have declared through their CEO that they "will not be responding to any further communications" (¶ 34), eliminating the only external constraint on their executing this irreversible step. The Router manufacturer's CTO has confirmed, based on direct communications with Defendants' personnel, that Defendants possess the technical capability to make the serial number "dead" such that it can "never be activated again" (Exhibit F). Once the serial number is permanently deactivated, no court order after the fact can restore the Router's functionality, and the central property interest at issue in this litigation will be destroyed. This threatened permanent destruction of a $2,725.82 specialized device containing bespoke secure configuration is irreparable harm that cannot be remedied by damages alone.

## D. Travel Plans Extended Indefinitely

48. **My international travel plans have been extended indefinitely as a direct consequence of Defendants' conduct.** I departed Sydney on January 22, 2026, on what was originally planned as a defined international trip. I traveled through Tokyo to Mexico and am presently located in Puerto Escondido, Oaxaca, Mexico.

49. I had originally booked ANA Business Class flights departing Mexico City on February 8, 2026 for Tokyo and then Sydney (Reservation Code CLVTXA, Ticket No. 2055468556531, total fare AUD $7,981.06). **I was unable to take these flights as scheduled and have had to reschedule them to a later date that I cannot yet fix.** I cannot commit to a specific return date because my business and communications infrastructure require the bonded connectivity that Defendants have disabled, and without

it, the international travel cannot serve its intended purpose. The rescheduling was necessitated in significant part by the disruption caused by Defendants' termination of my Speedify services, which forced me to divert enormous amounts of time and energy from my business operations to emergency legal proceedings across multiple jurisdictions (Australia, the United States, and prospectively the United Kingdom), to troubleshooting and attempting to restore connectivity, and to dealing with the cascading consequences of the loss of my secure management access and bonded connectivity infrastructure. **The inability to confirm a return date is not a delay of my choosing; it is a continuing and compounding consequence of Defendants' termination.** Each week I remain unable to commit to a return date represents further lost productivity, missed client deadlines, and accumulating regulatory exposure in Australia. True and correct copies of the ANA booking confirmation and rescheduling documentation are attached as **Exhibit L**.

50. I remain abroad with no fixed return date. The ongoing deprivation of Speedify service means that I presently lack, and will continue to lack absent judicial intervention, the bonded connectivity and redundancy functionality that was essential for my travel and business operations. As of the date of this Declaration, the deprivation has persisted for fourteen (14) consecutive days. During that period, I have already experienced measurable business disruption, already diverted over 130 hours from revenue-generating work to emergency legal proceedings, already incurred flight rescheduling costs, and already accumulated fourteen days of unmonitored network infrastructure and unverified regulatory compliance. These harms are concrete, have already occurred, and are compounding daily.

## E. Inability to Obtain Replacement Equipment or Services While in Mexico

51. I have actively and diligently attempted to obtain alternative solutions. I made telephone calls and sent inquiries to multiple sellers and resellers of Peplink multi-WAN bonding routers, the closest available alternative to my Miri/Speedify Router, to determine whether a replacement device could be obtained and shipped to my location in Mexico. I also conducted extensive online research seeking any alternative bonding VPN service or hardware solution that could restore my management plane access and bonded connectivity. **None of these efforts have produced a viable alternative.** As of the date of this Declaration, specialized multi-WAN bonding routers are not available for immediate purchase in Puerto Escondido, Mexico. My inquiries to Peplink resellers and alternative equipment suppliers confirmed that shipping specialized network hardware to Mexico requires a minimum of 7–10 business days due to customs procedures, and no local supplier maintains such equipment in inventory. Moreover, replacement hardware, even if obtained, cannot restore my Speedify-dependent management plane access, because my secure network is configured to accept connections only from Speedify's specific network egress endpoints, which no alternative bonding VPN provider offers or can replicate. This is not a theoretical limitation; it is a present, structural fact of my network architecture that I have verified through my own technical research and confirmed through communications with the Router manufacturer's CTO. I have exhausted every reasonable self-help option available to me.

52. The only alternative to injunctive relief is physical travel to Sydney (approximately 30+ hours from Puerto Escondido via Mexico City), at significant expense, to perform in-person reconfiguration, which would still not address the loss of the Router's bonding functionality or the threat of permanent device destruction. An alternative multi-WAN

bonding solution would cost approximately USD $56,151 to $98,370 over ten years, compared to my Router Plan price of USD $450.00 per year.

## F. Business Losses, Carrier Obligations, and Time-Critical Commitments

53. Defendants' destruction of my connectivity infrastructure during international travel has impaired my ability to perform existing contractual obligations and to pursue business opportunities requiring secure, reliable remote connectivity. This includes a contract obtained on January 20, 2026, to provide pre-filing expert testimony in a United States matter, which requires reliable connectivity for performance. It also includes time-critical communications with clients and counterparties of Glexia, which provides telecommunications services to government agencies.

54. The diversion of my time from revenue-generating business operations to troubleshooting, corresponding with Defendants, and preparing legal proceedings across multiple jurisdictions has caused substantial consequential losses. Between January 25 and February 7, 2026, I estimate I have devoted in excess of 130 hours to addressing the consequences of Defendants' unilateral termination. Time that would otherwise have been spent on Glexia's business operations and client commitments. This estimate is based on my contemporaneous email and communication records, which show near-continuous correspondence and legal preparation during this period. For context, the expert witness engagement referenced in the preceding paragraph (obtained January 20, 2026) requires reliable, secure connectivity for document review, teleconferences with counsel, and preparation of written expert testimony, all of which have been materially impaired by the loss of my bonded connectivity and secure management access. I am prepared to submit corroborating documentation, including the relevant engagement communications and/or

a declaration from the engaging party, under seal or subject to a protective order if the Court requires.

## G. Inadequacy of Monetary Damages

55. Monetary damages are inadequate to remedy the harm I am suffering for the following specific and concrete reasons:

(a) **Permanent device destruction cannot be undone by money.** If Defendants make my Router's serial number permanently "dead," no monetary award can restore the Router's functionality. The Router contains bespoke secure configuration and provisioning that cannot be replicated without physical access to my Sydney network. This is not a fungible consumer product that can simply be repurchased.

(b) **Management plane lockout cannot be retroactively remedied.** No amount of money can restore the real-time remote access to critical telecommunications infrastructure that I have been denied since January 27, 2026. Each day of lockout represents an irretrievable loss of management capability during which infrastructure degrades unmonitored, regulatory obligations go unmet, and security posture cannot be verified. A damages award months or years from now cannot travel back in time to restore management access on January 28, February 1, or any other specific date during the lockout.

(c) **The catch-22 is structural, not monetary.** The Speedify-only allowlist and circular ACL dependency create a self-reinforcing lockout that money cannot break. I cannot switch providers without Speedify access, and I cannot get Speedify access without Defendants' cooperation. This structural dependency makes the harm qualitatively different from a simple service interruption where the consumer can purchase a substitute.

(d) **Time-sensitive connectivity during travel cannot be restored after the fact.** The bonded connectivity I need for international travel and business operations is a real-time service.

An award of damages months or years from now cannot restore connectivity that I needed on January 28, January 29, February 1, or any other specific date during my indefinitely extended travel.

(e) **Consequential business losses are ongoing and incalculable in their full scope.** Since January 27, 2026, I have already lost identifiable business opportunities and diverted over 130 hours from revenue-generating work. The full scope of clients affected, relationships impaired, and regulatory exposure incurred during the continuing lockout period cannot be calculated with reasonable certainty because the lockout is ongoing, the harm compounds daily, and many consequential losses, such as reputational damage with government clients and lost future business referrals, are by their nature resistant to precise monetary quantification. This is not a past injury whose damages can be totaled at trial; it is a continuing and expanding injury whose ultimate scope grows with each day of deprivation.

(f) **Regulatory compliance obligations are accruing daily and cannot be retroactively satisfied.** I hold Australian Carrier Licence No. 554 (Exhibit Q), which imposes continuous statutory obligations including the duty to respond to lawful interception requests within specified timeframes. Since January 27, 2026, I have been unable to access the network management infrastructure through which such requests would be received and fulfilled. I cannot verify whether any such requests have been received during the fourteen-day lockout period. Any statutory obligation that has arisen, or that arises, during this period of enforced lockout cannot be met within the required timeframes, and no subsequent damages award can travel back in time to satisfy a missed regulatory deadline or cure the resulting non-compliance.

## H. This Harm Is Qualitatively Distinguished from Mere Deprivation of a Service

56. **The irreparable harm I face is not the "mere deprivation" of a commercial service that can be obtained elsewhere or remedied through a later damages award.** I am aware that the Third Circuit has recently emphasized that a movant seeking injunctive relief must demonstrate specific, concrete reasons why monetary damages cannot adequately compensate the harm, and that the mere loss of a commercial service, standing alone, does not establish irreparable injury. I submit that my situation is qualitatively distinguished from such cases because it involves multiple, compounding, and qualitatively distinct injuries, including threatened permanent destruction of physical property, structural lockout from critical infrastructure, ongoing regulatory compliance failures, and the demonstrated inability of any monetary award to restore real-time management access or undo completed regulatory violations, that individually and collectively render monetary damages inadequate, for the following specific reasons:

(a) **First,** Defendants threaten the **permanent physical destruction** of a specialized device I own. The Router manufacturer's CTO has confirmed that Defendants have communicated their intention to make my Router's serial number "dead," permanently and irreversibly. This is not a loss of access to a service; it is the threatened destruction of my property. No amount of money after the fact can "un-brick" a device whose serial number has been permanently deactivated.

(b) **Second,** the **structural catch-22** created by the Speedify-only allowlist means that Defendants' termination has not merely deprived me of one service option among many. It has locked me out of my own infrastructure in a self-reinforcing manner that cannot be broken without Defendants' cooperation or my physical return to Sydney. This is not a substitutable service; it is the only key to my own locked door.

(c) **Third,** each day of lockout creates **cumulative and irreversible regulatory compliance exposure** that cannot be undone retroactively. A carrier's obligation to respond to a lawful interception request within a specified timeframe either is or is not met; a damages award cannot travel back in time to meet a missed deadline.

(d) **Fourth,** the harm is **ongoing and worsening** with each passing day; it is not a discrete past event for which damages could provide a complete remedy. My travel remains indefinitely extended, my business operations remain impaired, my network remains unmonitored, and the threat of permanent device destruction continues to escalate.

(e) **Fifth,** these harms operate **in combination and cascadingly**: the catch-22 lockout prevents me from remotely mitigating the device destruction threat; my geographic distance from Sydney (approximately 13,000 kilometers) prevents in-person remediation; the ongoing travel disruption prevents me from returning to Sydney to perform reconfiguration; the regulatory obligations create daily accumulating compliance exposure; and the threat of imminent bricking creates pressure to capitulate to Defendants' unilateral termination rather than assert my legal rights. Each harm individually would support a finding of irreparability; in combination, they create a compounding emergency that only immediate restoration of Speedify service can address.

## I. Personal Hardship and Human Impact

56A.  Defendants' conduct has had concrete personal consequences beyond the business, technical, and regulatory impacts described above. Since January 27, 2026, I have been unable to plan my return travel to Australia because my business operations require the bonded connectivity that Defendants disabled, and without it, the remaining purpose of my international travel cannot be fulfilled. Between January 25 and February 7, 2026, I have devoted in excess of 130 hours to addressing the consequences of Defendants'

unilateral termination, including correspondence with Defendants, preparation of legal filings in three jurisdictions (Australia, the United States, and the United Kingdom), technical troubleshooting, and research into alternative solutions. This time was diverted directly from revenue-generating work for Glexia and from the expert-witness engagement obtained on January 20, 2026 (¶ 53). I have incurred AUD $7,981.06 in flight rescheduling costs (¶ 49, Exhibit L). I remain stranded approximately 13,000 kilometers from my infrastructure with no fixed return date.

## XII. Balance of Equities and Minimal Burden on Defendants

57. The balance of equities strongly favors entry of injunctive relief. Defendants can restore service through a simple administrative action. Defendants' own weekly usage reports show that my accounts have not been deleted from their system and continue to generate data, with the February 1, 2026 report showing combined data transfer of 44 GB, 85.3 hours of connected time, and 88 failover events across my two accounts, demonstrating that Defendants continue to deliver the service infrastructure and that restoration requires only an administrative reactivation.

58. By contrast, the harm to me from the denial of relief is severe: continued lockout from critical infrastructure, ongoing business losses, inability to return home on schedule, regulatory compliance exposure, and the looming threat of permanent device destruction. Defendants have no legitimate business interest in maintaining the termination of a paying customer's service while simultaneously refusing to engage with that customer's legitimate grievances. Moreover, Defendants have already completed every prerequisite step toward permanent device destruction (¶¶ 32–33): they have terminated my accounts, terminated a third party's account linked to my serial number, communicated to the

manufacturer their intent to make the serial number permanently "dead," and declared that they will not respond to any further communications. No internal safeguard, notice period, or external constraint delays the final irreversible execution (¶ 15). Once the serial number is permanently deactivated, no subsequent court order can restore it. Restoring service now, pending the Court's final adjudication, is the only measure that can halt the ongoing deprivation and preserve the property at the center of this litigation.

59. I have personally accessed, reviewed, and printed Defendants' published Terms of Service at speedify.com/terms-of-service/ on February 6, 2026. A true and correct copy of those Terms as publicly available on that date is attached hereto as **Exhibit R**. **Defendants cannot credibly invoke those Terms to justify maintaining the termination or threatening permanent device destruction, for the following independently sufficient reasons:** (a) **False pretext:** Defendants' own stated basis for the termination was a "cancellation request" that did not exist. Despite repeated written demands, Defendants have never identified any alternative contractual basis for the termination; they have simply refused to respond. (b) **Refund inconsistency:** Defendants' Terms of Service expressly provide that "If an account is terminated for violation of these Terms, no refund will be issued." Yet Defendants simultaneously processed full refunds to both accounts at the very moment of deactivation. This is Defendants' own contemporaneous acknowledgment that the termination was not for cause. Furthermore, Defendants' refunds addressed only the separately purchased Router Plan and Families Plan; Defendants did not and could not refund the 90-day Included Subscription bundled with the Router's AUD $2,725.82 purchase price (¶ 8), because that consideration was paid to the Router's reseller, not to Defendants. Defendants' termination thus extinguished a subscription entitlement that I paid for as part of the Router's purchase price and for which I have received no compensation of any kind. (c) **No device-level authority:** While the Terms contain a broad

reservation of rights to "suspend, terminate, or refuse the Service to anyone at any time for any reason," the Terms contain no provision whatsoever authorizing permanent device-level blacklisting, serial-number disablement, or any action designed to prevent a customer's owned hardware from functioning with any paid account (including accounts owned by third parties). The power to terminate a service subscription does not encompass the power to permanently destroy customer-owned hardware. (d) **Scope limitation:** Even accepting the broadest possible reading of the termination clause, that clause authorizes termination of "the Service," not the permanent destruction or disabling of independently purchased customer equipment. The Terms' acceptable use provisions prohibit specific enumerated conduct (reverse engineering, bypassing usage limitations, uploading unlawful material, etc.), none of which has been alleged against me, and none of which would justify device-level destruction even if it had been. (e) **Third-party account termination:** The Terms cannot authorize Defendants to terminate a completely separate third-party's paid account merely because that third party associated the account with hardware that I own. Defendants' termination of the Replacement Account (owned and paid for by a third party) demonstrates conduct that exceeds any plausible reading of the Terms.

60. I am willing and able to pay for Speedify service and, if necessary, to immediately repay any refunded amounts (including the USD $450.00 Router Plan refund and the AUD $251.11 Families Plan refund) as a condition of reinstatement. I do not seek free service; I seek restoration of paid service pending adjudication.

## XIII. Public Interest

61. The public interest favors entry of injunctive relief for the following specific and concrete reasons. **First,** there is a strong public interest in preventing technology companies from

using remote "kill switches" to permanently disable consumer-owned hardware as a tactic in commercial disputes. I am aware that the Federal Trade Commission investigated a substantially similar practice in 2016 when Google/Nest unilaterally bricked Revolv smart home hubs, and that the FTC staff acknowledged that "unilaterally rendering devices inoperable" causes "unjustified, substantial consumer injury that consumers themselves could not reasonably avoid." Multiple class action lawsuits are currently pending against device manufacturers for identical conduct, including against Belkin (Wemo smart home devices, bricking effective January 2026) and Google (Nest devices, filed November 2025). The public interest in consumer protection and orderly commercial conduct requires that such disputes be resolved through legal process, not unilateral technological force. **Second,** I am a licensed telecommunications carrier (ACMA Carrier Licence No. 554, Exhibit Q) whose infrastructure serves Australian Commonwealth and State government agencies, including the Department of Foreign Affairs and Trade, South Australia Police, and agencies of the New South Wales Government. The public interest is served by ensuring that a regulated telecommunications carrier can maintain its statutory obligations, including lawful interception capability and cyber security incident reporting, without being locked out of its own network by the unilateral action of a commercial VPN service provider. **Third,** granting injunctive relief restores the status quo ante, the state of active, paid service that existed before Defendants' wrongful conduct, and preserves the ability of this Court to adjudicate the merits. If the TRO is denied and Defendants permanently destroy the Router before trial, the controversy becomes partly or wholly moot, denying both this Court and the parties the ability to obtain a just resolution on the merits.

# XIV. Nature of Relief Sought, Status Quo, and Anticipated Defenses

62. **The relief I seek is primarily prohibitory in nature.** I ask that Defendants be ordered to cease their ongoing interference with my use of a product I own and a service I am willing to pay for. The injunction I seek does not require Defendants to create any new service, develop any new product, or enter into any relationship they have not already agreed to; it requires them to stop affirmatively blocking a service that was functioning properly until Defendants unilaterally and pretextually deactivated it. To the extent that Defendants' administrative reactivation of my accounts constitutes a mandatory act, it is only mandatory in the sense that restoring the status quo ante requires Defendants to undo the wrongful deprivation they themselves imposed. The operative conduct to be restrained is Defendants' ongoing and continuous interference with my service, my management access, and my property, not a request that Defendants provide me with something I never had. Moreover, even if this Court were to characterize the requested relief as a mandatory injunction subject to a heightened standard, I respectfully submit that the circumstances here are extraordinary and unique: Defendants threaten the permanent, irreversible destruction of my property; I am locked out of critical telecommunications infrastructure by a structural catch-22 that only Defendants can break; Defendants have demonstrated contempt for judicial authority across two sovereign jurisdictions; and I am a regulated telecommunications carrier stranded approximately 13,000 kilometers from my infrastructure with compliance obligations accruing daily. These are precisely the extraordinary circumstances that warrant mandatory injunctive relief even under a heightened standard.

63. **The status quo ante to be preserved is the state that existed immediately before Defendants' wrongful conduct, not the state that exists at the time of filing.** For a

period of 32 days (December 4, 2025 through January 26, 2026), I was an active, paying Speedify subscriber with full service. Defendants' own weekly usage reports (Exhibit G) confirm uninterrupted, heavy usage during this period. The status quo was disrupted solely by Defendants' unilateral deactivation on January 27, 2026, which was based on a false pretext (a "cancellation request" that did not exist). A TRO restoring service would return the parties to the position they occupied before Defendants' wrongful conduct, an active, paid subscription, and would preserve that status quo pending adjudication on the merits.

64. **I anticipate that Defendants may argue that I created my own vulnerability by configuring a Speedify-only allowlist, thereby making my infrastructure entirely dependent on Defendants' service.** This argument fails for three reasons. First, the Speedify-only allowlist is a standard and reasonable security configuration that reduces attack surface by limiting remote management access to a single, vetted origination path. This is a well-recognized security best practice, not an unreasonable or unusual dependency. Second, the Router was expressly marketed and sold as "Powered by Speedify" and was designed by its manufacturer to function exclusively with Defendants' Speedify service (as confirmed by the manufacturer's CTO in Exhibit F). Defendants' own product design and marketing encouraged, indeed required, the precise type of infrastructure dependency that now exists. Third, even if the allowlist configuration were considered unusual, it would not excuse Defendants' wrongful conduct in terminating my service on a false pretext and then threatening permanent destruction of my hardware. A victim's reliance on continued access to a service does not justify or excuse a provider's wrongful termination of that service.

65. **This is not a dispute over a $450 consumer subscription.** While the annual Speedify subscription costs USD $450.00, the actual scope of harm encompasses: (a) AUD $2,725.82 in Router hardware that Defendants threaten to permanently destroy, including

the value of the unreimbursed 90-day Included Subscription bundled with that purchase price; (b) approximately USD $56,151 to $98,370 in estimated replacement costs for an alternative multi-WAN bonding solution over ten years; (c) consequential business losses attributable to more than 130 hours of diverted time and impaired business operations; (d) ongoing and accumulating regulatory compliance exposure for an Australian telecommunications carrier; (e) AUD $7,981.06 in flight rescheduling costs; (f) the complete lockout from critical telecommunications infrastructure serving government clients; and (g) the extinguishment of the 90-day Included Subscription for which Defendants provided no refund and have no mechanism to refund, as the consideration was paid to the Router's reseller as part of the hardware purchase price. The modest subscription price does not reflect the magnitude of the harm caused by Defendants' unilateral and pretextual termination.

66. **I have at all relevant times acted in good faith and with as much diligence as I am capable of.** As noted, I am a self-represented pro se litigant without legal training. Despite this, I have worked diligently to pursue every available avenue of resolution before seeking the Court's intervention. I opened a professional support ticket providing logs and test data (Exhibit C). When that failed, I sent formal demand letters. I made telephone calls to Defendants' personnel and their counsel. I researched and attempted to pursue alternative hardware and service solutions, including contacting Peplink resellers and searching for other bonding VPN providers. I commenced emergency proceedings in the Supreme Court of New South Wales. I filed a USPTO Petition for Cancellation. I served notices under the California CLRA and UK law. I have done everything within my limited knowledge and ability to resolve this dispute and mitigate my harm before turning to this Court. My initial support ticket (#676251, Exhibit C) was submitted in a professional and technical manner. While I briefly inquired about a refund before the router license structure was explained

to me, I expressly retracted that inquiry the same day and confirmed in writing my intent to retain the service (¶ 25). No cancellation request was pending when Defendants deactivated my accounts two days later. I have not engaged in any conduct that would constitute a violation of Defendants' Terms of Service, and no such violation has ever been alleged by Defendants. I respectfully submit that Defendants cannot invoke the equitable doctrine of unclean hands against me where it is Defendants who have terminated a paid service on a false pretext, refused to provide any legitimate justification, threatened permanent destruction of my property, and ignored the authority of two courts across two sovereign jurisdictions.

67. **While the detailed legal arguments supporting likelihood of success on the merits will be presented in the accompanying Memorandum of Law, the sworn factual record established in this Declaration provides the following foundation for that showing:**

(a) **Ownership, Possession, and Deprivation of Personal Property:** I lawfully purchased and own the Router as personal property (AUD $2,725.82, Exhibit A), which included a bundled 90-day Speedify subscription as part of the purchase price. I further purchased and paid for two additional Speedify subscriptions (USD $450.00 and AUD $251.11, Exhibit B). The Router was marketed, sold, and designed to function exclusively with Defendants' Speedify service, as confirmed by the manufacturer's CTO (Exhibit F). Defendants' unilateral actions have deprived me of the use and enjoyment of my own property: the Router is physically in my possession in Mexico but is functionally inert for its intended bonding purpose (¶ 13), and Defendants have communicated their intent to permanently make the serial number "dead" (¶¶ 14–15), which would constitute a total and permanent destruction of the Router's value. I did not consent to the deactivation, and no lawful justification for it has been provided.

(b) **False Pretext and Absence of Contractual Justification:** Defendants deactivated my service based on a documented false pretext, a "cancellation request" that did not exist and that directly contradicted my express written rejection of cancellation two days earlier (¶¶ 25–28). Defendants issued full refunds simultaneously with the deactivation, which their own Terms of Service provide occurs only for non-violation terminations (¶ 28), establishing the absence of any for-cause basis. Defendants have never identified, produced, or acknowledged any record of a "cancellation request" despite repeated written demands (¶¶ 38–40A).

(c) **Escalation Beyond Account-Level to Device-Level Targeting:** After I objected to the deactivation, Defendants escalated from account-level to device-level measures, terminating a completely separate third party's independently purchased account solely because it was associated with my Router's serial number (¶¶ 30–32). Defendants then communicated to the Router's manufacturer their intent to permanently make my serial number "dead" (¶¶ 14–15, Exhibit F). Defendants' Terms of Service contain no provision authorizing permanent device-level blacklisting or serial-number disablement (¶ 59).

(d) **Pattern of Non-Engagement and Contempt for Judicial Authority:** Defendants have refused to engage with any of approximately forty (40) written communications, two court proceedings across two sovereign jurisdictions, a USPTO cancellation petition, a California CLRA pre-suit notice, and a UK legal notice (¶¶ 37–40A). Defendant Gizis directed a middle-finger emoji and, in substance, instructed Declarant to tell the Court to go "f--- itself," a characterization that Defendants have never denied despite repeated opportunity (¶ 35). This pattern of non-engagement means that only an order of this Court can prevent further irreversible harm.

(e) These facts, taken together and as more fully argued in the accompanying Memorandum of Law, support a strong likelihood of success on claims including, but not limited to, conversion, trespass to chattels, breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, unfair and deceptive trade practices under the Pennsylvania Unfair Trade Practices and Consumer Protection Law and the California Unfair Competition Law, and tortious interference with business relations.

## XV. Specific Relief Requested

68. Based on the foregoing, I respectfully request that the Court enter a Temporary Restraining Order and, following a hearing, a Preliminary Injunction, directing Defendants to: (a) immediately reactivate my Speedify Router Plan subscription (Invoice #502472) and Families Plan subscription (Invoice #494648), restoring full service functionality to my Router (serial number 00A601241115008); (b) immediately remove any device-level blocks, serial-number restrictions, or blacklisting that prevent my Router or any account associated with my Router from accessing Defendants' Speedify service; (c) refrain from deactivating, suspending, terminating, or interfering with my Speedify service pending final adjudication of this action; (d) refrain from permanently disabling, "bricking," or making "dead" my Router's serial number or taking any other action designed to permanently render my Router non-functional; and (e) refrain from terminating or interfering with any third-party Speedify account associated with my Router's serial number or device identifiers. I am willing and able to pay for the restored service and to immediately repay any refunded amounts (USD $450.00 and AUD $251.11) as a condition of reinstatement.

## XVI. Notice to Defendants

69. **Pursuant to Federal Rule of Civil Procedure 65(b), I certify that the following efforts have been made to give notice to Defendants of this motion:** On February 6, 2026, I served the Verified Complaint, this Declaration, and all supporting documents on Defendants and all identified counsel by email to the following addresses: agizis@connectify.me, support@speedify.com, uspto@connectify.me, kamran.emdadi@gmail.com, and the general counsel address listed in Defendants' Terms of Service. Defendants and their counsel have been on notice of this dispute since January 26, 2026, when the first formal notice of dispute was sent, and since January 27, 2026, when demands for restoration began. As set forth above and detailed in ¶ 38A, Defendants have received approximately forty (40) written communications via email, SMS, WhatsApp, formal legal notices, support tickets, and court filings; have been served with emergency proceedings in the Supreme Court of New South Wales (Case No. 2026/00043842); have been served with the published decision *Williams v. Connectify, Inc.* [2026] NSWSC 30; have been served with the Verified Complaint and notice of emergency motion in this Court; have been served with a Pre-Suit Notice pursuant to California Civil Code § 1782(a); have been served with formal pre-action notices for proceedings in the United Kingdom, Switzerland, and Estonia; and have been served with a Notice of Intended UK Proceedings sent to twelve recipients including attorneys at Stradley Ronon Stevens & Young LLP and TLG Attorneys. Defendants' own identified counsel, Mr. Ashery, was separately served four (4) times between January 31 and February 9, 2026, and did not respond to any of these service attempts. I am not seeking *ex parte* relief; I request that Defendants be given the opportunity to appear and respond before or at the TRO hearing. However, if Defendants fail to appear or respond, consistent with their established pattern of non-engagement with legal process across multiple

jurisdictions, and despite having received actual notice of both this action and the emergency motion through multiple channels, I respectfully request that the Court enter the TRO on the basis of this Declaration and the accompanying submissions, as permitted by Rule 65(b)(1) where the movant's attorney (or, in the case of a pro se litigant, the movant) certifies in writing the efforts made to give notice and the reasons why notice should not be required.

## XVII. Security and Bond

70. I respectfully request that any bond under Federal Rule of Civil Procedure 65(c) be waived or set at a nominal amount. The amount of security under Rule 65(c) is committed to the Court's discretion. The factors supporting a nominal or waived bond here include: (a) **Defendants face no cognizable financial risk from restoration of a paid service**. I am willing and able to pay for the service and to immediately repay all refunded amounts (USD $450.00 and AUD $251.11); (b) Defendants will suffer no financial harm from restoration of service they already provide to other paying customers; the sole burden is that they must honor the same service relationship that existed for 32 days before their wrongful termination; (c) **the only "harm" to Defendants from a TRO is that they must continue providing a service to a paying customer**, which is precisely the position they were in before their wrongful conduct; and (d) I am a pro se litigant currently stranded internationally, and an excessive bond requirement would effectively deny me the injunctive relief to which I may be entitled. In the alternative, I am willing to post a cash bond in an amount set by the Court, including by wire transfer or other method directed by the Clerk, and to comply with any conditions the Court may impose. I respectfully submit that a bond in the range of the subscription amounts at issue (approximately USD $700 total) would more than adequately protect Defendants' interests, given that the TRO would require Defendants to do nothing more than reactivate two paid subscriptions.

## XVIII. Exhibits

71. The following exhibits are attached to this Declaration or filed contemporaneously, and true and correct copies of which are in my possession:

(a) **Exhibit A:** Router purchase receipt (Corsair Solutions Pty Ltd Invoice VR8MTKX8-0001)

(b) **Exhibit B:** PayPal transaction receipt and subscription confirmation for Router Plan

(c) **Exhibit C:** Support Ticket #676251 communications (showing retraction of initial refund inquiry, confirmation of intent to retain service, and Gizis's ultimatum)

(d) **Exhibit D:** Deactivation/refund emails from Speedify (January 27, 2026, sent by "Alex from Speedify")

(e) **Exhibit E:** Communications with Defendant Gizis (including termination email, liability cap assertion, "do not contact us again" directive, middle-finger emoji, and "go f--- itself" message)

(f) **Exhibit F:** Miri Technologies CTO correspondence (confirming Speedify dependency, Router lockup causation, and "dead" serial number threat)

(g) **Exhibit G:** Speedify weekly usage reports (ten consecutive weekly reports from December 7, 2025 through February 8, 2026, including the most recent report showing 24.7 GB transferred, demonstrating continuous heavy reliance on the service throughout the entire period preceding and following Defendants' termination)

(h) **Exhibit H:** Urgent demand letter dated January 29, 2026 (sent via six channels)

(i) **Exhibit I:** Pre-Suit Notice under California Civil Code § 1782(a) dated February 5, 2026

(j) **Exhibit J:** NSW Supreme Court filings and published decision, *Williams v. Connectify, Inc.* [2026] NSWSC 30

(k) **Exhibit K:** Summary log of approximately forty (40) written communications to Defendants (January 25 – February 9, 2026), compiled by Declarant from personal email records, SMS/WhatsApp message logs, support ticket records, and court filing records; each entry is based on a communication personally sent or received by Declarant. The email record includes but is not limited to: Formal Notice of Dispute (Jan 26), Pre-Action Notice for UK/Switzerland/Estonia (Jan 30), NSW Supreme Court service emails (Jan 30–Feb 3), four unanswered service attempts to counsel Ashery (Jan 31, Feb 3, Feb 5, Feb 9), Urgent Legal Notice with 2-hour deadline (Feb 1), three communications on February 2 including Final Demand with February 4 deadline, service of NSWSC 30 decision (Feb 4), Emergency Filing forwarded to Stradley Ronon and TLG Attorneys (Feb 5), California CLRA pre-suit notice (Feb 5), and Notice of Intended UK Proceedings sent to twelve (12) recipients including two law firms (Feb 6). Not one of these communications received a substantive response.

(l) **Exhibit L:** ANA Business Class booking confirmation and rescheduling documentation (Reservation CLVTXA)

(m) **Exhibit O:** Photographs demonstrating possession of hardware authentication tokens (FIDO2 security keys)

(n) **Exhibit P:** Email open/read tracking data generated by Declarant's email tracking software showing that the January 29, 2026 urgent demand was opened and/or read at least sixteen (16) times by recipients, with timestamps of each open event

(o) **Exhibit Q:** ACMA Carrier Licence No. 554 and summary of applicable regulatory obligations

(p) **Exhibit R:** Speedify Terms of Service (as published at speedify.com/terms-of-service/ and accessed on or about February 6, 2026, including termination, refund, and acceptable use provisions)

February 10, 2026

I declare under penalty of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct. I have personal knowledge of the facts stated herein. Where statements are made on information and belief, I have identified them as such and have stated the basis for my information and belief.

Executed on February 10, 2026, in Puerto Escondido, Oaxaca, Mexico.

MICHAEL WILLIAMS, Pro Se
Suite 1524, 50-58 Macleay Street
Elizabeth Bay NSW 2011
Australia
Telephone: +1 701 484 1337
Email: Michael.Williams@glexia.com

/s/*Michael Williams*

Michael Williams

February 10, 2026

## **CERTIFICATE OF SERVICE**

      I, Michael Williams, hereby certify that on February 10, 2026, a true and correct copy of the foregoing Declaration was served upon all parties of record by email at the following addresses:

**Connectify, Inc.**

Attn: Alexander C. Gizis, Chief Executive Officer

601 Spring Garden Street, 3rd Floor

Philadelphia, PA 19123

cbiemiller@tlgattorneys.com, dscott@stradley.com, skats@stradley.com,

pkingsley@stradley.com, pforet@stradley.com, kcasey@stradley.com,

uspto@connectify.me, kamran.emdadi@gmail.com, support@speedify.com,

agizis@connectify.me, AsheryESQ@gmail.com, lashery@connectify.me

**Alexander C. Gizis**

430 Pine Street

Philadelphia, PA 19106

agizis@connectify.me

MICHAEL WILLIAMS, Pro Se
Suite 1524, 50-58 Macleay Street
Elizabeth Bay NSW 2011
Australia
Telephone: +1 701 484 1337
Email: Michael.Williams@glexia.com

/s/*Michael Williams*

_____
  Michael Williams