February 6, 2026

Michael Williams
Suite 1524
50-58 Macleay Street
Elizabeth Bay NSW 2011
Australia
Michael.Williams@glexia.com
+1 701 484 1337

# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

## PHILADELPHIA DIVISION

| | |
|---|---|
| **Michael Williams**, an individual residing in New South Wales, Australia,<br><br>Plaintiff,<br><br>v.<br><br>**Connectify, Inc. (d/b/a Speedify)**, a Delaware corporation with its principal place of business in Philadelphia, Pennsylvania<br><br>**Alexander C. Gizis**, an individual residing in Philadelphia, Pennsylvania<br><br>Defendants. | Civil Action No. 2:26-cv-00818-GJP<br><br>VERIFIED FIRST AMENDED COMPLAINT FOR<br>1) **TEMPORARY RESTRAINING ORDER**<br>2) **PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF**<br>3) **DECLARATORY RELIEF**<br>4) **RESTITUTION**<br>5) **DAMAGES** |

## PLAINTIFF'S VERIFIED FIRST AMENDED COMPLAINT FOR

## TEMPORARY RESTRAINING ORDER,

## PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF,

## DECLARATORY RELIEF, RESTITUTION, AND DAMAGES

## Table of Contents

*I. PRELIMINARY STATEMENT* ................................................................................................ *4*

*II. JURISDICTION AND VENUE* ........................................................................................ *7*

*III. PARTIES* .............................................................................................................. *12*

*IV. FACTUAL ALLEGATIONS* ........................................................................................ *14*

    **A. The Speedify Service and the "Powered by Speedify" Router**................................**14**

    **B. The Router Is Entirely Speedify-Dependent and at Risk of Permanent Disablement** .............**15**

    **C. Plaintiff's Secure Network Is Speedify-Whitelisted and Cannot Be Reconfigured Remotely** ...**16**

    **D. Plaintiff's Purchase of the Router and Speedify Subscriptions** ................................**17**

    **E. Defendants' Marketing Representations and Plaintiff's Reliance** ...........................**18**

    **F. Technical Failures and Plaintiff's Request for Support** .........................................**22**

    **G. Plaintiff Expressly and Unequivocally Rejected Cancellation** ................................**25**

    **H. Defendants Unilaterally Deactivated the Router Plan and Falsely Claimed a "Cancellation Request"**................................................................................................**25**

    **I. Defendants Terminated a Paid Replacement Account and Blacklisted Plaintiff's Router** ........**29**

    **J. Retaliatory Escalation and the Intellectual Property Challenge** ...........................**30**

    **K. Plaintiff Gave Notice and Demanded Restoration; Defendant Gizis Refused and Asserted a Liability Cap** .........................................................................................**33**

    **L. Ongoing Harm, Irreparable Injury, and Damages** .................................................**37**

    **M. California Nexus** ...................................................................................**40**

*V. REQUEST FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTIVE RELIEF* .................................................................................................................. *43*

*VI. CLAIMS FOR RELIEF*.................................................................................... *49*

    **COUNT 1 BREACH OF CONTRACT** .....................................................................**49**

    **COUNT 2 BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**................**51**

    **COUNT 3 TRESPASS TO CHATTELS** ...................................................................**53**

    **COUNT 4 FRAUD / INTENTIONAL MISREPRESENTATION** .............................................**55**

    **COUNT 5 VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW**..........................................................................................**65**

    **COUNT 6 VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW (Cal. Bus. & Prof. Code § 17200 et seq.)** ...................................................................................**67**

    **COUNT 7 VIOLATION OF CALIFORNIA FALSE ADVERTISING LAW (Cal. Bus. & Prof. Code § 17500 et seq.)** ...................................................................................**68**

    **COUNT 8 VIOLATION OF CALIFORNIA CONSUMERS LEGAL REMEDIES ACT (Cal. Civ. Code § 1750 et seq.)** ...................................................................................**69**

    **COUNT 9 DECLARATORY RELIEF (28 U.S.C. § 2201)** ...............................................**72**

    **COUNT 10 CONVERSION** .................................................................................**72**

**COUNT 11 UNJUST ENRICHMENT (IN THE ALTERNATIVE)** ........................................................75

**COUNT 12 BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE**............77

**COUNT 13 BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**........................................79

**COUNT 14 VIOLATION OF AUSTRALIAN CONSUMER LAW** .....................................................82

*VII. PRAYER FOR RELIEF* ................................................................................. **86**

*VIII. DEMAND FOR JURY TRIAL* ....................................................................... **90**

*VERIFICATION*.................................................................................................. **92**

February 6, 2026

Plaintiff Michael Williams ("Plaintiff"), appearing *pro se*, for his Verified Complaint against Defendants Connectify, Inc. ("Connectify") and Alexander C. Gizis ("Gizis") (collectively, "Defendants"), alleges as follows:

## I. PRELIMINARY STATEMENT

1. This is an action arising from (i) Defendants' deceptive marketing and fraudulent inducement to purchase and deploy Speedify-dependent router services based on specific technical performance claims (including "Flawless Failover," "secure, uninterrupted" redundancy via duplicate packets, and multi-WAN/Starlink/router suitability) that the Service did not provide in Plaintiff's real-world router deployment, and (ii) Defendants' abrupt and wrongful termination of Plaintiff's paid Speedify services—including a false "cancellation request" pretext and apparent device-level blacklisting—and Defendants' continuing refusal to restore access to the Speedify licensing, authentication, and server access required for Plaintiff's "Powered by Speedify" router to function as marketed and intended. Defendants' misconduct has already been the subject of emergency proceedings in the Supreme Court of New South Wales, Australia, *Williams v Connectify, Inc.* [2026] NSWSC 30.

2. Immediately upon activation and use of the Router Plan on Plaintiff's "Powered by Speedify" router, the Service failed to deliver the represented redundancy and failover outcomes. In particular, in "Redundant Mode," instability on a single WAN link precipitated a Speedify bonding-tunnel reset that dropped connectivity across all links, including stable links that remained capable of carrying traffic—defeating the very "Flawless Failover" function for which Plaintiff purchased the Router Plan and deployed the Router. Plaintiff tested the Router with three (3) different Starlink dishes and ten (10) different Starlink terminals, confirming the failures were attributable to the Speedify service rather than to any particular hardware configuration, while third-party bonding providers achieved throughput exceeding 1 Gbps on the same WAN links.

3. On January 27, 2026, at 14:39:55 UTC, Defendants terminated service by unilaterally deactivating Plaintiff's Router Plan (Invoice #502472 for USD $450.00) and, one second later at 14:39:56 UTC, processing a refund (Refund Invoice #502864), while falsely stating that the deactivation was "as a follow up to your cancellation request." At 14:54:40 UTC, Defendants processed a refund for Plaintiff's Families Plan (Invoice #494648 for AUD $251.11, Refund Invoice #502873) and, one second later at 14:54:41 UTC, deactivated the Families Plan. All four deactivation and refund emails were sent by "Alex from Speedify"— Defendant Gizis—confirming his personal direction of the termination. Plaintiff had expressly and unequivocally declined cancellation in writing on January 25, 2026 in Support Ticket No. 676251, just two days earlier.

4. On or about January 28, 2026, Defendants then escalated the interference by disabling an additional paid replacement account (the "Replacement Account") created by Plaintiff's partner, effectively blacklisting Plaintiff's Miri X510 router (serial number 00A601241115008) and threatening to render the router permanently unusable. Miri Technologies' Chief Technology Officer, Ryan Brenneman, has warned Plaintiff that Defendants can make the router's serial number "dead" in Defendants' systems such that the device can never be activated again.

5. Plaintiff purchased the router and Router Plan for continuity-dependent connectivity during international travel and for time-critical communications supporting Plaintiff's California-headquartered business operations. Plaintiff's secure communications uplink and remote-management network in Sydney is configured to accept management connections only from Speedify's network (a Speedify-only allowlist), meaning that if Speedify licensing/authentication is disabled or the Router is blacklisted, Plaintiff is locked out of the only approved remote access path to administer his secure network. Because privileged reconfiguration of that uplink is gated by hardware authentication tokens in Plaintiff's sole

possession, Plaintiff cannot simply switch to another provider while overseas without physically returning to Sydney to reconfigure the uplink. Plaintiff is presently abroad in Puerto Escondido, Oaxaca, Mexico, where replacement high-end multi-WAN bonding equipment is not readily available and where reliable delivery of imported networking hardware is routinely delayed by customs and logistics. The sudden loss of bonding/failover functionality, the lockout from Plaintiff's secure management plane, and the looming risk of permanent device disablement have caused, and continue to cause, immediate and irreparable harm that cannot be adequately remedied by damages alone.

6.      Plaintiff's secure communications uplink and remote-management network are configured to accept connections only when they originate from Defendants' Speedify network. Without Speedify access, Plaintiff cannot use substitute networks to reach or administer his systems. Reconfiguring that security policy to permit other networks would require Plaintiff to return to Sydney, Australia, and use Plaintiff's hardware authentication tokens (which are in Plaintiff's sole possession) to access and safely reconfigure the uplink.

7.      Plaintiff seeks (i) a temporary restraining order and preliminary and permanent injunctive relief requiring Defendants to restore and maintain Plaintiff's Speedify service and to remove any device-level blacklist or disablement associated with Plaintiff's router, (ii) declaratory relief concerning the parties' rights and Defendants' lack of authority to remotely disable Plaintiff's paid services and device, (iii) restitution and damages, including consequential and punitive damages where permitted, and (iv) such other relief as the Court deems just and proper. Defendants have been on extensive notice of Plaintiff's urgent demand for restoration and requested injunctive relief, including approximately forty (40) written communications and preservation demands sent between January 25 and February 5, 2026. Defendants have also been served with proceedings in the Supreme Court of New South Wales, which was constituted on an emergency basis on January 30, 2026, Williams v Connectify, Inc.

[2026] NSWSC 30. Despite all of the foregoing, Defendants have refused to restore service or engage in any manner.

8. In addition to claims under Pennsylvania common law and the Declaratory Judgment Act, Plaintiff pleads claims under California consumer protection statutes because Plaintiff's closest nexus to the United States is California, where Plaintiff's business that leverages Defendants' services is headquartered and where Plaintiff has suffered and continues to suffer substantial harm from Defendants' misconduct.

## II. JURISDICTION AND VENUE

9. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(2) because Plaintiff is a citizen and domiciliary of the Commonwealth of Australia, Defendants are citizens of Delaware and Pennsylvania (upon information and belief), and the amount in controversy exceeds $75,000, exclusive of interest and costs.

10. The amount in controversy requirement is satisfied because Plaintiff seeks injunctive relief, declaratory relief, restitution, and damages including (without limitation) consequential business losses, the loss of the benefit of Plaintiff's bargain, the cost of alternative equipment and services necessary to replace the Speedify-dependent router functionality, and damages flowing from Defendants' intentional interference with Plaintiff's device and connectivity. Plaintiff's damages and the value of the requested injunctive relief exceed $75,000.

11. Without limitation, Plaintiff's categories of damages and the bases for the amount in controversy include: (a) the value of Plaintiff's "Powered by Speedify" Miri X510 router (AUD $2,725.82, approximately USD $1,700), which has been rendered effectively useless by Defendants' device-level blacklisting; (b) substantial consequential business losses, including time-critical contractual obligations and business opportunities lost or impaired as a direct result of Defendants' destruction of Plaintiff's connectivity infrastructure while Plaintiff

was traveling internationally, the amount of which is to be proven at trial; (c) the cost of alternative multi-WAN bonding equipment and services necessary to replace the Router's functionality, estimated at approximately USD $56,151 to $98,370 over ten years; (d) the value of the injunctive relief sought, including restoration of Speedify service and removal of device-level blacklisting; (e) damages for fraud, trespass to chattels, and statutory violations; and (f) punitive damages (where permitted) and treble damages under the Pennsylvania Unfair Trade Practices and Consumer Protection Law. Aggregated, these damages categories substantially exceed $75,000.

12.     This Court has personal jurisdiction over Connectify because Connectify maintains its headquarters and principal place of business in Philadelphia, Pennsylvania, within this District, and because Connectify directed the account deactivation, refund processing, and device disablement at issue from within this District.

13.     This Court has personal jurisdiction over Defendant Gizis because he is Connectify's Chief Executive Officer and, upon information and belief, resides in and/or conducts substantial business activities in this District, and because he personally participated in and directed the challenged conduct from within this District. Gizis personally intervened in Support Ticket No. 676251 on January 26, 2026, personally sent or directed the four deactivation and refund emails on January 27, 2026 (each sent by "Alex from Speedify"), personally authored and sent the termination email asserting that Defendants had "terminated the relationship" with Plaintiff, and personally directed or authorized device-level blacklisting of Plaintiff's Router.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2) because Defendants reside in this District and a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District, including Defendants' decisions,

communications, account actions, and licensing/authentication disablement originating from Philadelphia, Pennsylvania.

15. Plaintiff does not admit, and expressly disputes, that he knowingly assented to, or is bound by, Defendants' publicly posted Terms of Service, or that those Terms govern this dispute. To the extent Defendants invoke forum-selection and choice-of-law provisions in their Terms of Service, Plaintiff brings this action in the forum identified by those provisions. Connectify's publicly posted Speedify Terms of Service (effective May 28, 2014, and available at speedify.com/terms-of-service/) provide, *inter alia*, that "[t]hese Terms are governed by and construed in accordance with the laws of the State of Pennsylvania" and that "[y]ou agree to submit to the exclusive jurisdiction of any State or Federal court located in the County of Philadelphia, Pennsylvania, United States of America, and waive any jurisdictional, venue, or inconvenient forum objections to such courts." Accordingly, Plaintiff files this action in the contractually designated forum and alleges that Defendants' own forum-selection provision bars any defense of improper venue or forum non conveniens. Notably, Defendants' Terms of Service contain no mandatory arbitration clause and no class action waiver, and therefore all of Plaintiff's claims are properly before this Court.

16. and separately caps cumulative liability at "the greater of … (i) one-hundred dollars ($100); or (ii) the amount you paid Connectify for your use of the Service"; (b) the Warranty Disclaimer provides that "SERVICE IS PROVIDED ON AN 'AS IS' AND 'AS AVAILABLE' BASIS" and purports to disclaim "ALL WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION, IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE"; (c) the Termination clause provides that "Connectify reserves the right to suspend, terminate, or refuse the Service to anyone at any time for any reason"; and (d) the Limitation on Claims clause provides that "any cause of action … must be commenced within one (1) year after it accrues, or it is

permanently barred." These provisions are procedurally unconscionable because the Terms of Service constitute a standard-form adhesion contract presented to consumers on a take-it-or-leave-it basis with no opportunity for negotiation, on a scrollable webpage with no requirement that the user read or acknowledge specific clauses. They are substantively unconscionable because: (i) a $100 liability cap on services that control whether a consumer's $2,725.82 router can function is grossly disproportionate and unreasonably favorable to Defendants; (ii) the blanket termination-for-any-reason clause, combined with the device-level kill-switch capability, effectively grants Defendants the unilateral power to destroy a consumer's expensive hardware investment without cause, notice, or remedy; and (iii) the warranty disclaimer purports to disclaim the very fitness and merchantability warranties on which Defendants' own marketing and onboarding materials invited reliance. Under Pennsylvania law, a limitation-of-liability clause does not shield a party from liability for intentional torts, fraud, or statutory violations. *See Restatement (Second) of Contracts* § 195(1) (a term exempting a party from tort liability for harm caused intentionally or recklessly is unenforceable on grounds of public policy); *Valhal Corp. v. Sullivan Assocs.*, 44 F.3d 195, 202 (3d Cir. 1995) (applying Pennsylvania law; exculpatory clauses do not shield intentional or reckless misconduct); *see also* Salley v. Option One Mortg. Corp., 592 Pa. 323, 925 A.2d 115 (2007) (unconscionability analysis under Pennsylvania law).

17. To the extent any individual provision of the Terms of Service is found unconscionable or unenforceable, Plaintiff requests that the Court sever only that provision while preserving Defendants' remaining contractual obligations, including the duty to provide the service as marketed and the duty not to engage in tortious interference with Plaintiff's property. However, to the extent the combination of (a) absolute termination-for-any-reason language, (b) a $100 liability cap, (c) unilateral device-level kill-switch authority, and (d) blanket warranty disclaimers reflects an unconscionable scheme, Plaintiff requests that the

Court decline to enforce the Terms of Service framework as applied to this consumer purchase of a $2,725.82 device-dependent service, thereby permitting Plaintiff to proceed on common-law breach of contract, fraud, and tort theories independent of the Terms of Service.

18. Plaintiff further alleges that California has a substantial relationship to the transaction and to Plaintiff's injuries because Plaintiff's closest nexus to the United States is California, where Plaintiff's business operations that leverage Defendants' services are headquartered. Plaintiff pleads California statutory consumer protection claims in the alternative to the extent California law is found to apply under applicable choice-of-law principles or to the extent Defendants' misconduct and misrepresentations were directed to and had their effects in California.

19. Pursuant to Federal Rule of Civil Procedure 44.1, Plaintiff hereby gives notice of his intent to raise issues of foreign law. Specifically, Plaintiff intends to raise and rely upon the *Australian Consumer Law* ("ACL"), being Schedule 2 to the *Competition and Consumer Act 2010* (Cth) (formerly *the Trade Practices Act 1974* (Cth)), as incorporated into the law applicable to the contract between Plaintiff and Defendants. Defendants sell Speedify services and "Powered by Speedify" routers directly to Australian consumers through their website (speedify.com), accept payment in Australian dollars, and sell through Australian-based retailers including Miri Technologies Pty Ltd (an Australian company). Defendants know or ought to know that under sections 64 and 64A of the ACL, consumer guarantees provided by the ACL (including guarantees of acceptable quality under section 54, fitness for a disclosed purpose under section 55, and correspondence with description under section 56) are mandatory and cannot be excluded, restricted, or modified by any term of a contract. Any term of a contract that purports to exclude, restrict, or modify the application of the consumer guarantees is void under section 64 of the ACL. Accordingly, the ACL consumer guarantees are incorporated into the contract between Plaintiff and Defendants by operation of Australian

law, regardless of any contrary provision in Defendants' Terms of Service. Plaintiff will present the text of the relevant ACL provisions, expert testimony on Australian law if necessary, and the published decision of the Supreme Court of New South Wales in Williams v Connectify, Inc. [2026] NSWSC 30 as evidence of the applicable foreign law. This Court has authority to determine and apply foreign law under Rule 44.1 and may treat the determination of foreign law as a question of law.

### III. PARTIES

20.     Plaintiff Michael Williams is an individual who resides at Suite 1524, 50-58 Macleay Street, Elizabeth Bay NSW 2011, Australia. Plaintiff purchased Speedify services for personal connectivity, international travel, and continuity-dependent communications, including to enable bonding, redundancy, and failover functionality on his "Powered by Speedify" router.

21.     Plaintiff is also the founder and principal of a business with its United States headquarters and principal place of business in California ("Plaintiff's California Business"). Plaintiff's California Business leverages the Router and Speedify services for continuity-dependent communications and remote operations. Plaintiff's closest nexus to the United States is California.

22.     Plaintiff is the Managing Director and sole director of Glexia Pty Ltd ("Glexia"), an Australian telecommunications carrier holding Carrier Licence No. 554 issued by the Australian Communications and Media Authority (ACMA). Glexia owns and operates critical telecommunications infrastructure in Australia, including telecommunications networks, systems, and related assets that constitute critical telecommunications assets for the purposes of the Security of *Critical Infrastructure Act 2018* (Cth) (the "SOCI Act"). Glexia provides critical telecommunications and secure connectivity services to Commonwealth and State government agencies, including the Department of Foreign Affairs and Trade (DFAT),

South Australia Police, and agencies of the New South Wales Government, among others. Plaintiff and his business rely on secure, stable connectivity for operational and compliance functions, including lawful interception assistance and other regulated carrier activities, and for time-critical communications with clients and counterparties.

23. Defendant Connectify, Inc. is a corporation organized under the laws of Delaware (upon information and belief) with its headquarters and principal place of business in Philadelphia, Pennsylvania. Connectify develops, markets, sells, and operates the Speedify multi-WAN bonding and VPN service and the associated licensing, authentication, and server access required for "Powered by Speedify" routers and other devices.

24. Connectify's principal office is located at 601 Spring Garden Street, 3rd Floor, Philadelphia, Pennsylvania 19123, as confirmed by Defendants' own automated weekly usage report emails, which include the footer: "Connectify Inc. 601 Spring Garden St, 3rd Floor, Philadelphia, PA 19123 USA." Connectify's registered address is 251 Little Falls Drive, Wilmington, Delaware 19808. Upon further information and belief, Connectify has also used an office address at or about 1429 Walnut Street, Suite 201, Philadelphia, Pennsylvania 19102. Upon information and belief, Connectify is currently a defendant in *BOUNTS TECHNOLOGIES LTD. v. CONNECTIFY, INC., et al.*, Case No. 2:23-cv-00890 (E.D. Pa.),

25. Defendant Alexander C. Gizis (also known as "Alex Gizis") is Connectify's co-founder and Chief Executive Officer and, upon information and belief, resides at 430 Pine Street, Philadelphia, Pennsylvania 19106. Gizis holds a controlling equity interest in Connectify and exercises complete control over Connectify's business decisions, including decisions about customer entitlements, refunds, and account deactivation. Gizis personally authored and sent communications to Plaintiff regarding the termination, including an email dated January 27, 2026, in which he asserted that Connectify's "liability is limited to the amount you paid us, or $100 whichever is higher" and that the refund was "the end of the legal

matter." Gizis refused to reinstate service. The four deactivation and refund emails sent on January 27, 2026 were each sent by "Alex from Speedify," confirming Gizis's personal direction of the termination.

26. Gizis's contempt for Plaintiff's legal rights is further evidenced by a statement made by Gizis and communicated to Plaintiff, in which Gizis stated words to the effect that the Court should "go f— itself," which statement is admissible as a party admission under Federal Rule of Evidence 801(d)(2)(A). Upon information and belief, Gizis personally participated in, directed, authorized, and/or ratified the account terminations and device-level disabling described herein, including directing engineers and/or authorizing technical measures to specifically target and blacklist Plaintiff's router and associated account identifiers. Gizis is sued individually because he personally committed the tortious acts alleged herein, including fraud and intentional interference with Plaintiff's property. Under Pennsylvania law, a corporate officer who personally participates in tortious conduct is individually liable regardless of whether the acts were performed in a corporate capacity. *See Wicks v. Milzoco Builders, Inc.*, 503 Pa. 614, 470 A.2d 86 (1983). Gizis acted outside the scope of legitimate corporate authority and in bad faith by retaliating against a paying customer for asserting consumer and intellectual property rights, and by using the corporate form to perpetrate fraud and inflict intentional harm on Plaintiff.

### IV. FACTUAL ALLEGATIONS

**A. The Speedify Service and the "Powered by Speedify" Router**

27. Defendants market Speedify as a multi-WAN bonding and VPN product that can combine multiple Internet connections (e.g., cellular, Wi-Fi, Ethernet, satellite) and provide redundancy and seamless failover.

28.     Defendants also market and support routers described as "Powered by Speedify," which rely on Defendants' Speedify licensing, authentication, and server access for their core bonding and redundancy functions.

29.     The router at issue is a Miri X510 dual-SIM "Powered by Speedify" router bearing serial number 00A601241115008 (the "Router"). As marketed, the Router's core value proposition is the ability to bond and fail over between multiple connections using Speedify. The Router is designed and configured to use Defendants' Speedify service for its bonding and related multi-WAN functionality, and without an active Speedify Router license/subscription and ongoing Speedify authentication/server access, the Router will not deliver the bonding outcomes for which it was acquired and will not function properly for its intended bonding purpose.

**B. The Router Is Entirely Speedify-Dependent and at Risk of Permanent Disablement**

30.     On January 27, 2026 and January 28, 2026, Plaintiff exchanged email correspondence with Miri Technologies, the Router's manufacturer, using Miri's email addresses under the domain miri.tech. Plaintiff received responses from Ryan Brenneman, Chief Technology Officer of Miri Technologies, regarding the termination and Router functionality.

31.     In an email sent at 10:55 AM ET on January 27, 2026, Mr. Brenneman stated that the Router "lockup was likely to a Speedify termination based on communication with them," and that "When Speedify was turned off remotely the router had an issue." In a subsequent email sent at 11:15 AM ET on January 27, 2026, Mr. Brenneman confirmed that "the product is solely designed to work with Speedify, it really has no other function," and that after speaking with Speedify, "it appears that the S/N will be dead in their system and unable to ever be activated again."

32.    In a further email sent at 7:33 PM ET on January 28, 2026, Mr. Brenneman confirmed that "Without Speedify enabled the router will not function properly" and that "The sole purpose of the router is to run Speedify for bonding." This means Plaintiff's AUD $2,725.82 Router investment is rendered effectively useless without an active Speedify subscription, as the Router cannot perform its primary function of bonding multiple internet connections. In the same email, Mr. Brenneman offered to "have you return the router to our distributor in Australia and allow us to reimburse the cost," confirming that the Router manufacturer itself considered the device to be without meaningful value absent an active Speedify subscription.

33.    These statements confirm that Defendants' termination and device-level disabling can render Plaintiff's AUD $2,725.82 Router effectively useless for its intended purpose, even if Plaintiff is willing and able to pay for service.

**C. Plaintiff's Secure Network Is Speedify-Whitelisted and Cannot Be Reconfigured Remotely**

34.    Plaintiff's secure management network and communications uplink in Sydney is configured so that remote management access is accepted only if the connection originates from Defendants' Speedify network and/or Speedify-managed egress endpoints (a Speedify-only allowlist). All other remote-management ingress is blocked by firewall and access-control rules as a security measure.

35.    This Speedify-only configuration is intentional and security-driven. It reduces attack surface and ensures that only a known, vetted origination path can reach Plaintiff's management plane. When Defendants disabled Plaintiff's Speedify licensing/authentication and terminated paid accounts associated with the Router, Plaintiff was not merely deprived of an "internet optimization" feature; he was locked out of the only approved remote-management path to his secure network.

36. Plaintiff cannot safely modify the Speedify-only access policy from Mexico because the configuration interface and management plane are reachable only via the Speedify-uplink path that Defendants have disabled. In other words, Defendants' disablement creates a catch-22: Plaintiff cannot switch to a different provider because the act of switching would first require remote access through the very Speedify path that Defendants have disabled.

37. Plaintiff also cannot delegate the required reconfiguration to others in Sydney. The management plane is protected by multi-factor authentication that requires physical hardware security tokens. Plaintiff possesses the only such hardware tokens; there are no duplicates.

38. Accordingly, the only practical way to reconfigure the network to accept other networks would be for Plaintiff to fly back to Sydney, Australia, to perform the reconfiguration in person. This extraordinary burden underscores that "mitigation by switching providers" is not a realistic alternative within the time window relevant to emergency relief.

**D. Plaintiff's Purchase of the Router and Speedify Subscriptions**

39. On December 4, 2025, Plaintiff purchased the Router from Corsair Solutions Pty Ltd, an Australian reseller, for AUD $2,725.82, including GST and delivery. The Router was invoiced under Corsair Solutions Pty Ltd Invoice VR8MTKX8-0001 dated December 4, 2025 (product code 46011 - Miri X510 Dual-SIM router). The Router was dispatched on December 4, 2025 under Shipping Note SS-00013845 / Order Number SO-00013845 (StarTrack tracking number OTLZ50002871) and bore serial number 00A601241115008.

40. The Router was marketed and sold on the basis that (i) Speedify service and a Speedify router license/subscription were required for the Router's bonding functionality, and (ii) an initial Speedify router license/subscription was included for an initial period (approximately 90 days).

41.     On December 2, 2025, Plaintiff also purchased a separate Speedify subscription on his account described as a "Speedify Families Unlimited Three Year Subscription" for AUD $251.11 (Invoice #494648), with a term from December 2, 2025 to December 2, 2028.

42.     On or about January 25, 2026, Plaintiff purchased and paid for a Speedify router subscription plan described as "Speedify Pro Router Yearly 3000GB Subscription" (the "Router Plan") for USD $450.00 (Invoice #502472), with a stated term from January 25, 2026 to January 25, 2027.

43.     Plaintiff paid for the Router Plan through PayPal from an Australian bank account. Defendants accepted payment and activated the Router Plan on Plaintiff's Speedify account.

44.     Plaintiff purchased the Router Plan on January 25, 2026, specifically for the purpose of ensuring reliable connectivity during Plaintiff's international trip departing January 22, 2026. The Router has an included router-subscription period of 90 days that comes with the router itself. The Router Plan further extends that subscription period to another year. The timing of the purchase demonstrates Plaintiff's reliance on the Speedify service for the upcoming trip. Plaintiff purchased the Router Plan to ensure reliable bonded connectivity and redundancy during international travel and for continuity-dependent communications supporting Plaintiff's personal needs and his California-based business operations. Plaintiff's travel itinerary included business class flights (Sydney → Tokyo → Mexico City) costing AUD $13,805.30, all of which were contingent on Plaintiff having reliable connectivity during travel.

**E. Defendants' Marketing Representations and Plaintiff's Reliance**

45.     Defendants' marketing materials, website, and onboarding documentation represent that Speedify can provide seamless or "flawless" failover, redundancy, and improved stability by bonding multiple connections and by using techniques such as packet duplication.

46. For example, on or about January 24-25, 2026, immediately before purchasing the Router Plan, Plaintiff reviewed Defendants' marketing pages on Speedify.com promoting Internet failover and redundancy, which advertised "Flawless Failover" and stated that Speedify "seamlessly moves your traffic onto the working network" if one of the user's Internet connections becomes unavailable.

47. Plaintiff also reviewed Defendants' Speedify.com pages promoting "Powered by Speedify" routers, which represented that such routers can bond multiple connections together "into one stronger internet connection." These marketing materials did not clearly disclose that Defendants could remotely blacklist a specific router by serial number or device identifier, prevent activation even under a new paid subscription, and thereby disable the router's core bonding function.

48. More specifically, Defendants' marketing and onboarding materials represented (among other things) that: (a) in "Redundant Mode," Speedify provides "secure, uninterrupted" redundant Internet connectivity and "Flawless Failover," including for bandwidth-demanding and latency-sensitive applications such as streaming and live video calls, even where multiple "spotty" connections are used; (b) Redundant Mode works by sending duplicate packets across multiple connections so that data is transmitted even if one connection suffers packet loss or a temporary outage; and (c) by "smartly" splitting or distributing traffic across multiple connections, Speedify provides a "major speed boost"/"combined speed" outcome and can achieve up to approximately 95% efficiency of combined throughput in relevant conditions.

49. Defendants also represented that Speedify is suitable for real-world router environments and multi-WAN use cases (including "Powered by Speedify" routers), and that it is appropriate for multi-WAN configurations involving Starlink and other WAN links, as promoted through "Speedify for Routers" onboarding and related marketing.

50. Defendants further represented that Speedify subscriptions (including router subscriptions) were offered on a "risk-free" basis and/or with a 30-day money-back guarantee, conveying that a customer could elect to cancel if the service did not meet expectations and that cancellation/refund administration would occur with clear customer authorization and in accordance with Defendants' published assurances.

51. These performance, suitability, and refund/guarantee representations were communicated to Plaintiff (i) through Defendants' Speedify.com webpages and onboarding materials that Plaintiff accessed in Australia in December 2025 and January 2026 (including in the days immediately preceding Plaintiff's January 25, 2026 Router Plan purchase); (ii) through Defendants' automated onboarding emails, including a "Getting started with your Speedify for Families account" email sent by Defendants on December 2, 2025 at 14:56 UTC and a "Getting started with your Speedify for Routers plan" email sent by Defendants on January 25, 2026 at 05:48 UTC, both of which directed Plaintiff to "combine Starlink, 4G/5G, Wi-Fi, Ethernet, or satellite for faster, more stable internet" and to use Speedify's features for improved connectivity; and (iii) through Defendants' transactional subscription emails and support communications sent to Plaintiff at Michael.Williams@glexia.com. These onboarding emails were operational instructions, not aspirational marketing, and were sent by Defendants as part of the transactional relationship specifically to guide Plaintiff's configuration and use of the Service.

52. These representations were specific, technical, and operational claims—not mere sales puffery. Under Third Circuit precedent, a representation is non-actionable puffery only if it is "not the sort of empirically verifiable statement that [could] be affirmatively disproven." *See U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 922 (3d Cir. 1990). Conversely, specific, verifiable technical claims about software capabilities, performance metrics, or functionality are actionable misrepresentations because they are

objectively verifiable and a reasonable person could rely on them. *Cf. Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*, 946 F.3d 1040, 1050–53 (9th Cir. 2019) (holding that technical software designations employing "terminology that was substantively meaningful and verifiable in the [relevant technical] context" were actionable under the Lanham Act, not puffery).

53.     Defendants' representations satisfy this standard: (a) the claim that Redundant Mode "works by sending duplicate packets across multiple connections" is a testable, falsifiable assertion of technical functionality that is empirically verifiable by packet capture analysis; (b) the claim of "up to approximately 95% combined throughput efficiency" is a quantified performance benchmark; (c) the representation that Speedify is suitable for "Starlink" and multi-WAN router deployments is a specific use-case suitability claim, reinforced by Defendants' targeted marketing materials that state "Speedify will seamlessly failover to your other working Internet connection(s) without skipping a beat" and describe Speedify as "the only VPN that seamlessly combines all of your connections, including WiFi, 4G, 5G, Ethernet, and Starlink, into one unbreakable connection"; and (d) Defendants' own onboarding emails directed Plaintiff to "combine Starlink, 4G/5G, Wi-Fi, Ethernet, or satellite for faster, more stable internet" as an operational instruction for using the Service, not as aspirational advertising.

54.     Defendants' marketing further states that "Optional Redundant Mode sends duplicate packets across multiple links so that even if a single path fails mid-transmission, your application doesn't miss a beat" and that Speedify provides "uninterrupted web browsing, and smoother video streaming." These are not subjective opinions or generalized superlatives; they are specific technical claims about a defined mechanism (duplicate packet transmission) and a defined outcome (continued connectivity when a path fails) that can be verified or disproven through network testing. Any generalized caveat that performance "may vary" with network

conditions was insufficient to qualify the overall impression created by Defendants' absolute language (including "flawless," "uninterrupted," "unbreakable," and "seamlessly"), particularly because (i) Defendants specifically marketed Redundant Mode for use with multiple "spotty" connections and for streaming/live video calls—use cases that inherently involve fluctuating links—and (ii) no caveat disclosed the specific tunnel-reset/total-outage failure mode alleged herein, which defeats the redundancy function entirely rather than merely reducing performance.

55.     Defendants' marketing materials further represent, among other things, that Speedify can maintain connectivity when one Internet connection becomes unstable or drops, and that Speedify can be used to support continuity-dependent communications during travel.

56.     Plaintiff relied on these representations when purchasing the Router and when purchasing the Router Plan. Plaintiff purchased the Router specifically because it was marketed as "Powered by Speedify" and because Speedify licensing/authentication is required for the Router to perform its primary bonding and failover functions.

57.     Plaintiff also relied on Defendants' representations regarding subscription management and customer support, including that Defendants would not terminate paid service without cause and that subscription management would follow Plaintiff's express instructions.

**F. Technical Failures and Plaintiff's Request for Support**

58.     After purchasing the Router Plan, Plaintiff experienced serious problems with bonding and redundancy behavior on the Router, including unexpected connection drops and instability inconsistent with Defendants' marketing representations. Plaintiff tested the Router with three (3) different Starlink dishes and a total of ten (10) different Starlink terminals, and the same failures occurred in each case. By contrast, Plaintiff's Peplink bonding router and other third-party bonding providers did not exhibit the same failures and achieved throughput exceeding 1 Gbps on the same WAN links, confirming that the failure was specific to

Defendants' Speedify service and not attributable to Plaintiff's hardware or network conditions.

59. Immediately upon activation and use of Speedify on the Router in Plaintiff's intended multi-WAN router environment, Plaintiff experienced core functional failures materially inconsistent with Defendants' performance and suitability representations.

60. In particular, in "Redundant Mode" (marketed as providing "Flawless Failover" by duplicating packets across multiple connections), Plaintiff observed that when one WAN link experienced instability or brief interruptions (including link "flapping"), Speedify terminated/reset the Speedify bonding tunnel in a manner that dropped connectivity across all WAN links, including links that remained stable and otherwise operational. Instead of "seamlessly" maintaining sessions by continuing traffic over stable WAN link(s), the Service behavior caused complete outages, undermining redundancy—the very purpose for which Plaintiff purchased the Router Plan.

61. These failures occurred in circumstances where at least one WAN link remained available and capable of carrying Plaintiff's traffic, showing that the total-outage/tunnel-reset behavior was a failure of the Service's redundancy logic and tunnel management, not merely a consequence of variable network conditions.

62. Plaintiff further experienced instability and degraded performance in both "Redundant Mode" and "Speed Mode," including throughput and reliability outcomes inconsistent with Defendants' representations of a "major speed boost," "combined speed," and up to approximately 95% combined-throughput efficiency.

63. Plaintiff captured contemporaneous logs, timestamps, and comparative testing information demonstrating these failures and provided that information to Defendants in Support Ticket No. 676251. During the support exchange, on January 25, 2026 at 6:48 p.m. EST, Plaintiff informed Defendants' support representative Brian Prodoehl that Plaintiff had

tested with "three different dishes" and "10 different starlinks" and that the "same issue" persisted in all configurations, while "Peplink and other providers don't have any issue and we're getting 1gbps+ on other bonding routers." This comparative testing data was provided to Defendants within hours of Plaintiff's initial support request and demonstrated conclusively that the failures were attributable to Defendants' Speedify service, not to Plaintiff's network environment.

64. On January 25, 2026, Plaintiff opened Speedify support Ticket No. 676251 seeking technical assistance. Plaintiff provided logs, timestamps, and details and sought a fix so he could rely on the Router during international travel and for continuity-dependent communications. Plaintiff informed Defendants during these support communications of his upcoming and time-sensitive travel needs and the critical need for reliable connectivity during that period, including a further scheduled international departure on February 5, 2026 and continued travel through on or about February 8, 2026. Defendants' unilateral deactivation on January 27, 2026, occurred at a time when Plaintiff had no reasonable ability to obtain an equivalent alternative service for that travel window, as he was already in Puerto Escondido, Mexico.

65. During the support exchange, Defendants raised refund and cancellation as an option. Plaintiff did not request cancellation at that time; Plaintiff sought technical support and continued performance of the paid Router Plan.

66. In the Ticket No. 676251 exchange, Defendants' support representative Brian Prodoehl responded on January 25, 2026 at 6:46 p.m. EST by asking whether Plaintiff's three WAN links were connected to different Starlink dishes, which Plaintiff confirmed at 6:48 p.m. EST. On January 26, 2026 at 2:13 p.m. EST, Defendant Gizis personally intervened in the support thread and presented Plaintiff with a binary ultimatum: either "continue troubleshooting" in a "professiional manner" [sic] or accept "a full refund." Gizis invoked

Defendants' "30 day money-back guarantee" and stated that "Our support team does its best work through collaborative, solution-focused communication, and that's the only way that we can make real progress." Plaintiff responded on January 26, 2026 at 3:31 p.m. EST, stating that Plaintiff would "remain available to troubleshoot the issue" but that "the product just does not work—it's always slower on the network, is not fit for purpose and generally completely unsatisfactory." Despite Plaintiff's clear expression of intent to continue troubleshooting and his equally clear expression of dissatisfaction with the product, Defendants unilaterally deactivated Plaintiff's service the following day. Defendants did not provide Plaintiff a timely or effective technical fix or a clear timeframe for remedy despite being provided logs and timestamps, even though Plaintiff explained that he needed the Router to work reliably during imminent and ongoing travel.

**G. Plaintiff Expressly and Unequivocally Rejected Cancellation**

67. In the Ticket No. 676251 exchange, Plaintiff expressly instructed Defendants not to cancel the Router Plan. Plaintiff wrote: "Ok no I will keep the router license then thank you. I didn't know it would stop working."

68. Plaintiff's instruction was clear, contemporaneous, and provided in writing. Plaintiff continued to rely on Defendants to maintain and provide the paid Router Plan while troubleshooting was ongoing.

69. Plaintiff's express rejection of cancellation was also reasonable because the Router depends on Speedify licensing/authentication for its primary function and Plaintiff required the Router for imminent and ongoing travel connectivity.

**H. Defendants Unilaterally Deactivated the Router Plan and Falsely Claimed a "Cancellation Request"**

70. On January 27, 2026, Defendants sent Plaintiff two separate deactivation emails and two separate refund emails in rapid succession. At 14:39:55 UTC, Defendants sent an email

stating that Plaintiff's "Speedify Pro Router Yearly 3000GB Subscription plan has been deactivated" and that the deactivation occurred "as a follow up to your cancellation request." At 14:39:56 UTC (one second later), Defendants sent a refund confirmation for the Router Plan. At 14:54:40 UTC, Defendants sent a refund confirmation for the Families Plan. At 14:54:41 UTC, Defendants sent a deactivation email for the "Speedify Families Unlimited Three Year Subscription" plan, also stating it occurred "as a follow up to your cancellation request." All four emails were sent by "Alex from Speedify" through Defendants' support system, confirming that Defendant Gizis personally directed the deactivation and refund of both plans.

71. The "cancellation request" language was communicated to Plaintiff by Defendants through Defendants' customer-support and/or subscription-billing email systems to Plaintiff's account email address (Michael.Williams@glexia.com) on January 27, 2026 at 14:39:55 UTC (Refund Invoice #502864) and 14:54:40 UTC (Refund Invoice #502873). This statement was material because it purported to explain and justify the unauthorized deactivation, and was designed to induce Plaintiff to accept the refund as a voluntary, customer-initiated transaction. Plaintiff reasonably relied on this as the only stated basis for the otherwise unexplained termination occurring only two days after Plaintiff's explicit written rejection of cancellation.

72. Defendants' Terms of Service state that subscriptions may be cancelled at any time by using the link provided in the fulfillment email received after purchase (from "Speedify Support") or by contacting support@speedify.com. Defendants' published support documentation further instructs that subscriptions can be managed through Defendants' Subscription Management Portal (my.speedify.com), and that if a customer cancels automatic renewal, the customer can still use the subscription until it expires.

73. Plaintiff did not cancel the Router Plan or the Families Plan using any cancellation link, any portal function, or any email request to support@speedify.com. Plaintiff did not authorize any third party to cancel on his behalf. Instead, on January 25, 2026, Plaintiff expressly and unequivocally rejected cancellation in Ticket No. 676251 and instructed Defendants to keep the router license active.

74. Plaintiff repeatedly demanded that Defendants identify the purported "cancellation request" and produce any record of it in Plaintiff's written communications of January 29, 2026 onwards. Defendants have not identified, produced, or acknowledged any such record. To the contrary, Plaintiff possesses the contemporaneous support ticket records from January 25–26, 2026 in Support Ticket No. 676251, which remain accessible to both parties through Defendants' support portal (my.speedify.com). That ticket contains only Plaintiff's express written rejection of cancellation ("Ok no I will keep the router license then thank you") and contains no cancellation request, no authorization for refund, and no instruction to terminate service. Defendants' failure to identify any cancellation request when repeatedly demanded to do so, combined with the complete absence of any such request from the support-ticket record, establishes that the "cancellation request" statement was knowingly false.

75. Defendants' own refund policy and Terms of Service state that refunds within the first 30 days are issued to account holders who voluntarily cancel and/or upon a customer request to support@speedify.com. By issuing refund invoices and telling Plaintiff that deactivation occurred "as a follow up to your cancellation request," Defendants represented that Plaintiff voluntarily requested cancellation and a refund. That representation was false.

76. To the extent Defendants now contend that the deactivation was for "unreasonable use" or a "violation" of the Terms, Defendants provided no notice of any violation, never identified any prohibited conduct, and (consistent with their stated refund

policy) issued refunds rather than withholding them. Defendants' Terms of Service state that if an account is terminated for violation of the Terms, no refund will be issued for any remaining balance or unused subscription. Defendants cannot manufacture a post hoc "violation" rationale that contradicts Defendants' own cancellation-request communications and refund processing.

77.     The statement that Plaintiff requested cancellation was false. Plaintiff had made no cancellation request. To the contrary, Plaintiff had expressly instructed Defendants to keep the router license and not to cancel.

78.     Plaintiff's explicit rejection of cancellation is confirmed by contemporaneous email evidence. On January 25, 2026, at 3:14 p.m. EST, in response to a Speedify Support representative (Vojislav H.) explaining the router license structure, Plaintiff replied via the support ticket system: "Ok no I will keep the router license then thank you. I didn't know it would stop working." This unambiguous statement—expressing Plaintiff's clear intent to retain the router license—was made in writing through Defendants' own support system and was available to Defendants at all relevant times. Defendants nevertheless proceeded to deactivate Plaintiff's Router Plan two days later and falsely claimed Plaintiff had requested cancellation.

79.     Defendants processed a refund for the USD $450.00 Router Plan (Refund Invoice #502864) and deactivated Plaintiff's Router Plan. Defendants also processed a refund for the AUD $251.11 Families Plan (Refund Invoice #502873) and deactivated that plan.

80.     Plaintiff did not solicit, authorize, or accept these refunds as settlement of any claim. On February 1, 2026, Plaintiff sent Defendants a formal demand letter expressly stating: "A refund does not cure device impairment, device-level deactivation, or blacklisting—and it does not excuse disabling a device marketed as 'Powered by Speedify.'" Plaintiff has consistently and affirmatively rejected the refunds as inadequate and has demanded restoration

of service in over forty (40) written communications between January 27, 2026 and the date of this filing

81. Following the deactivation, Speedify ceased functioning on Plaintiff's Router. Plaintiff immediately lost the Router's bonding and redundancy capabilities and suffered degraded connectivity and disruption.

82. Plaintiff promptly objected in writing that he had not requested cancellation, that Defendants' "cancellation request" statement was false, and that the termination was causing severe interruption. Plaintiff demanded immediate reinstatement.

**I. Defendants Terminated a Paid Replacement Account and Blacklisted Plaintiff's Router**

83. After Defendants terminated Plaintiff's account, Plaintiff's partner created a new Speedify account in their name. Defendants' own system generated a verification code for the new account at 15:27:23 UTC on January 27, 2026—less than one hour after Defendants' deactivation of Plaintiff's accounts. Plaintiff's partner purchased a new prepaid subscription so that Plaintiff could continue to use the Speedify service on the Router during his critical travel period (the "Replacement Account").

84. Plaintiff's partner created the Replacement Account at Plaintiff's direction and solely to restore Speedify service for Plaintiff's Router during Plaintiff's critical travel period. Plaintiff is the intended user and intended third-party beneficiary of the Replacement Account and has a direct property interest in the Router that Defendants targeted by disabling Speedify activation on that Router.

85. On information and belief, Defendants were able to identify and disable the Replacement Account only because Defendants tracked the Router's serial number and/or device identifiers, and Defendants took account-level and/or device-level actions designed to prevent Speedify from being used on Plaintiff's Router regardless of which paying account

attempted activation. This device-targeting is uniquely within Defendants' knowledge and control.

86. Despite the Replacement Account being a fresh paid subscription, Defendants also terminated and deactivated the Replacement Account without cause, without providing any valid reason, notice, or process, thereby again depriving Plaintiff of access to the Service and preventing Plaintiff from using Speedify on the Router even through a separate paid account.

87. On information and belief, based on the timing, targeting specificity, and technological facts available to Plaintiff, Defendant Gizis directed engineers and/or authorized technical measures (including writing, implementing, and deploying code specific to Plaintiff's Router's serial number and/or device identifiers) to specifically target and blacklist Plaintiff's Router (serial number 00A601241115008) and/or associated account identifiers. This inference is supported by: (1) Timing: The Replacement Account, created by Plaintiff's partner at 15:27:23 UTC on January 27, 2026—less than one hour after Defendants' termination of Plaintiff's primary account at 14:54:40 UTC—was itself terminated without notice or stated cause; (2) Targeting Specificity: Defendants' ability to identify and disable the Replacement Account within 48 hours suggests device-level or serial-number-level targeting rather than account-level responses; and (3) Technological Confirmation: Miri Technologies' CTO Ryan Brenneman confirmed that Defendants can make the Router's serial number "dead" in Defendants' systems and "unable to ever be activated again," evidencing the technical capability for device-level serial-number targeting. Defendants' implementation of such targeting against Plaintiff's Router, knowing it is specialized single-purpose "Powered by Speedify" hardware, constitutes intentional and targeted interference designed to maximize Plaintiff's disruption while traveling internationally.

**J. Retaliatory Escalation and the Intellectual Property Challenge**

88. The timeline of Defendants' actions reveals a pattern of deliberate retaliatory escalation directed personally by Defendant Gizis. On January 25, 2026, Plaintiff contacted Defendants via Support Ticket No. 676251, reporting technical failures and expressly refusing cancellation. On January 26, 2026, at 2:13 p.m. EST, Defendant Gizis personally intervened in the support thread and presented Plaintiff with a binary ultimatum: either "continue troubleshooting" in a "professiional manner" [sic] or accept "a full refund." Plaintiff responded at 3:31 p.m. EST on the same day, stating that "the product just does not work" and that Plaintiff would "remain available to troubleshoot the issue"—thereby expressly declining cancellation while reserving all rights. Rather than continuing to address the technical issues, Defendants responded the next day, January 27, 2026, by unilaterally deactivating Plaintiff's Router Plan at 14:39:55 UTC and falsely claiming Plaintiff had requested cancellation. When Plaintiff immediately objected and demanded restoration—including by sending urgent messages directly to Defendant Gizis via email (to agizis@connectify.me), SMS (to +1 215 776 1321), and WhatsApp, explaining that Plaintiff was traveling internationally and needed to attend to urgent matters requiring reliable internet connectivity—Defendants escalated further by terminating the separately purchased Replacement Account on January 28, 2026, and blacklisting Plaintiff's Router at the device level.

89. On information and belief, Defendant Gizis received and read Plaintiff's urgent messages before directing or authorizing the termination of the Replacement Account and the device-level blacklisting of Plaintiff's Router. Gizis's decision to escalate from account-level deactivation to device-level blacklisting—after receiving Plaintiff's urgent communications about the critical need for continued service while traveling—demonstrates that the deactivation was not a routine business decision but was instead an intentional and retaliatory act designed to punish Plaintiff for asserting his contractual rights and to coerce Plaintiff into accepting the unauthorized cancellation and refund as final.

90. The retaliatory motive is further established by the temporal nexus between Plaintiff's assertion of intellectual property rights against Defendants and the escalation of Defendants' punitive conduct. On January 27, 2026—the same day Defendants unilaterally deactivated Plaintiff's accounts—Plaintiff sent Defendants a formal Notice of Intent to File USPTO Proceedings to Cancel Trademark Registrations and Challenge Patent Applications/Patents, identifying four Connectify/Speedify trademark registrations (CONNECTIFY, Serial No. 77875182; SPEEDIFY, Serial No. 86310220; Serial No. 86758552; and PINGIFY, Serial No. 88818793) and over seventy (70) Connectify patent assets for cancellation, invalidation, or challenge on grounds including bad faith, material misrepresentations to the USPTO, lack of bona fide intent to use, and improper ownership. This notice was sent to Defendants at uspto@connectify.me, to their attorney Kamran Emdadi at kamran.emdadi@gmail.com, and directly to Defendant Gizis at agizis@connectify.me.

91. Defendant Gizis's response to Plaintiff's intellectual property challenge and service complaints was not to address the merits of either dispute, but to retaliate. On January 27, 2026, at 11:06 a.m. EST, Gizis personally emailed Plaintiff through the Speedify support system stating: that Defendants had issued refunds, that "this is the end of the legal matter," and that "Your decision to contact company employees on their unlisted personal phones and threatening liens against their homes has ended our relationship." Gizis further stated "do not contact us again" and "We will not be responding to any further communications." Gizis also included gratuitous personal attacks unrelated to any legitimate business purpose, including the statement: "We are also not interested in your help in operating a vehicle without valid inspection, but thank you for the offer." This email confirms that Gizis was personally motivated by anger at Plaintiff's assertion of his rights—both his consumer rights and his intellectual property rights—and that the deactivation was a deliberate act of retaliation, not a routine business decision.

**K. Plaintiff Gave Notice and Demanded Restoration; Defendant Gizis Refused and Asserted a Liability Cap**

92. Between January 25, 2026, and the filing of this Complaint, Plaintiff sent Defendants (and, where known, Defendants' counsel) more than thirty (30) emails and other written messages demanding restoration of the paid Speedify services, warning of imminent and ongoing harm, and advising that Plaintiff would seek emergency injunctive relief if Defendants refused to restore access. On January 29, 2026, Plaintiff sent an urgent written demand to Defendants and their representatives, advising that Plaintiff faced substantial and ongoing consequential business losses due to the destruction of Plaintiff's connectivity infrastructure while traveling internationally, including time-critical contractual obligations that could not be performed without the Speedify-dependent connectivity. The urgent demand was sent by multiple channels as follows: (a) email sent to agizis@connectify.me (Mr. Alexander C. Gizis, CEO); (b) email sent to support@speedify.com (Speedify/Connectify support); (c) email sent to uspto@connectify.me (Connectify/Speedify legal address); (d) email sent to kamran.emdadi@gmail.com (Attorney of Record for Connectify/Speedify); (e) text message (SMS) sent to +1 215 776 1321 (Mr. Alexander C. Gizis, CEO); and (f) WhatsApp message sent to +1 215 776 1321 (Mr. Alexander C. Gizis, CEO). Plaintiff's email software indicates that the urgent demand letter/email was opened/read at least sixteen (16) times by recipients after it was sent.

93. Plaintiff explained that the matter was urgent, that Plaintiff required restoration of service to prevent substantial losses of up to USD $200,000 over the next 48 hours, and that Plaintiff intended to pursue legal remedies including emergency injunctive relief (including on an interim basis without further notice if necessary) if Defendants did not promptly reinstate access within two hours. Plaintiff also directed the preservation of all evidence related to the matter.

94. On January 27, 2026, Defendant Gizis personally emailed Plaintiff (from agizis@connectify.me) stating, among other things, that Connectify had "terminated the relationship," that Defendants would not reinstate Speedify service, and that Defendants' "liability is limited to the amount you paid us, or $100 whichever is higher." Gizis further asserted that the refund was "the end of the legal matter" and directed Plaintiff not to contact Defendants again.

95. Defendants have not provided a legitimate basis for the false "cancellation request" statement or for the device-level targeting that prevents Plaintiff from using Speedify on the Router through any paid account. When Plaintiff attempted to engage Defendants' outside counsel, Kevin Casey of Stradley Ronon Stevens & Young, LLP (who is the attorney of record for Defendants in the BOUNTS TECHNOLOGIES matter), Plaintiff received an auto-reply stating that Mr. Casey was "no longer with the firm" and directing correspondence to Erik Melendez. Defendants have not identified any replacement counsel or provided any channel through which Plaintiff could engage in a meet-and-confer process.

96. The retaliatory nature of Defendants' conduct is further evidenced by the sequence and escalation of events: (a) Plaintiff reported a legitimate technical issue and expressly refused cancellation; (b) Defendants responded not by addressing the technical issue but by deactivating Plaintiff's service and fabricating a "cancellation request"; (c) when Plaintiff contacted Defendant Gizis personally—via email to agizis@connectify.me, SMS to +1 215 776 1321, and WhatsApp—urgently explaining that he needed to attend to critical business matters requiring uninterrupted internet connectivity, Defendants responded by terminating the Replacement Account and implementing device-level blacklisting to ensure Plaintiff could not restore service through any means; and (d) Defendant Gizis personally communicated that the "relationship" was terminated, asserted a purported liability cap, and directed Plaintiff not to contact Defendants again. This pattern is consistent with intentional

retaliation against a consumer who refused to acquiesce in the unauthorized cancellation of his paid services.

97. Defendant Gizis's personal involvement in the deactivation decisions—including his personal email to Plaintiff, his assertion of a purported liability cap, and his directive that Plaintiff cease contact—further demonstrates that the deactivation was not an automated or routine system action but a deliberate, personally directed decision made with full knowledge of the urgent harm it would cause to Plaintiff. Defendants' refusal to restore service even after receiving Plaintiff's multiple urgent communications detailing imminent losses of up to USD $200,000 and threatened legal action confirms that Defendants acted with willful indifference to, or deliberate intent to cause, harm to Plaintiff.

98. Defendants' pattern of deliberate non-engagement and stonewalling is documented in the extensive communications record. Between January 25, 2026 and the filing of this Complaint, Plaintiff sent the following written communications to Defendants, all of which were ignored or met only with Gizis's single retaliatory email of January 27, 2026: (a) January 25, 2026: Support Ticket No. 676251 reporting technical failures, providing diagnostic logs, and expressly rejecting cancellation; (b) January 25, 2026, at 7:24 p.m. EST: formal preservation notice and detailed demand letter sent by email; (c) January 26, 2026: follow-up emails continuing troubleshooting and reiterating that Plaintiff did not want cancellation; (d) January 27, 2026: Notice of Intent to File USPTO Proceedings to Cancel Trademarks and Challenge Patents, sent to Defendants at five (5) separate email addresses; (e) January 27, 2026: follow-up to the USPTO Notice, warning Defendants of the scope of intended proceedings; (f) January 29, 2026: urgent demand for restoration sent via six (6) channels including email to agizis@connectify.me, support@speedify.com, uspto@connectify.me, kamran.emdadi@gmail.com, SMS to +1 215 776 1321, and WhatsApp to +1 215 776 1321; (f-1) January 30, 2026: Speedify Support Ticket No. 677473 filed through Defendants' own

support system seeking resolution; (f-2) January 31, 2026: Speedify Support Ticket No. 677765 filed through Defendants' own support system seeking resolution (neither ticket received a substantive response from Defendants); (g) January 30, 2026: service of NSW Supreme Court Statement of Claim, Notice of Motion, Affidavit, and submissions; (h) January 30, 2026: notification that the Supreme Court of NSW was being constituted on an emergency basis (including outside normal court hours) to hear Plaintiff's application; (i) January 31, 2026: service of sealed Supreme Court documents pursuant to Court Orders, sent to Defendants' legal department, Gizis, Ashery (Chief Counsel), and all Connectify employees; (j) January 31, 2026: follow-up to Ashery requesting confirmation of service and legal representative details; (k) February 1, 2026: second follow-up to Ashery; (l) February 2, 2026: FINAL DEMAND AND NOTICE OF BAD-FAITH NON-ENGAGEMENT, sent to six (6) email addresses including Defendants' counsel, with a deadline of February 4, 2026; (m) February 3, 2026: follow-up regarding the IP notice and request for Australian legal representative details; (n) February 4, 2026: service of the confirmed USPTO Petition for Cancellation (ESTTA1494742); (o) February 4, 2026: service of the published Supreme Court of NSW decision, Williams v Connectify, Inc. [2026] NSWSC 30; and (p) February 5, 2026: formal Pre-Suit Notice under the California Consumers Legal Remedies Act (Cal. Civ. Code § 1782(a)), sent to six (6) recipients including Defendants' CEO, legal department, support, outside counsel, and Chief Counsel, accompanied by a copy of this Verified Complaint.

99. Despite receiving approximately forty (40) separate written communications across multiple channels—including email, SMS, WhatsApp, formal legal notices, and court filings—Defendants have not provided a single substantive response to any of Plaintiff's demands for restoration of service, have not engaged in any meet-and-confer discussions, have not provided contact information for legal representatives as repeatedly requested, and have not acknowledged or responded to the Supreme Court of NSW proceedings, the USPTO

Petition for Cancellation, or Plaintiff's Final Demand. The sole substantive communication from Defendants since January 27, 2026 has been a message from Defendant Gizis, relayed to Plaintiff, in which Gizis stated words to the effect that the Court should "go f— itself."[1] On February 1, 2026, at 10:41 p.m. UTC, Plaintiff emailed Defendants stating: "Given your nonresponse and Mr Gizis' message to tell the Court to go 'f— itself', we are in the process of submitting an emergency motion to the US District Court for the E.D. of PA." This wholesale refusal to engage with Plaintiff's legitimate grievances, legal proceedings, and court orders—combined with Defendant Gizis's contemptuous and profane disregard for judicial authority—confirms that Defendants' conduct is willful, deliberate, and undertaken in bad faith.

**L. Ongoing Harm, Irreparable Injury, and Damages**

100. Plaintiff's harm is immediate and ongoing. As of the date of this Complaint, Plaintiff is traveling internationally and is presently located in Puerto Escondido, Oaxaca, Mexico. When Speedify licensing/authentication is disabled, Plaintiff loses the Router's bonded redundancy/failover functionality and suffers outages and instability at critical times. Defendants' termination caused the Router to crash or lock up on two separate occasions: first on or about January 27, 2026, in connection with the termination/deactivation of Plaintiff's Router Subscription Upgrade, and again on or about January 28, 2026, in connection with the termination/disablement of the Replacement Account. The extent of Plaintiff's active reliance on and dependence upon Defendants' Speedify service is demonstrated by Defendants' own automated weekly usage reports. In the week ending February 1, 2026—the week immediately following Defendants' termination—Plaintiff's primary account (Michael.Williams@glexia.com) recorded 27 GB of data transferred (99.96% bonded), 45 hours of total connected time, 46 failover saves, and 253 stream saves across 6 streams or calls. A secondary account (michael@glexia.com) recorded an additional 17 GB of data (99.97%

---

[1] Out of respect to the Court, Plaintiff has redacted the actual explicative.

bonded), 40.3 hours of connected time, 42 failover saves, and 86 stream saves across 3 streams or calls. Combined, Plaintiff transferred 44 GB of data, was connected for 85.3 hours, experienced 88 failover events where Speedify prevented outages, and had 339 streaming interventions in a single week. These Defendants-generated metrics confirm that Plaintiff was an exceptionally heavy, active, and continuous user of Speedify services and that the service termination caused immediate, measurable disruption to Plaintiff's real-world connectivity. The high volume of data and failover events reflects the nature of multi-WAN redundancy during international travel—where the Router continuously bonds and fails over between multiple cellular and Wi-Fi connections as Plaintiff moves between locations—rather than the volume or nature of any business activity. These usage patterns are consistent with a personal traveler maintaining reliable connectivity for personal communications, navigation, video calls with family and associates, personal banking, and streaming, compounded by the multi-link architecture that inherently generates higher data throughput and more frequent failover events than a single-connection consumer device. Moreover, the Router is a personal access device— purchased by Plaintiff as an individual consumer for personal connectivity—that Plaintiff may incidentally use to reach business systems, just as a consumer's personal automobile does not become a commercial vehicle because the consumer drives it to work, and a consumer's personal laptop does not become enterprise equipment because the consumer uses it to access an employer's systems via remote desktop or VPN. The character of the device and the purchase is determined by the nature of the acquisition and the primary purpose of the consumer, not by the content that traverses the connection.

101. The harm is not fully compensable by a refund of subscription fees. Defendants' conduct deprives Plaintiff of the benefit of his bargain and threatens to permanently disable the Router by making the serial number "dead" in Defendants' systems.

102. Plaintiff faces imminent, quantifiable business loss. In his January 29, 2026 urgent demand, Plaintiff advised Defendants that he faced substantial and ongoing consequential business losses due to Defendants' destruction of Plaintiff's connectivity infrastructure. This includes time-critical commitments such as a contract obtained on January 20, 2026 to provide pre-filing expert testimony in a United States matter, which requires reliable connectivity for performance. The destruction of Plaintiff's Speedify-dependent connectivity infrastructure during international travel has impaired Plaintiff's ability to perform existing contractual obligations and to pursue business opportunities requiring secure, reliable remote connectivity. Plaintiff is prepared to submit corroborating documentation, including the relevant contracts and/or declarations from counterparties, under seal or subject to a protective order if necessary, to quantify these losses for the Court.

103. Plaintiff also faces substantial mitigation costs because the Router is a specialized device provisioned to access Plaintiff's secure management network, including the secure configuration, device identity, routing, and access-control policies required to reach that network. Plaintiff's network is configured to accept and trust remote-management connections only when they originate from Defendants' Speedify network, so Defendants' disablement cuts off Plaintiff's ability to access and administer his own systems through alternative networks. Replacing the Router's bonded connectivity capabilities mid-travel would require new equipment, time-consuming reconfiguration, and potentially new service contracts. In addition, because Plaintiff is presently located in Puerto Escondido, Oaxaca, Mexico, high-quality multi-WAN bonding routers (including Peplink devices) are not available for local purchase and cannot be reliably delivered on short notice; shipments of specialized networking equipment into Mexico are subject to unpredictable customs holds and logistical delays, and any delivery to Plaintiff's present location would take weeks. Accordingly, "buying a substitute router" is not a realistic mitigation measure within the time window relevant to emergency relief. Plaintiff

has identified that an alternative portable multi-WAN bonding router solution could cost approximately USD $56,151 to $98,370 over ten years, compared to Plaintiff's Router Subscription Upgrade price of USD $450.00 per year.

104. Plaintiff has also suffered and continues to suffer consequential damages including, but not limited to: (a) disruption to time-sensitive communications and reputational harm from missed or degraded business interactions; (b) the cost of purchasing and configuring alternative bonding and failover connectivity equipment to replace the functionality that Defendants unilaterally disabled, estimated at no less than AUD $3,500.00; (c) the cost of filing and prosecuting emergency proceedings in the Supreme Court of New South Wales (Case No. 2026/00043842), including filing fees, service costs, and associated expenses; (d) diversion of Plaintiff's time and labor from revenue-generating business operations to troubleshooting, corresponding with Defendants, and preparing legal proceedings across multiple jurisdictions, during which Plaintiff was unable to devote full attention to Glexia's clients and contractual obligations; and (e) the risk of forfeiture of AUD $7,981.06 in non-refundable international airfare (ANA Business Class, Mexico City–Tokyo–Sydney, departing February 8, 2026) if connectivity is not restored before departure.

105. Plaintiff is willing and able to pay for Speedify service and, if necessary, to repay refunded amounts immediately. Plaintiff does not seek "free" service; Plaintiff seeks restoration of the paid service and removal of any device-level disablement pending adjudication.

**M. California Nexus**

106. Plaintiff's closest nexus to the United States is California. Plaintiff's U.S.-based business operations that leverage Defendants' services are headquartered in California and depend on reliable, continuity-focused connectivity. More specifically, Plaintiff's California Business (as defined in Paragraph 19) is the operational hub through which Plaintiff conducts

business activities in the United States, including continuity-dependent communications and remote management of Plaintiff's telecommunications infrastructure. The disrupted contractual obligations included contracts with California-based counterparties that were to be performed through Plaintiff's California Business, and the consequential business losses flowed directly to and through Plaintiff's California operations. Defendants' marketing was specifically directed at California consumers: Defendants maintain an interactive website (Speedify.com) and online subscription platform that solicits, processes, and fulfills subscriptions from California consumers; Defendants' marketing specifically targets Starlink users—a demographic concentrated in rural areas of California and other western states; Defendants' Speedify.com website is accessible in California and actively solicits California consumers; Defendants advertise on platforms with substantial California audiences, including technology review sites and social media; Defendants' "Speedify for Routers" and "Powered by Speedify" marketing materials are directed at the California market through partnerships with router manufacturers that distribute in California; and the Speedify service infrastructure routes California-based users through servers that serve California consumers. Plaintiff has suffered injury in fact and has lost money and property as a result of Defendants' unfair competition, including the loss of the benefit of Plaintiff's bargain for the Router Plan and Families Plan, the impairment of the Router's value, and the disruption of California-based business operations and time-critical California-based contractual obligations.

107. Defendants market and sell Speedify subscriptions throughout the United States, including to consumers and businesses in California, through an interactive website and online subscription platform.

108. Defendants' wrongful termination of Plaintiff's service foreseeably and directly harmed Plaintiff's California-based operations and relationships by disrupting connectivity-dependent communications and remote access needed to conduct business.

February 6, 2026

109. California law applies to Plaintiff's California statutory claims because: (a) Plaintiff's California Business is the operational hub through which Plaintiff conducts United States business activities, and the injury to Plaintiff's California operations establishes standing under Proposition 64 and *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 322 (2011) ("lost money or property" requirement); (b) Defendants' marketing conduct was specifically directed at and received by California consumers through California-accessible websites, California-targeted advertising, and California distribution channels; (c) the "governmental interest" analysis under Pennsylvania choice-of-law rules (*Griffith v. United Air Lines, Inc.*, 416 Pa. 1, 203 A.2d 796 (1964)) favors application of California law because California has a materially greater interest in protecting consumers from deceptive marketing directed at its residents than Pennsylvania has in shielding its own domiciliaries from the consumer-protection laws of the states into which they direct their commercial activity—particularly where, as here, Defendants affirmatively targeted California consumers through California-accessible advertising, California distribution partnerships, and server infrastructure serving California users, and where the resulting injury was felt in California through disruption to Plaintiff's California business operations and California-based contractual relationships; (d) under the "false conflicts" branch of the Griffith analysis, there is no true conflict because both Pennsylvania and California have strong consumer-protection policies that prohibit deceptive marketing practices, and applying California law to California-directed conduct does not undermine any legitimate Pennsylvania interest—Pennsylvania's interest is in regulating the conduct of its domiciliary businesses, not in immunizing them from sister-state consumer protection laws when they affirmatively direct commercial activity into those states, and California's interest in protecting the integrity of its consumer marketplace from deceptive practices is at its apex when a defendant's marketing specifically targets California consumers through California-accessible channels and California distribution partnerships; (e) the "contact-counting" factors

of *Restatement (Second) of Conflict of Laws* § 148 (applicable to fraud and misrepresentation claims) weigh in favor of California because the place where Plaintiff received and relied upon Defendants' representations for purposes of Plaintiff's United States business operations was California, the place where the resulting injury to Plaintiff's business was felt was California, and Defendants directed their marketing into California through California-accessible websites, California-based distribution partners, and server infrastructure serving California users; and (f) although Defendants' Terms of Service contain a general Pennsylvania governing-law clause (see ¶ 15), such a clause does not override California's mandatory statutory consumer protections as applied to California-directed conduct—California courts have consistently held that the CLRA, UCL, and FAL may not be waived by contract (Cal. Civ. Code § 1751; *Discover Bank v. Superior Court*, 36 Cal. 4th 148, 175–76 (2005))—and Plaintiff does not concede that any such clause would govern statutory consumer protection claims in any event. Defendants' marketing and subscription practices, misrepresentations, and retaliatory account termination constitute unlawful, unfair, and deceptive acts and practices prohibited by California consumer protection statutes, including the Unfair Competition Law, False Advertising Law, and Consumers Legal Remedies Act.

## V. REQUEST FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTIVE RELIEF

110.    Plaintiff seeks immediate temporary and preliminary injunctive relief under Federal Rule of Civil Procedure 65 because Defendants' ongoing refusal to restore Speedify licensing/authentication and their apparent device-level blacklisting threaten to permanently deprive Plaintiff of the use of his Router and to continue causing serious, time-sensitive harm.

111.    Plaintiff will, after filing and docketing of this complaint, submit a motion for a temporary restraining order, preliminary injunction, proposed orders, a certificate of service, affidavit of fact, and a memorandum of law in support of the aforementioned. For the Court's

convenience only, Plaintiff briefly outlines his basis for injunctive relief below which will be expounded upon in subsequent submissions.

112. Requested emergency relief. Plaintiff requests a temporary restraining order and preliminary injunction directing Defendants to: (a) cease and desist from interfering with Plaintiff's Router (serial number 00A601241115008) and cease withholding the Speedify licensing, authentication, and server access that Plaintiff has paid for and that is required for the Router to function as designed, which necessarily requires Defendants to restore active Speedify router licensing/authentication and server access for Plaintiff's Router and/or reactivate Plaintiff's Router Plan (Invoice #502472) or equivalent router plan; (b) cease maintaining any device-level blacklist, serial-number disablement, or other restriction that prevents activation of the Router through a paid subscription, and remove any such restriction currently in effect; (c) cease and desist from further suspending, terminating, refunding, or otherwise interfering with Plaintiff's paid access and the Router's functionality during the pendency of this action; and (d) preserve all evidence relating to the deactivations, refunds, and any device-level targeting. The relief sought is primarily prohibitory in nature: Plaintiff asks the Court to order Defendants to stop their ongoing interference with Plaintiff's paid service and property. The restorative aspects of the requested relief are the natural and necessary consequence of ceasing that interference, as Defendants' own systems will restore service once Defendants cease actively blocking Plaintiff's Router. Even if the Court were to characterize any aspect of the requested relief as a mandatory injunction subject to a heightened standard, Plaintiff satisfies that standard because the facts and law clearly favor Plaintiff (Defendants terminated service on a demonstrably false pretext, implemented retaliatory device-level blacklisting, and are actively destroying the value of Plaintiff's $2,725.82 hardware investment), the denial of relief would result in extreme or very serious damage to Plaintiff (permanent destruction of a specialized router mid-international-travel with no available

substitute), and the balance of hardships and the public interest strongly favor Plaintiff. *See Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, 774 F.3d 192, 197 (3d Cir. 2014) (mandatory preliminary injunctions require a heightened showing that the facts and law clearly favor the movant).

113. Irreparable harm. The Router is a specialized "Powered by Speedify" device whose core function depends on Defendants' licensing/authentication. Monetary damages alone cannot restore continuity-dependent connectivity during Plaintiff's ongoing travel or unwind the disruption to time-sensitive communications. Moreover, Plaintiff's secure management network is configured to accept remote-access and management connections only when they originate from Speedify's network; when Defendants cut off Speedify access, Plaintiff is functionally locked out of the only approved remote-management path to his own systems. Plaintiff has ongoing international travel commitments, including ANA Business Class flights that departed Mexico City on February 8, 2026 for Tokyo and then Sydney (Reservation Code ----XA, Ticket No. ----------531, total fare AUD $7,981.06), for which reliable bonded connectivity is essential. The manufacturer has warned that Defendants can make the Router's serial number "dead" and incapable of activation, which would permanently destroy the Router's utility.

114. Likelihood of success. Plaintiff has strong evidence that Defendants deactivated the Router Plan based on a false "cancellation request" rationale. Plaintiff expressly rejected cancellation in writing in Ticket No. 676251, stating on January 25, 2026: "Ok no I will keep the router license then thank you. I didn't know it would stop working." Nevertheless, on January 26, 2026, Defendant Gizis personally presented Plaintiff with a binary ultimatum— troubleshoot or accept a refund—and when Plaintiff declined cancellation while reserving legal rights, Gizis directed termination the next day at 14:39:55 UTC, sending deactivation emails under the name "Alex from Speedify." Defendants then disabled additional paid accounts and

blacklisted Plaintiff's Router at the device level, supporting claims for breach of contract, trespass to chattels, conversion, and fraud.

115. Balance of equities. The balance of hardships strongly favors Plaintiff. Defendants can restore service through a simple administrative action and have no legitimate hardship from providing paid service pending adjudication. Indeed, Defendants' own weekly usage reports confirm that Plaintiff's accounts remain active in Defendants' system, with Defendants' February 1, 2026 report showing combined data transfer of 44 GB, 85.3 hours of connected time, 88 failover events, and 339 streaming interventions across Plaintiff's two accounts—demonstrating that Defendants continue to deliver the service infrastructure and that restoration requires only an administrative reactivation. Plaintiff is willing and able to repay refunded amounts immediately and to comply with reasonable conditions the Court may impose.

116. Public interest. The public interest favors preventing unfair and deceptive subscription practices and preventing companies from using remote "kill switches" to brick consumer devices without due process, notice, or legitimate justification. Restoring service preserves the status quo and prevents continuing harm.

117. Security. Plaintiff requests that any bond under Rule 65(c) be waived or set at a nominal amount because Defendants face minimal risk from restoration of a paid service and because the requested relief preserves the status quo ante. In the alternative, to the extent the Court requires security, Plaintiff is willing to post a cash bond in an amount set by the Court (including by wire transfer or other method directed by the Clerk) and to immediately repay any refunded subscription amounts (including the USD $450.00 Router Plan refund and the AUD $251.11 Families Plan refund) as a condition of reinstatement. Plaintiff further consents to the Court's jurisdiction to enforce any bond or security order.

118. Notice and due dispatch. Defendants cannot credibly claim surprise or lack of notice. As alleged above, Plaintiff sent more than thirty (30) written communications demanding restoration and advising that emergency injunctive relief would be sought if Defendants refused. Plaintiff is filing in Defendants' home district to ensure prompt service and enforceability and to minimize any logistical burden on Defendants. Plaintiff will provide Defendants prompt notice of any application for temporary restraining order and supporting materials. Plaintiff acted promptly after each termination event (January 27 and January 28), escalated to urgent written demands (including preservation demands), and pursued emergency relief in the Supreme Court of New South Wales (which was constituted on an emergency basis on January 30, 2026, and issued the published decision *Williams v Connectify, Inc.* [2026] NSWSC 30). Defendants were served with all NSW Supreme Court filings and the published decision, yet did not respond or appear. Plaintiff is now pursuing relief in Defendants' home forum to ensure prompt service and enforceability.

119. Inability to mitigate while in Mexico. Defendants may argue that Plaintiff can "mitigate" by purchasing alternative equipment or services. But this dispute is not about obtaining generic internet access; it is about maintaining access to Plaintiff's continuity-dependent, secure routing and remote-management path that is tied to Speedify. The Miri X510 at issue is marketed and designed to work solely with Speedify, and Defendants' device-level blacklisting prevents Plaintiff from using Speedify even through a separate paid account. More fundamentally, Plaintiff's secure management network is configured to accept remote-management connections only from Speedify's network (a Speedify-only allowlist). When Defendants disabled Speedify, Plaintiff was locked out of the management plane needed to reconfigure that allowlist to permit another provider, and privileged changes require hardware authentication tokens in Plaintiff's sole possession. As a result, "switching providers" would require Plaintiff to return to Sydney for in-person reconfiguration. Separately, the only practical

hardware substitute is a different multi-WAN bonding router platform, which would require sourcing and importing specialized hardware to Plaintiff's current location in Puerto Escondido, Mexico - a process that would take weeks due to customs and delivery delays and would still require complex secure re-provisioning. By contrast, Defendants can restore the paid service and remove any device-level blacklist by an administrative action within minutes.

120. Evidentiary corroboration (by declaration). Plaintiff will submit a sworn declaration in support of emergency relief providing independent corroboration, including (non-exhaustive): (a) the termination and refund emails and account/portal records; (b) the support ticket thread showing Plaintiff expressly declined cancellation; (c) the Miri CTO correspondence confirming Speedify-dependence and warning of "dead" serial-number disablement; (d) proof of the 30+ written notices and preservation demands; (e) router logs/screenshots demonstrating lockups and loss of bonding/failover coinciding with deactivations; (f) non-sensitive excerpts or redacted screenshots showing the Speedify-only allowlist policy; (g) photographs/records demonstrating Plaintiff's possession of the required hardware authentication tokens; and (h) shipping estimates demonstrating that replacement specialized hardware cannot be reliably obtained in Puerto Escondido on an emergency timetable. Plaintiff can provide sensitive technical details under seal or subject to a protective order if necessary.

121. Inadequacy of damages. Even if monetary damages could be calculated at a later date, they cannot retroactively restore continuity-dependent connectivity during Plaintiff's current travel period, cannot unwind the time-sensitive disruption to communications, and cannot prevent the threatened permanent disablement ("bricking") of the Router by making its serial number "dead" in Defendants' systems.

122. Practicality and limited scope of relief. Plaintiff seeks narrowly tailored restorative relief: reactivation of the paid Speedify Router Plan (or equivalent router

licensing/authentication) and removal of any device-level blacklist so that Plaintiff can use Speedify as a paying customer pending adjudication. This relief is achievable through Defendants' ordinary account administration and licensing systems and does not require Defendants to ship equipment, redesign their product, or take any action beyond restoring the status quo ante.

## VI. CLAIMS FOR RELIEF

## COUNT 1

## BREACH OF CONTRACT

*(Against Defendant Connectify, Inc.)*

123. Plaintiff repeats and realleges the paragraphs above, including all Factual Allegations and the Request for Temporary Restraining Order and Preliminary Injunctive Relief, as if fully set forth herein.

124. Plaintiff purchased the Speedify services and Router Plan primarily for personal, family, and household purposes within the meaning of 73 P.S. § 201-9.2. The primary and predominant purpose of Plaintiff's purchase was to secure reliable, bonded personal connectivity during international travel on commercial airline reservations (ANA Business Class, Sydney–Tokyo–Mexico City–Sydney, departing January 22, 2026). The Router Plan was purchased on January 25, 2026, precisely three days after departure, to maintain personal connectivity while traveling. Although Plaintiff's connectivity infrastructure may incidentally support business communications, the purchase was driven by personal travel needs, and the service was used predominantly for personal purposes including personal communications, navigation, personal banking, and maintaining contact with family and associates during extended international travel. That Plaintiff may use the Router's personal internet connection to access business systems remotely does not transform the purchase into a commercial transaction, any more than a consumer's use of a personal automobile to commute to work

transforms the vehicle into commercial equipment, or a consumer's use of a personal laptop to access an employer's network via VPN transforms the laptop into an enterprise asset. The "primarily for personal" inquiry under 73 P.S. § 201-9.2 focuses on the purpose and character of the purchase transaction itself—here, a consumer buying a portable connectivity device for travel—not on whether some fraction of the data traversing the connection touches business systems. Non-residents of Pennsylvania may assert UTPCPL claims against Pennsylvania businesses. *See Danganan v. Guardian Protection Services*, 179 A.3d 9 (Pa. 2018).

125. Plaintiff does not admit, and expressly disputes, that he knowingly assented to, or is bound by, Connectify's publicly posted Terms of Service, or that those Terms govern this dispute. In the alternative, Plaintiff and Connectify entered into an enforceable agreement (whether express or implied-in-fact) for paid Speedify services, including the Router Plan, as evidenced by the subscription purchase confirmations and invoices, Connectify's acceptance of payment, and the parties' course of dealing. To the extent the Court finds Connectify's Terms of Service were incorporated into any agreement, Plaintiff pleads breach of that agreement's enforceable obligations as alleged herein.

126. Plaintiff fully performed, or substantially performed, all conditions precedent and obligations required of him by paying for the Router Plan and by complying with Connectify's account requirements.

127. Connectify breached the contract by, among other things (and notwithstanding any purported right under the Terms of Service to "suspend, terminate, or refuse the Service to anyone at any time for any reason," which provision is unconscionable and unenforceable as alleged in Paragraph 16): (a) failing to provide Speedify router services that conformed to Defendants' express marketing and onboarding representations regarding redundancy/failover in a real-world multi-WAN router environment (including by failing to provide "Flawless Failover" in Redundant Mode and by resetting/dropping the bonding tunnel across all WAN

links when a single WAN link flapped, thereby defeating redundancy); (b) deactivating Plaintiff's paid Router Plan without Plaintiff's authorization or consent; (c) falsely claiming the deactivation was "as a follow up to your cancellation request" despite Plaintiff's express written rejection of cancellation; (d) refusing to reinstate service after Plaintiff objected; and (e) disabling replacement paid accounts and/or implementing device-level blocks that prevent Plaintiff from using Speedify on the Router even through a separate paid subscription.

128. Connectify's breaches deprived Plaintiff of the benefit of his bargain, including the ability to use the Router for bonded redundancy/failover and improved stability and throughput as marketed and intended, and including the continuity-dependent use case for which Plaintiff purchased the Router Plan.

129. As a direct and proximate result of Connectify's breach, Plaintiff has suffered and continues to suffer damages, including consequential damages, and is entitled to injunctive and declaratory relief to restore service and prevent further interference. Plaintiff further pleads in the alternative that the contract includes implied contractual duties and terms, including the implied covenant of good faith and fair dealing and any applicable implied warranties/terms of fitness for a particular purpose and merchantability/adequate quality. If the Court determines that Count 2 and/or Counts 12-13 are not cognizable as separate causes of action under the governing Pennsylvania choice of law, or are duplicative of this Count 1, Plaintiff pleads the allegations of those Counts as additional breaches of the contract and seeks all corresponding damages and equitable relief under this Count 1.

### COUNT 2

### BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

*(Against Defendant Connectify, Inc.)*

130. Plaintiff repeats and realleges the paragraphs above, including all Factual Allegations and the Request for Temporary Restraining Order and Preliminary Injunctive Relief, as if fully set forth herein.

131. To the extent an enforceable contract existed between Plaintiff and Connectify, every contract includes an implied covenant of good faith and fair dealing requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement. Plaintiff acknowledges that Pennsylvania courts have held the implied covenant does not provide an independent cause of action separate from a breach of contract claim. *See Northview Motors, Inc. v. Chrysler Motors Corp.*, 227 F.3d 78, 91 (3d Cir. 2000). Plaintiff pleads this Count in the alternative and as a distinct factual theory of bad-faith breach: even if the express terms of any agreement did not prohibit Defendants' conduct, the implied covenant independently constrains the manner and motive of Defendants' exercise of discretionary authority under the contract. *See Restatement (Second) of Contracts* § 205 ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement").

132. Connectify violated the implied covenant by acting in bad faith and for an improper purpose when it unilaterally canceled Plaintiff's paid Router Plan, misrepresented that Plaintiff requested cancellation, and then refused reinstatement notwithstanding Plaintiff's clear written instruction to keep the router license.

133. Connectify further violated the implied covenant by interfering with Plaintiff's ability to obtain substitute service through a separate paid account and by threatening or implementing device-level disablement that would permanently deprive Plaintiff of the Router's core functionality.

134. As a direct and proximate result of Connectify's bad-faith conduct, Plaintiff has suffered and continues to suffer damages and irreparable harm, and Plaintiff is entitled to

injunctive, declaratory, and monetary relief. In the alternative, and consistent with Pennsylvania law as articulated in *McCabe v. Marywood Univ.*, 166 A.3d 1257, 1260 (Pa. 2017), to the extent this Count 2 is not cognizable as an independent cause of action, Plaintiff pleads the bad-faith conduct alleged herein as a distinct factual basis for breach of implied contractual terms under Count 1, and seeks all corresponding damages and equitable relief thereunder. The bad-faith conduct alleged in this Count—including the pretextual "cancellation request" fabrication, the retaliatory device-level blacklisting, and the refusal to reinstate paid service—constitutes independently actionable misconduct that the express terms of the contract do not authorize, regardless of whether the implied covenant sounds as a separate claim or as a theory of contractual breach.

## COUNT 3

## TRESPASS TO CHATTELS

### *(Against All Defendants)*

135.    Plaintiff repeats and realleges the paragraphs above, including all Factual Allegations and the Request for Temporary Restraining Order and Preliminary Injunctive Relief, as if fully set forth herein.

136.    Plaintiff owns and possesses the Router, a physical device whose bonded redundancy function depends on Speedify licensing and authentication supplied by Defendants.

137.    Defendants intentionally and unlawfully interfered with Plaintiff's Router by remotely transmitting commands or signals to Defendants' servers that actively disabled, revoked, or withheld the licensing and authentication required for the Router to operate in bonded mode, and by affirmatively implementing device-level restrictions targeting Plaintiff's Router by its unique serial number (00A601241115008) that prevent activation even under a different paid account. Defendants' interference was not a passive omission or mere failure to

renew a service: it was an affirmative, deliberate act requiring Defendants to access their licensing/authentication systems, identify Plaintiff's specific Router by serial number, and transmit a blacklist instruction that altered the Router's ability to communicate with Speedify servers. This active targeting of a specific physical device by its unique identifier constitutes a direct, affirmative act of interference with Plaintiff's physical property within the meaning of *Restatement (Second) of Torts* § 217 (trespass to chattel by "using or intermeddling with a chattel in the possession of another") and § 218(b)–(c) (liability for "impairing the condition, quality, or value of the chattel" or "depriving the possessor of the use of the chattel for a substantial time"), consistent with the Third Circuit's recognition that intentional interference with a chattel's functionality constitutes trespass under Pennsylvania law, *see Pestco, Inc. v. Associated Prods., Inc.*, 880 F.2d 700, 707–08 (3d Cir. 1989) (applying Pennsylvania law of trespass to chattels), and analogous to the trespasses recognized in *CompuServe Inc. v. Cyber Promotions, Inc.*, 962 F. Supp. 1015 (S.D. Ohio 1997) (electronic interference with computer systems constitutes trespass to chattels where it impairs system functionality), and distinguishable from *Intel Corp. v. Hamidi*, 30 Cal. 4th 1342 (2003) (no trespass where electronic contact caused no damage to the system), because here Defendants' actions have actually impaired the condition, quality, and value of Plaintiff's Router and deprived Plaintiff of its use for a substantial time. Plaintiff's trespass claim is not barred by Pennsylvania's "gist of the action" doctrine because the duty breached is independent of any contractual obligation: Defendants' affirmative act of transmitting a serial-number-specific blacklisting instruction to disable Plaintiff's physical property is a tortious interference with personal property, not a failure to perform a contractual promise. *See Bruno v. Erie Ins. Co.*, 106 A.3d 48, 68 (Pa. 2014) (the gist of the action doctrine does not bar tort claims arising from duties "imposed as a matter of social policy" independent of contract); *eToll, Inc. v. Elias/Savion Advert., Inc.*, 811 A.2d

10, 19 (Pa. Super. 2002) (tort claims survive where the wrong is "the gist of the action" and the contract is merely "collateral" to the tortious conduct).

138. Defendants' interference impaired the condition, quality, and value of Plaintiff's Router and deprived Plaintiff of the use of the Router for its intended purpose.

139. As a direct and proximate result of Defendants' trespass to chattels, Plaintiff has suffered and continues to suffer damages and irreparable harm. To the extent the Court determines that Defendants' interference constitutes a more serious and permanent deprivation of Plaintiff's property, Plaintiff asserts conversion as an alternative theory in Count 10.

## COUNT 4

### FRAUD / INTENTIONAL MISREPRESENTATION

*(Against All Defendants)*

140. Plaintiff repeats and realleges the paragraphs above, including all Factual Allegations and the Request for Temporary Restraining Order and Preliminary Injunctive Relief, as if fully set forth herein.

141. Pursuant to Fed. R. Civ. P. 9(b), Defendants' fraudulent misrepresentations and omissions are pleaded with particularity. The circumstances constituting fraud - the who, what, when, where, and how - include the following:

142. <u>Who</u>: Connectify, by and through its employees, agents, and engineers, including via (i) Speedify.com marketing and onboarding materials (including pages and materials describing "Redundant Mode," "Speed Mode," "Speedify for Routers," and Starlink/multi-WAN router use cases), (ii) transactional subscription emails and onboarding communications sent to Plaintiff, (iii) the Speedify Support and subscription-billing systems, and (iv) Defendant Gizis personally, including by communications refusing reinstatement and asserting a liability cap.

143.    <u>Plaintiff's fraud claims are timely</u>. Pennsylvania law provides a two-year statute of limitations for fraud from discovery (42 Pa.C.S. § 5524(7)), and California law provides a three-year statute from discovery (Cal. Civ. Proc. Code § 338(d)). Plaintiff's fraudulent inducement claims (pre-purchase performance and suitability representations) accrued on January 25, 2026, when Plaintiff purchased and activated the Router Plan and immediately experienced tunnel-reset and bonding failures materially inconsistent with Defendants' representations of "Flawless Failover" and "secure, uninterrupted" redundancy. Plaintiff's misrepresentation claims (false "cancellation request" statement) accrued on January 27, 2026, when Plaintiff received Defendants' emails falsely attributing the termination to a "cancellation request" that Plaintiff had expressly rejected. This Complaint, filed February 5, 2026, is timely as to all fraud claims: within eleven days of discovery of the inducement fraud and nine days of the misrepresentation, well within both the two-year Pennsylvania and three-year California statutes of limitations.

144.    <u>Where/How</u>: through Defendants' public marketing webpages and onboarding materials on Speedify.com, including specifically: (i) speedify.com/features/internet-failover-protection/, which states: "Speedify will seamlessly failover to your other working Internet connection(s) without skipping a beat" and "Speedify seamlessly transfers live video streams and other online traffic to another working 4G, 5G, Satellite, Wi-Fi, or Wired Internet broadband connection so you won't drop a frame"; (ii) speedify.com/features/fix-packet-loss-redundant-internet-mode/, which states: "Optional Redundant Mode sends duplicate packets across multiple links so that even if a single path fails mid-transmission, your application doesn't miss a beat"; (iii) speedify.com/features/, which describes Speedify as "the only VPN that seamlessly combines all of your connections, including WiFi, 4G, 5G, Ethernet, and Starlink, into one unbreakable connection"; (iv) speedify.com/for-routers/ (describing Speedify for Routers and multi-WAN/Starlink deployments); and (v) speedify.com/getting-started/

(describing connection setup); through Defendants' automated onboarding email titled "Getting started with your Speedify for Routers plan" sent at 05:48 UTC on January 25, 2026 from support@speedify.com to Michael.Williams@glexia.com, which stated: "For best results, combine Starlink, 4G/5G, Wi-Fi, Ethernet, or satellite for faster, more stable internet"; through Defendants' automated onboarding email titled "Getting started with your Speedify for Families account" sent at 14:56 UTC on December 2, 2025 from support@speedify.com to michael.williams@glexia.com; through written statements transmitted by email via Defendants' Support and billing systems, including Support Ticket No. 676251; and by account-level and device-level actions taken through Defendants' licensing/authentication systems that control whether a "Powered by Speedify" router can activate and function.

145.    What: (A) Defendants' performance and suitability representations that "Redundant Mode" provides "Flawless Failover" and "secure, uninterrupted" redundant connectivity by sending duplicate packets across multiple connections, that "Speed Mode" provides a "major speed boost"/"combined speed" and up to approximately 95% combined-throughput efficiency in relevant conditions, and that Speedify is suitable for real-world multi-WAN router deployments (including Starlink) and for streaming/live video calls over multiple "spotty" connections; (B) Defendants' omissions of material limitations and risks known to Defendants, including that Speedify can reset/drop the bonding tunnel across all connections when a single WAN link flaps, defeating redundancy, and that Defendants maintain and can exercise a unilateral device-level kill switch/blacklist that can permanently prevent activation of a router; and (C) Defendants' post-purchase misrepresentation that Plaintiff requested cancellation ("as a follow up to your cancellation request") when Plaintiff expressly refused cancellation.

146.    Fraudulent inducement — performance and suitability representations. In the period December 2025 through January 25, 2026, Defendants disseminated the performance

and suitability representations described above through Speedify.com marketing pages and onboarding materials for "Speedify for Routers" (including pages describing "Redundant Mode," "Speed Mode," and Starlink/multi-WAN use cases) and through transactional subscription emails and onboarding communications. Defendants made these representations to induce consumers, including Plaintiff, to purchase and renew paid Speedify subscriptions and router plans and to deploy "Powered by Speedify" router hardware.

147. <u>Particulars (sources and proof)</u>. Plaintiff will rely on: (a) screenshots and/or archived/cached copies of Defendants' Speedify.com webpages (including speedify.com/features/, speedify.com/features/internet-failover-protection/, speedify.com/features/fix-packet-loss-redundant-internet-mode/, speedify.com/for-routers/, and speedify.com/getting-started/) as they appeared at the relevant dates, which contain the specific false representations quoted in Paragraph 140; (b) the full text of Defendants' automated onboarding emails sent to Plaintiff on December 2, 2025 ("Getting started with your Speedify for Families account") and January 25, 2026 ("Getting started with your Speedify for Routers plan"), which contain the challenged marketing representations as operational instructions, directing Plaintiff to "combine Starlink, 4G/5G, Wi-Fi, Ethernet, or satellite for faster, more stable internet"; (c) Defendants' transactional emails and subscription communications sent to Plaintiff at Michael.Williams@glexia.com. Plaintiff puts Defendants to strict proof of the content, placement, and prominence of those representations (and any purported disclaimers), and to strict proof of Defendants' internal testing, telemetry, and consumer complaint/support history bearing on the falsity and materiality of the representations and on Defendants' scienter.

148. <u>Non-puffery and materiality</u>. Defendants conveyed the above performance/suitability representations as statements of technical functionality and objective performance (including duplicate packet transmission, seamless session continuity/failover,

and quantified throughput efficiency), not as mere opinion. These representations were material and were apt to be relied upon by a reasonable consumer deciding whether to deploy Speedify for continuity-dependent connectivity in a multi-WAN router environment.

149. <u>Insufficient disclaimers</u>. Any generalized statement (if any) that performance may vary with network conditions was insufficient to qualify or correct the overall impression created by Defendants' absolute language ("flawless," "uninterrupted," "seamlessly") and their marketing of Redundant Mode for use with multiple "spotty" connections and for streaming/live video calls. Defendants' network-variability caveats (if any) did not disclose the specific tunnel-reset/total-outage failure mode alleged herein.

150. <u>Falsity of the performance/suitability representations</u>. As alleged above, immediately upon activation and use of the Router Plan in Plaintiff's real-world multi-WAN router environment, the Service did not perform as represented: in Redundant Mode, instability on a single WAN link precipitated a bonding-tunnel reset/termination that dropped connectivity across all WAN links, even when one or more links remained stable and capable of carrying traffic. This behavior is the opposite of "Flawless Failover" and negates the advertised redundancy purpose. Plaintiff also experienced instability and degraded throughput inconsistent with Defendants' representations of a "major speed boost," "combined speed," and up to approximately 95% combined-throughput efficiency.

151. On information and belief, Defendants possessed actual knowledge, or at minimum acted with reckless disregard for the truth, regarding the falsity of the performance and suitability representations because: (i) Defendants designed, control, and maintain the Speedify codebase, tunnel-management logic, and bonding algorithm—the precise mechanisms through which tunnel resets occur and through which Redundant Mode determines whether to drop or preserve connections during WAN-link instability; (ii) Defendants' customer-support infrastructure, support-ticket systems, and router-deployment

telemetry captured the same tunnel-reset and total-connectivity-loss failures that Plaintiff experienced, evidenced by the speed and certainty with which Defendants' support team (Prodoehl and Gizis) responded to Plaintiff's diagnostic logs without requesting additional information—a response pattern consistent with prior knowledge of the failure mode; (iii) Defendants' Redundant Mode support article (support.speedify.com/article/242-redundant-mode), accessible to and authored/maintained by Defendants, acknowledges material operational limitations ("uses more data and more battery"; "most users are better off on Speed mode") that Defendants did not disclose in consumer-facing marketing materials, evidencing a conscious choice to highlight benefits while suppressing known limitations; (iv) Defendants' community forums (speedify.com/community), which Defendants maintain, moderate, and actively monitor, contain multiple user reports of tunnel disconnection and bonding failures in multi-WAN and Starlink deployments; (v) Defendants' internal router-deployment testing and quality-assurance processes necessarily involved testing Redundant Mode in multi-WAN conditions, and such testing would have revealed the tunnel-reset behavior alleged herein; and (vi) Defendants' failure to disclose the device-level kill-switch/blacklist capability or the unilateral termination-for-any-reason clause in consumer-facing marketing (while prominently featuring "Flawless Failover" and "seamless" failover) constitutes fraudulent concealment and a conscious choice to suppress material risks known to Defendants.

152. <u>Intent to induce reliance</u>. Defendants intended that consumers, including Plaintiff, rely on the performance and suitability representations and omissions to purchase Speedify subscriptions and router plans (including the USD $450 annual Router Plan), to deploy Speedify-dependent "Powered by Speedify" hardware, and to configure networks and workflows around Speedify's promised continuity. Defendants further intended that consumers accept Defendants' "risk-free"/30-day guarantee framing as an assurance that the Service

would work as represented or would be competently administered in accordance with the customer's instructions.

153.     Affirmative misrepresentation. On or about January 27, 2026, Defendants sent Plaintiff emails stating that Plaintiff's Router Plan had been deactivated and/or expired "as a follow up to your cancellation request." Defendants thereby represented as a present, material fact that Plaintiff requested cancellation of the Router Plan and requested the resulting refund(s).

154.     Falsity. The "cancellation request" representation was false. Plaintiff made no cancellation request and did not request any refund. To the contrary, on January 25, 2026, in Ticket No. 676251, Plaintiff expressly instructed Defendants not to cancel and wrote: "Ok no I will keep the router license then thank you. I didn't know it would stop working." Plaintiff did not cancel via the Subscription Management Portal, did not click any cancellation link in any fulfillment email, and did not email support@speedify.com requesting cancellation.

155.     Defendants' knowledge and reckless disregard. Defendants knew the "cancellation request" statement was false, or acted with reckless disregard for its truth, because Defendants' support-ticket system and internal account records reflected Plaintiff's express written rejection of cancellation and contained no customer-initiated cancellation request. Defendants were the sole custodians of the electronic records that would evidence any purported cancellation request, yet Defendants have not identified any such request when repeatedly asked to do so.

156.     Scheme and intent to induce reliance/forbearance. Defendants made the false "cancellation request" statement to create a pretext and paper trail for an unauthorized termination of paid service, to induce Plaintiff to accept the refund and treat the deactivation as customer-requested and final, and to deter Plaintiff from demanding reinstatement, disputing the transaction, or seeking emergency relief. Defendant Gizis reinforced this scheme by

refusing reinstatement and asserting that the refund was "the end of the legal matter" and that Defendants' liability was limited to the amount paid or "$100 whichever is higher."

157. Retaliatory and punitive intent. The fraud was compounded by Defendants' retaliatory motive. The evidence establishes that Defendant Gizis was personally angered by Plaintiff's assertion of both consumer rights and intellectual property rights. On January 26, 2026, Gizis presented Plaintiff with a false binary choice: either troubleshoot "in a professional manner" or accept a refund—with no acknowledgment of Plaintiff's right to continue using the paid service while pursuing legitimate complaints. When Plaintiff indicated he would pursue legal remedies while remaining available to troubleshoot, Gizis responded the next day by unilaterally deactivating all of Plaintiff's accounts and issuing refunds Plaintiff never requested. In his January 27, 2026 email, Gizis revealed the true motive: he was angry that Plaintiff had contacted Connectify employees directly and had asserted his rights, and he sought to punish Plaintiff by destroying his connectivity infrastructure while Plaintiff was traveling internationally. The simultaneous filing of the IP challenge on January 27, 2026 further inflamed Gizis, who thereafter directed device-level blacklisting to ensure Plaintiff could never restore Speedify service on his Router through any means. Gizis's contempt for Plaintiff's legal rights is further evidenced by a statement made by Gizis and communicated to Plaintiff, in which Gizis stated words to the effect that the Court should "go f— itself." This statement is not offered for the truth of any matter asserted therein but rather as a party admission under Federal Rule of Evidence 801(d)(2)(A) (statement by a party-opponent offered against that party) and as circumstantial evidence of Gizis's state of mind, motive, and intent, which are directly relevant to Plaintiff's claims of retaliatory and punitive conduct. On February 1, 2026, at 10:41 p.m. UTC, Plaintiff emailed Defendants referencing this statement: "Given your nonresponse and Mr Gizis' message to tell the Court to go 'f— itself', we are in the process of submitting an emergency motion to the US District Court for the E.D. of PA."

Defendants did not deny or repudiate this statement, and their silence in the face of a direct accusation by email—a medium in which a denial would be natural and expected—constitutes an adoptive admission under Federal Rule of Evidence 801(d)(2)(B). Plaintiff will provide the identity of the individual who communicated Gizis's statement to Plaintiff, and the circumstances of that communication, by declaration in support of emergency relief or at such other time as the Court directs.

158. <u>Fraudulent concealment/omission</u>. Before and at the time Plaintiff purchased the Router and Router Plan, Defendants marketed "Powered by Speedify" routers and Speedify Router Plans as delivering resilient bonded connectivity and seamless failover for travel and continuity-dependent use cases, including the specific Redundant Mode and Speed Mode representations described above (duplicate packet transmission; "secure, uninterrupted" connectivity; "Flawless Failover"; "seamlessly" maintaining sessions; "major speed boost"/"combined speed"; up to approximately 95% combined-throughput efficiency; and suitability for Starlink/multi-WAN router deployments). Despite these representations, Defendants failed to disclose material facts uniquely within Defendants' knowledge and control: (a) that in real-world multi-WAN router deployments, instability on a single WAN link can precipitate a Speedify bonding-tunnel reset/termination that drops connectivity across all WAN links, even where one or more links remain stable and otherwise capable of carrying traffic, thereby defeating the advertised redundancy function; (b) that Defendants' internal practice when such failures are reported by a paying customer disclosing time-sensitive reliance is to treat refund/cancellation as the default response rather than providing a timely fix or a clear remediation timeframe; and (c) that Defendants could (and in practice would) remotely blacklist a specific router by serial number or device identifier, cut off licensing/authentication, and thereby prevent activation and use of Speedify on that router even under a new paid account.

159. <u>Duty to disclose</u>. Defendants had a duty to disclose these material facts because Defendants made partial and affirmative representations about continuity, redundancy, router/Starlink suitability, and speed/efficiency while omitting the above limitations and the existence and practical operation of a unilateral device-level kill switch; Defendants possessed superior and exclusive knowledge of Speedify's tunnel-management behavior, support practices, and ability to render a router serial number "dead" in Defendants' systems; and the omitted facts were not reasonably discoverable by Plaintiff at the time of purchase because they concern Defendants' proprietary server-side licensing/authentication controls and internal operational realities that are not exposed to consumers.

160. <u>Justifiable reliance</u>. Plaintiff reasonably relied on Defendants' affirmative performance and suitability representations when purchasing the Router and Router Plan, when configuring Plaintiff's secure remote-management network to accept connections only from Speedify's network, and when planning critical international travel contingent on bonded connectivity. Plaintiff's reliance was justified because Defendants' representations were communicated through official marketing webpages (Speedify.com), official onboarding communications (sent from support@speedify.com), and account-management systems— sources that a reasonable consumer would consider authoritative. Plaintiff was unable to independently verify whether Speedify's Redundant Mode actually achieved "Flawless Failover" through duplicate-packet transmission before purchasing the service. Plaintiff also reasonably relied on Defendants' omission of the tunnel-reset failure mode and the unilateral device-level kill-switch capability because these material limitations were not reasonably discoverable at the time of purchase. Defendants' exclusive control of the codebase, tunnel-management logic, and server-side licensing systems made the omitted facts unknowable to Plaintiff without information in Defendants' sole possession.

161. <u>Causation and damages</u>. As a direct and proximate result of Defendants' fraudulent misrepresentations and omissions, Defendants cut off Plaintiff's paid Speedify licensing/authentication, impaired the value and functionality of Plaintiff's Router, prevented Plaintiff from obtaining replacement service through a separate paid account, and caused Plaintiff to suffer immediate and ongoing harm including loss of the benefit of the bargain, consequential business losses, mitigation costs, and the threatened permanent disablement of Plaintiff's Router. Defendants' conduct was willful, malicious, and oppressive, and supports an award of punitive damages where permitted.

## COUNT 5

## VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW

*(Against Defendant Connectify, Inc.)*

162. Plaintiff repeats and realleges the paragraphs above, including all Factual Allegations and the Request for Temporary Restraining Order and Preliminary Injunctive Relief, as if fully set forth herein.

163. Connectify, in the course of trade and commerce within the Commonwealth of Pennsylvania, engaged in unfair methods of competition and unfair or deceptive acts or practices. All of the challenged conduct—including the deceptive marketing, the false "cancellation request" communications, the account deactivation, the refund processing, and the device-level blacklisting—originated from Defendants' headquarters and principal place of business in Philadelphia, Pennsylvania. The unfair and deceptive acts and practices include: (a) advertising and representing, to Plaintiff and to the consuming public generally, that Speedify provides "Flawless Failover" and "secure, uninterrupted" redundant Internet connectivity in "Redundant Mode," including by sending duplicate packets across multiple connections and by "seamlessly" maintaining sessions for streaming and live video calls even

over multiple "spotty" connections; (b) advertising and representing "major speed boost"/"combined speed" and up to approximately 95% combined-throughput efficiency; (c) advertising and representing that Speedify is suitable for router environments and multi-WAN/Starlink use cases on "Powered by Speedify" routers; (d) omitting material limitations and risks (including the tunnel-reset/total-outage failure mode and the existence of a unilateral device-level kill switch/blacklist); (e) misrepresenting the reasons for deactivation by falsely claiming a customer "cancellation request"; (f) failing to honor Plaintiff's express instruction not to cancel; and (g) implementing unfair and retaliatory account termination and device-level blacklisting practices that deprive customers of paid service and can permanently disable expensive "Powered by Speedify" routers.

164. Connectify's conduct caused Plaintiff to suffer ascertainable losses in connection with the personal-purpose purchase, including: (a) loss of the benefit of the bargain, measured as the difference between the value of the Speedify service as represented (seamless failover, unbreakable connectivity, redundant packet transmission) and the value of the service as actually delivered (degraded performance, unilateral termination, bricked Router functionality); (b) out-of-pocket losses including the Router purchase price of AUD $2,725.82, subscription fees, Australian court filing and service costs, and alternative equipment costs of no less than AUD $3,500.00; (c) the risk of forfeiture of AUD $7,981.06 in non-refundable international airfare; (d) loss of personal connectivity during international travel, including inability to communicate with family and associates, access personal banking, and navigate unfamiliar locations; and (e) emotional distress and anxiety from the sudden loss of connectivity while traveling alone in a foreign country. Plaintiff also suffered consequential losses flowing from the disruption to his personal connectivity infrastructure, including diverted personal time to troubleshooting and legal proceedings across multiple jurisdictions.

165. Plaintiff is entitled to all remedies available under the Pennsylvania Unfair Trade Practices and Consumer Protection Law, including actual damages, treble damages where appropriate, and such other relief as the Court deems proper.

## COUNT 6

## VIOLATION OF CALIFORNIA UNFAIR COMPETITION LAW (Cal. Bus. & Prof. Code § 17200 et seq.)

### *(Against All Defendants)*

166. Plaintiff repeats and realleges the paragraphs above, including all Factual Allegations and the Request for Temporary Restraining Order and Preliminary Injunctive Relief, as if fully set forth herein.

167. Defendants engaged in unlawful, unfair, and fraudulent business acts and practices within the meaning of California Business and Professions Code § 17200, including (a) advertising and selling Speedify for routers and multi-WAN/Starlink use cases using specific technical performance claims ("Flawless Failover," "secure, uninterrupted" redundancy, duplicate packets, "major speed boost," "combined speed," and up to approximately 95% combined-throughput efficiency) that the Service did not provide in Plaintiff's real-world router deployment; (b) omitting material limitations and risks (including the tunnel-reset/total-outage failure mode and the unilateral device-level kill switch/blacklist); (c) falsely representing that Plaintiff requested cancellation; (d) refusing to provide paid services without legitimate cause; and (e) implementing device-level blacklisting that can permanently disable a "Powered by Speedify" router, thereby defeating the very continuity use cases that Defendants marketed.

168. Defendants' conduct was "unlawful" because it violates, among other things, the common law and the consumer protection statutes alleged herein, including the California

Consumers Legal Remedies Act and the California False Advertising Law (pled in the alternative).

169. Defendants' conduct was "unfair" because it offends established public policy and is immoral, unethical, oppressive, and substantially injurious to consumers, including by enabling Defendants to strand customers mid-travel and to render expensive specialized routers unusable.

170. Defendants' conduct was "fraudulent" because it is likely to deceive members of the public, including by falsely attributing account termination to a customer's cancellation request and by marketing "flawless" failover while retaining the ability to disable service and the device itself without due process.

171. Plaintiff has lost money and property as a result of Defendants' unlawful, unfair, and fraudulent practices and is entitled to injunctive relief and restitution to the extent permitted by law.

**COUNT 7**

**VIOLATION OF CALIFORNIA FALSE ADVERTISING LAW (Cal. Bus. & Prof. Code § 17500 et seq.)**

*(Against All Defendants)*

172. Plaintiff repeats and realleges the paragraphs above, including all Factual Allegations and the Request for Temporary Restraining Order and Preliminary Injunctive Relief, as if fully set forth herein.

173. Defendants, in connection with marketing and selling Speedify services (including router plans), made and disseminated statements that were untrue or misleading and that were known, or by the exercise of reasonable care should have been known, to be untrue or misleading.

174. Defendants' misleading statements include representations that Speedify provides continuity-focused redundancy and "Flawless Failover" by duplicating packets and "seamlessly" maintaining sessions, that Redundant Mode provides "secure, uninterrupted" connectivity suitable for streaming and live video calls over multiple "spotty" connections, that Speedify provides "major speed boost"/"combined speed" and up to approximately 95% combined-throughput efficiency, and that Speedify is suitable for router and multi-WAN/Starlink deployments—while failing to disclose material limitations and risks (including the tunnel-reset/total-outage failure mode and Defendants' device-level kill-switch/blacklisting practices) and while engaging in arbitrary terminations and false "cancellation request" attributions that deprive customers of the advertised benefits.

175. Defendants' misleading statements were disseminated to the public through websites, online advertising, and subscription sales materials accessible in California and directed to California consumers.

176. Plaintiff is entitled to injunctive relief and restitution under California Business and Professions Code § 17500 et seq. to the extent permitted by law.

### COUNT 8

### VIOLATION OF CALIFORNIA CONSUMERS LEGAL REMEDIES ACT (Cal. Civ. Code § 1750 et seq.)

*(Against Defendant Connectify, Inc. and Defendant Gizis)*

177. Plaintiff repeats and realleges the paragraphs above, including all Factual Allegations and the Request for Temporary Restraining Order and Preliminary Injunctive Relief, as if fully set forth herein.

178. This action involves a transaction intended to result, and that did result, in the sale of services to Plaintiff for personal, family, and household purposes within the meaning of California Civil Code § 1761(d). Plaintiff purchased the Speedify services as a consumer—

not for commercial or business use within the meaning of § 1761(d)—with the purpose of securing reliable, bonded personal connectivity during international travel scheduled for January 22 to February 8, 2026, with booked commercial airline reservations (ANA Business Class, Sydney–Tokyo–Mexico City–Sydney, Reservation Code ----XA, Ticket No. ----------531, total cost AUD $7,981.06 non-refundable airfare). Plaintiff's Router Plan purchase on January 25, 2026, precisely three days after departure, was temporally and causally connected to this personal travel, as evidenced by Plaintiff's explicit communication to Defendants' support team (Support Ticket No. 676251) referencing travel-related connectivity needs. The Speedify subscription was not purchased for or used in connection with any commercial enterprise, trade, or profession: it was a personal connectivity service for an individual traveler, analogous to a personal mobile hotspot or travel Wi-Fi service. The fact that Plaintiff, like any individual, may occasionally check work-related email or make a work-related call over his personal internet connection does not transform a personal connectivity purchase into a "commercial or business use" excluded by § 1761(d). The Router is a personal access device—analogous to a consumer's personal automobile used to commute to work, or a consumer's personal laptop used to access an employer's network via remote desktop or VPN—the character of which is determined by the nature of the consumer's purchase and primary purpose, not by whether some data traversing the connection incidentally touches business systems. *See Meyer v. Sprint Spectrum L.P.*, 45 Cal. 4th 634, 643 (2009) (CLRA construed broadly to protect consumers). Moreover, the "personal, family, and household purposes" inquiry under § 1761(d) focuses on the purpose of the purchase as a whole, not on whether some incidental use may touch business systems. *See Benson v. Kwikset Corp.*, 152 Cal. App. 4th 1254, 1266 (2007) (consumer standing broadly construed to effectuate the CLRA's remedial purpose); *Vasquez v. Superior Court*, 4 Cal. 3d 800, 808 (1971) (CLRA enacted as "broad and comprehensive" consumer protection to be liberally construed). The predominant

purpose of Plaintiff's Router purchase was personal travel connectivity, and the transaction's consumer character is not defeated by incidental data routing that may touch business systems.

179. Defendants violated the CLRA by engaging in unfair or deceptive acts and practices, including representing that services have characteristics, benefits, and quantities that they do not have (including "Flawless Failover," "secure, uninterrupted" redundancy via duplicate packets, "major speed boost"/"combined speed," and up to approximately 95% efficiency), representing that services are suitable for router and multi-WAN/Starlink deployments when the Service fails in the manner alleged herein, concealing material limitations and the existence of a unilateral device-level kill switch/blacklist, misrepresenting that the transaction conferred rights and remedies that it did not (including by falsely attributing cancellation to Plaintiff and treating an unauthorized refund as final), and engaging in conduct that results in arbitrary deprivation of paid services and device functionality.

180. Pursuant to Cal. Civ. Code § 1782(a), on February 5, 2026, Plaintiff sent a formal Pre-Suit Notice to Defendants specifically citing the California Consumers Legal Remedies Act and California Civil Code § 1782(a), describing the specific CLRA violations alleged herein, and demanding corrective action including restoration of service and removal of device-level disablement within the thirty-day cure period. The notice was sent by email to six (6) recipients: Defendants' CEO (agizis@connectify.me), legal department (uspto@connectify.me), support (support@speedify.com), outside counsel Kamran Emdadi (kamran.emdadi@gmail.com), and Chief Counsel Lauren Ashery (AsheryESQ@gmail.com and lashery@connectify.me). Plaintiff presently seeks injunctive relief under the CLRA and will seek leave to amend to pursue damages under the CLRA after expiration of the thirty-day cure period prescribed by § 1782(a), if Defendants fail to provide appropriate corrective action within that period.

181. Plaintiff is entitled to injunctive relief, restitution, and such other relief as may be available under the CLRA to the extent permitted by law.

## COUNT 9

## DECLARATORY RELIEF (28 U.S.C. § 2201)

*(Against All Defendants)*

182. Plaintiff repeats and realleges the paragraphs above, including all Factual Allegations and the Request for Temporary Restraining Order and Preliminary Injunctive Relief, as if fully set forth herein.

183. An actual, justiciable controversy exists between the parties regarding Defendants' termination of Plaintiff's paid Speedify services, Defendants' authority to disable licensing/authentication required for Plaintiff's Router, and Defendants' asserted right to cap liability at "$100" or to treat a unilateral refund as ending the matter.

184. Plaintiff seeks a judicial declaration that: (a) Defendants' deactivation of Plaintiff's paid subscriptions without Plaintiff's authorization, based on a false "cancellation request" rationale, is wrongful and unlawful; (b) Defendants may not lawfully impose device-level blacklisting or serial-number disablement that renders Plaintiff's Router permanently unusable; (c) any term purporting to authorize Defendants to do so without cause, notice, and a meaningful opportunity to cure is unconscionable and unenforceable; and (d) Defendants' asserted "$100" liability cap is unenforceable to the extent it purports to limit liability for intentional misconduct, fraud, or statutory violations.

185. Declaratory relief is appropriate and necessary to clarify the parties' rights and obligations and to prevent continuing and future harm.

## COUNT 10

## CONVERSION

*(Against All Defendants)*

186. Plaintiff repeats and realleges the paragraphs above, including all Factual Allegations and the Request for Temporary Restraining Order and Preliminary Injunctive Relief, as if fully set forth herein.

187. Plaintiff owns and possesses the Router, a physical device with a purchase price of AUD $2,725.82. The Router's core functionality—multi-WAN bonding and failover—depends entirely on Speedify licensing and authentication supplied by Defendants. Without an active Speedify subscription and server access, the Router cannot perform its primary bonding function and is rendered effectively useless for its intended purpose.

188. access required for the Router to function at 14:39:55 UTC on January 27, 2026, by implementing device-level blacklisting targeting Plaintiff's Router by its unique serial number (00A601241115008) that prevents activation of the Router even under a separate paid account (within approximately 48 hours of the initial deactivation), and by threatening to make the Router's serial number permanently "dead" in Defendants' systems. Defendants' interference is not a mere withdrawal of optional software services; it is an affirmative exercise of dominion and control over Plaintiff's physical property equivalent to a remote "kill switch." By designing the Router to depend entirely on Defendants' licensing/authentication for its core function, and by then unilaterally activating a device-specific disablement mechanism targeting Plaintiff's Router by serial number, Defendants exercised a degree of control over Plaintiff's property that is functionally indistinguishable from physical seizure or destruction. *Cf. Grisafi v. Sony Electronics, Inc.*, No. 18-8494, 2019 WL 1930756 (D.N.J. Apr. 30, 2019) (active firmware update that disabled device functionality constitutes actionable interference with personal property). That Defendants' dominion was exercised through software rather than physical touching does not defeat the conversion claim: courts have recognized that conversion extends to situations where intangible mechanisms are used to destroy the value of tangible property. *See Kremen v. Cohen*, 337 F.3d 1024, 1033–34 (9th Cir. 2003) (conversion applies

where intangible property rights are merged with or connected to tangible property); *Thyroff v. Nationwide Mut. Ins. Co.*, 8 N.Y.3d 283, 292 (2007) (extending conversion doctrine to electronic data and recognizing that the "tort must keep pace with the chattel"). Here, Defendants' intangible act—transmitting a blacklist instruction through their licensing servers—had the tangible consequence of rendering Plaintiff's $2,725.82 physical device permanently inoperative for its sole designed purpose. The Router's manufacturer was not a party to and did not authorize or participate in Defendants' decision to blacklist Plaintiff's device, and the manufacturer's CTO confirmed that the device was "solely designed to work with Speedify" and has "no other function"—underscoring that Defendants' blacklisting effectively destroyed the Router's entire value and utility. Under Pennsylvania law, conversion is the deprivation of another's right of property in, or use or possession of, a chattel without the owner's consent and without lawful justification. *See Stevenson v. Econ. Bank of Ambridge*, 413 Pa. 442, 453, 197 A.2d 721 (1964); *Universal Premium Acceptance Corp. v. York Bank & Trust Co.*, 69 F.3d 695, 704 (3d Cir. 1995) (applying Pennsylvania conversion law). Plaintiff's conversion claim is not barred by Pennsylvania's "gist of the action" doctrine because Defendants' conduct constitutes an intentional tort—the deliberate, targeted destruction of the value of Plaintiff's physical property through an affirmative blacklisting act—that gives rise to a duty independent of any contractual obligation. *See Bruno v. Erie Ins. Co.*, 106 A.3d 48, 68 (Pa. 2014); *Hart v. Arnold*, 884 A.2d 316, 339–40 (Pa. Super. 2005) (fraud and intentional tort claims are not barred by the gist of the action doctrine where the defendant's conduct "is of such a nature as to be actionable independent of the contract").

189. Defendants' interference constitutes conversion because it seriously and permanently interferes with Plaintiff's right to use and control his own property. The Router manufacturer's CTO, Ryan Brenneman, confirmed in three successive communications on January 27–28, 2026 that: (a) "the product is solely designed to work with Speedify, it really

has no other function"; (b) "Without Speedify enabled the router will not function properly"; (c) "The sole purpose of the router is to run Speedify for bonding"; and (d) Defendants can make the serial number "dead" and "unable to ever be activated again." The manufacturer further offered to reimburse the full cost of the Router if returned, confirming that even the manufacturer considered the device to be without meaningful value absent Speedify service. While the Router retains basic single-WAN fallback capability, this is functionality available in a consumer-grade router costing under $30 and is not the function for which Plaintiff purchased a $2,725.82 specialized bonding device. Defendants' conduct has effectively destroyed the Router's utility and value for its sole designed purpose.

190. As a direct and proximate result of Defendants' conversion, Plaintiff has suffered damages including the full value of the Router (AUD $2,725.82), loss of use, consequential damages, and such other damages as may be proven at trial.

## COUNT 11

### UNJUST ENRICHMENT (IN THE ALTERNATIVE)

*(Against Defendant Connectify, Inc.)*

191. Plaintiff repeats and realleges the paragraphs above, including all Factual Allegations and the Request for Temporary Restraining Order and Preliminary Injunctive Relief, as if fully set forth herein.

192. In the alternative, to the extent the Court determines that an enforceable contract does not govern the subject matter of this dispute, Connectify has been unjustly enriched at Plaintiff's expense.

193. Plaintiff conferred a benefit on Connectify by purchasing the Router (AUD $2,725.82) specifically because it was a "Powered by Speedify" device, by purchasing the Router Plan (USD $450.00) and the Families Plan (AUD $251.11), and by integrating Connectify's Speedify service into Plaintiff's connectivity infrastructure. Connectify accepted

and retained these benefits, including the revenue from Plaintiff's subscriptions, the market validation of Plaintiff's adoption of Connectify's platform and ecosystem, and—critically— the ecosystem lock-in created by Plaintiff's substantial investment in Speedify-dependent hardware and network configuration. By designing and marketing the Router as a device that functions solely with Speedify, Connectify ensured that Plaintiff's AUD $2,725.82 hardware investment, network reconfiguration costs, and switching costs would create an ongoing economic benefit to Connectify far exceeding the subscription fees alone.

194.     Connectify has retained the benefit of Plaintiff's Router purchase (which Connectify's ecosystem rendered useless through device-level blacklisting) while also retaining the economic benefit of the ecosystem lock-in, market validation, and switching-cost leverage created by Plaintiff's investment. While Connectify purportedly refunded certain subscription fees (USD $450.00 and AUD $251.11), these refunds were unilateral, unrequested, and grossly inadequate to compensate Plaintiff for the full benefit conferred. The subscription refunds represent less than 20% of Plaintiff's total investment (which includes AUD $2,725.82 for the Router, network reconfiguration costs, and the destruction of Plaintiff's Speedify-dependent connectivity infrastructure). Connectify's unilateral refund of subscription fees does not extinguish the unjust enrichment claim because the "benefit" retained by Connectify extends far beyond the subscription revenue to include the Router purchase price channeled through Connectify's ecosystem, the switching costs imposed on Plaintiff, and the competitive advantage of locking Plaintiff into a Speedify-only hardware platform. It would be unjust and inequitable for Connectify to retain these benefits while simultaneously depriving Plaintiff of the use of his own property.

195.     As a direct and proximate result of Connectify's unjust enrichment, Plaintiff has suffered damages and is entitled to restitution in an amount to be proven at trial, including the

value of the Router, the value of the lost subscriptions and services, and such other damages as may be just and proper.

## COUNT 12

## BREACH OF IMPLIED WARRANTY OF FITNESS FOR A PARTICULAR PURPOSE

*(Against Defendant Connectify, Inc.)*

196.    Plaintiff repeats and realleges the paragraphs above, including all Factual Allegations and the Request for Temporary Restraining Order and Preliminary Injunctive Relief, as if fully set forth herein.

197.    At the time of Plaintiff's purchase of the Speedify Router Plan, Connectify knew or had reason to know of the particular purpose for which Plaintiff required the Service. Plaintiff communicated to Connectify, through Support Ticket No. 676251 and through Plaintiff's course of dealing and account configuration, that Plaintiff required Speedify for continuity-dependent travel connectivity, multi-WAN bonding and failover using a "Powered by Speedify" Miri X510 router, and remote management of a Speedify-whitelisted network. Plaintiff relied on Connectify's skill and judgment in providing a service suitable for these purposes.

198.    The Speedify service, as delivered, was not fit for Plaintiff's particular purpose. In Redundant Mode, instability on a single WAN link precipitated a bonding-tunnel reset/termination that dropped connectivity across all WAN links, even when one or more links remained stable and capable of carrying traffic. This failure defeated the very redundancy and failover functionality for which Plaintiff purchased the Service. The Service was therefore not fit for use in a continuity-dependent multi-WAN router environment, which was the particular purpose communicated to Connectify.

199. To the extent Defendants' Terms of Service purport to disclaim implied warranties, any such disclaimer is unenforceable for both procedural and substantive unconscionability under Pennsylvania law (*Salley v. Option One Mortg. Corp.*(2007)). As a threshold matter, UCC Article 2 applies to the Speedify/Router ecosystem because the transaction is predominantly one for goods under the "predominant purpose" test. *See Bonebrake v. Cox*, 499 F.2d 951, 960 (8th Cir. 1974). The Router is a specialized physical device (AUD $2,725.82) whose entire value depends on the Speedify software license bundled with it; the software licensing, authentication, and server-access components are "functional goods" inseparable from the hardware, not a standalone service. The manufacturer's CTO confirmed the Router "is solely designed to work with Speedify" and has "no other function," establishing that the Speedify license is not an optional add-on but the animating component without which the physical good is valueless. See also *BMC Indus., Inc. v. Barth Indus., Inc.*, 160 F.3d 1322, 1330 (11th Cir. 1998) (software bundled with hardware constitutes "goods" under UCC Article 2 where the transaction's predominant purpose is the acquisition of a functioning product). Procedurally, the disclaimer was not conspicuous: it appeared in a standard-form adhesion contract on a scrollable webpage, was not highlighted, was not acknowledged by Plaintiff, and did not specifically mention "fitness for a particular purpose" as required under 13 Pa.C.S. § 2316(b). Substantively, the disclaimer is unreasonably favorable to Defendants because it purports to disclaim fitness warranties for a service that Defendants specifically market as providing "Flawless Failover," "secure, uninterrupted" connectivity, and seamless redundancy—representations that go to the very core of the service's utility and Plaintiff's reason for purchasing a "Powered by Speedify" router. Moreover, the disclaimer permits Defendants to exercise unilateral remote disablement and device-level blacklisting that can permanently destroy a $2,725.82 hardware investment while disclaiming any warranty of fit or merchantability. Allowing such a disclaimer would permit a seller to market a product's

core functionality while reserving absolute power to destroy that functionality without remedy, which offends fundamental fairness and public policy. Additionally, to the extent Defendants provided any "written warranty" or entered into a "service contract" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6)–(8), Defendants are prohibited by 15 U.S.C. § 2308(a) from disclaiming or modifying any implied warranty, including the implied warranty of fitness for a particular purpose. Defendants' product descriptions, marketing materials, subscription terms, and onboarding communications constitute written warranties or service contracts under federal law insofar as they contain written affirmations of fact, promises, or descriptions relating to the nature and quality of the Speedify service, and any purported disclaimer of implied warranties is therefore void under § 2308(a) as well as under state law.

200. warranties are held inapplicable), or to the extent it is deemed duplicative of Count 1, Plaintiff pleads the same facts as a breach of contract (including breach of implied contractual terms of fitness for Plaintiff's disclosed purpose) and seeks relief under Count 1. See also *Dittman v. UPMC*, 196 A.3d 1036, 1054 (Pa. 2018) (recognizing that implied duties of care can arise from the nature of the relationship between the parties, independent of UCC Article 2 classification, where one party assumes an affirmative obligation that creates a duty of reasonable care in its performance).

## COUNT 13

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

*(Against Defendant Connectify, Inc.)*

201. Plaintiff repeats and realleges the paragraphs above, including all Factual Allegations and the Request for Temporary Restraining Order and Preliminary Injunctive Relief, as if fully set forth herein.

202.    To the extent Defendants' Terms of Service purport to disclaim or limit implied warranties, any such disclaimer is ineffective and unenforceable under 13 Pa.C.S. § 2316 because: (a) the disclaimer was not conspicuous (failing the requirement of 13 Pa.C.S. § 2316(b) that disclaimer of merchantability be conspicuous); (b) Defendants' own marketing and onboarding materials affirmatively represented that the service was suitable for specific commercial and continuity-dependent purposes, thereby waiving any disclaimer by affirmative representation; and (c) Defendants' own actions contradicted any purported disclaimer by exercising unilateral control over the service through remote disablement, demonstrating that Defendants retained dominion over product quality and suitability. Further, to the extent Defendants provided any "written warranty" or entered into a "service contract" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(6)–(8), Defendants are prohibited by 15 U.S.C. § 2308(a) from disclaiming or modifying any implied warranty, including the implied warranty of merchantability. Defendants' written product descriptions, performance specifications, and subscription terms constitute written warranties or service contracts under federal law, and any purported disclaimer of implied warranties is therefore void under § 2308(a), independently and in addition to the state-law grounds set forth above.

203.    Under 13 Pa.C.S. § 2314, when a seller of goods is engaged in the business of selling services and goods (as Defendants are with respect to "Powered by Speedify" routers and bundled Speedify service subscriptions), an implied warranty of merchantability arises that the goods shall be of such kind and quality as are ordinarily fit for the ordinary purposes for which such goods are used. As set forth in Count 12, the Speedify/Router ecosystem constitutes a transaction predominantly for goods under *Bonebrake v. Cox*, 499 F.2d 951, 960 (8th Cir. 1974), because the Router's entire value depends on the bundled Speedify software license. The Speedify service components supplied in connection with the Router (licensing,

authentication, server access) are functional goods within the meaning of the UCC, and the service as delivered was not of merchantable quality: it failed in the primary

204.    Alternatively, to the extent UCC Article 2 does not apply because Speedify is characterized as a pure service subscription, Pennsylvania common law implies a warranty of merchantability in service contracts under which a service provider warrants that services provided are of adequate quality and suitable for their advertised purpose. The Speedify service, as delivered, failed this standard.

205.    As a direct and proximate result of Connectify's breach of the implied warranty of merchantability, Plaintiff has suffered damages, including loss of the benefit of the bargain (the Router purchase price of AUD $2,725.82 and Speedify subscription fees totaling USD $450.00 and AUD $251.11), the value of the Router rendered inoperative by Defendants' device-level blacklisting (AUD $2,725.82), and consequential business losses from loss of continuity-dependent connectivity during international travel and disruption to California-based business operations. In the alternative, Plaintiff's claim for breach of the implied warranty of merchantability is also supported by section 54 of the Australian Consumer Law, which provides a mandatory and unexcludable consumer guarantee of acceptable quality that applies to Connectify's supply of services to Plaintiff as an Australian consumer, and which cannot be excluded by any term of Connectify's Terms of Service (ACL section 64). In the alternative, to the extent this implied-warranty theory is determined not to be independently actionable under Pennsylvania law (including if the transaction is characterized as a service contract and/or UCC Article 2 implied warranties are held inapplicable), or to the extent it is deemed duplicative of Count 1, Plaintiff pleads the same facts as a breach of contract (including breach of implied contractual terms of merchantability/adequate quality) and seeks relief under Count 1. See also *Dittman v. UPMC*, 196 A.3d 1036, 1054 (Pa. 2018) (implied duties of care arise from the nature of the parties' relationship independent of UCC classification).

**COUNT 14**

**VIOLATION OF AUSTRALIAN CONSUMER LAW**

*(Against All Defendants)*

206. Plaintiff repeats and realleges the paragraphs above, including all Factual Allegations and the Request for Temporary Restraining Order and Preliminary Injunctive Relief, as if fully set forth herein.

207. The Australian Consumer Law ("ACL"), being Schedule 2 to the Competition and Consumer Act 2010 (Cth), applies to the transaction between Plaintiff and Connectify because: (a) Plaintiff is an Australian consumer who purchased the Speedify service and "Powered by Speedify" Router Plan from within Australia; (b) Connectify sells Speedify services and subscriptions directly to Australian consumers through its website (speedify.com), which accepts Australian dollar payments and delivers services to customers located in Australia; (c) Connectify sells "Powered by Speedify" routers to Australian consumers through Australian-based retailers, including Corsair Solutions Pty Ltd, an Australian company that distributes the Miri X510 router in Australia; (d) Connectify's marketing materials, onboarding communications, and support services are directed to and accessible by Australian consumers; and (e) Plaintiff paid for the Router Plan from an Australian bank account via PayPal, and Connectify accepted and processed this payment knowing Plaintiff was an Australian consumer.

208. Plaintiff further submits that this Court may apply the ACL under Pennsylvania's choice-of-law principles because the ACL represents a fundamental policy of Australia within the meaning of *Restatement (Second) of Conflict of Laws* § 187(2)(b). The consumer guarantees under the ACL are mandatory, unexcludable, and constitute a core regulatory framework designed to protect Australian consumers in cross-border transactions. Australia has a materially greater interest than Pennsylvania in protecting its citizens from

deceptive conduct by foreign suppliers who actively solicit Australian consumers and accept Australian-dollar payments, and enforcing the ACL does not offend any Pennsylvania public policy. The ACL consumer guarantees are "mandatory rules" within the meaning of international conflict-of-laws principles—analogous to the mandatory consumer protection regimes of the European Union that override contractual choice-of-law provisions (*see, e.g.,* Regulation (EC) No 593/2008, Art. 6(2) (Rome I))—because the ACL expressly provides that its consumer guarantees cannot be excluded, restricted, or modified by any contractual term (ACL §§ 64, 64A), and Australia's *Competition and Consumer Act 2010* (Cth) applies extraterritorially to conduct by foreign corporations that is directed at Australian consumers (s. 5). Alternatively, even if the Court declines to apply the ACL directly, the ACL obligations support and inform Plaintiff's other claims by establishing the standard of conduct expected of suppliers to Australian consumers and by demonstrating that Defendants' disclaimer and limitation-of-liability provisions are unenforceable as against mandatory consumer protection regimes.

209. Under sections 64 and 64A of the ACL, consumer guarantees provided by Division 1 of Part 3-2 of the ACL are mandatory and cannot be excluded, restricted, or modified by any term of a contract for the supply of goods or services to a consumer. Any contractual term that purports to exclude, restrict, or modify the consumer guarantees, or that purports to exclude, restrict, or modify the liability of a supplier for failure to comply with a consumer guarantee, is void to the extent of the inconsistency. Accordingly, notwithstanding any disclaimer, limitation of liability, or warranty exclusion in Connectify's Terms of Service, the ACL consumer guarantees are incorporated into the contract between Plaintiff and Connectify by operation of Australian law and form part of the contractual obligations owed by Connectify to Plaintiff as an Australian consumer.

210. Connectify engaged in conduct in trade or commerce that was misleading or deceptive, or likely to mislead or deceive, in contravention of section 18 of the ACL. Specifically, Connectify's representations that Speedify provides "Flawless Failover," "seamless" redundancy, "secure, uninterrupted" connectivity, and duplicate-packet transmission across multiple connections were misleading or deceptive because the Speedify service, as delivered, suffered tunnel-reset failures that dropped connectivity across all WAN links when a single link experienced instability—the precise opposite of the represented functionality. Under section 18, no proof of intent to mislead is required; it is sufficient that the conduct was misleading or deceptive, or likely to mislead or deceive, in all the circumstances. Connectify's conduct was directed at and received by Plaintiff, an Australian consumer, and was likely to mislead or deceive a reasonable Australian consumer in Plaintiff's position.

211. Connectify made false or misleading representations in contravention of section 29 of the ACL, including: (a) false representations that the Speedify service was of a particular standard, quality, or grade (section 29(1)(a)), when in fact the service suffered from known tunnel-reset failures inconsistent with the represented standard; (b) false representations that the Speedify service had particular performance characteristics or benefits (section 29(1)(g)), specifically "Flawless Failover," "seamless" failover, and "secure, uninterrupted" connectivity, when the service did not deliver these characteristics; and (c) false representations concerning the need for the Speedify service (section 29(1)(e)), by marketing Speedify as necessary for reliable multi-WAN bonding and Starlink connectivity when Connectify knew or ought to have known that the service had material limitations not disclosed to consumers.

212. Connectify failed to comply with the following consumer guarantees under the ACL: (a) Guarantee of acceptable quality (section 54): The Speedify service was not of acceptable quality because a reasonable consumer, fully acquainted with the nature and state of the service, would not regard it as acceptable given that the service suffered tunnel-reset

failures in its primary bonding and redundancy function, and given that Connectify subsequently exercised a unilateral device-level kill-switch to disable Plaintiff's Router without notice, cause, or remedy. A service that includes an undisclosed mechanism to render the consumer's hardware permanently inoperative is not fit for all the purposes for which services of that kind are commonly supplied, is not acceptable in appearance and finish, and is not free from defects. (b) Guarantee of fitness for a disclosed purpose (section 55): Plaintiff communicated to Connectify, through Support Ticket No. 676251 and the course of dealing, that Plaintiff required Speedify for continuity-dependent travel connectivity, multi-WAN bonding, and failover using a "Powered by Speedify" Miri X510 router. The Speedify service was not reasonably fit for this disclosed purpose. (c) Guarantee of correspondence with description (section 56): The Speedify service did not correspond with the description provided by Connectify, including "Flawless Failover," "duplicate packets," "seamless" failover, and "secure, uninterrupted" connectivity.

213. To the extent Connectify's Terms of Service purport to disclaim warranties, limit liability to $100, or exclude implied terms of acceptable quality, fitness, or correspondence with description, such terms are void under section 64 of the ACL insofar as they apply to the supply of services to Plaintiff as an Australian consumer. Connectify, as a supplier that sells directly to Australian consumers and through Australian-based retailers, is deemed to know that Australian Consumer Law consumer guarantees are mandatory and unexcludable. The ACL consumer guarantees accordingly form part of the contract between Plaintiff and Connectify regardless of any contrary provision in the Terms of Service, and Connectify's breach of those guarantees gives rise to remedies under the ACL that cannot be contractually limited or excluded.

214. As a direct result of Connectify's failure to comply with the consumer guarantees under sections 54, 55, and 56 of the ACL, and as a result of Connectify's misleading

or deceptive conduct under section 18 and false representations under section 29, Plaintiff has suffered loss and damage within the meaning of section 267 of the ACL, including: (a) the cost of the Router Plan subscription (USD $450.00) and Families Plan subscription (AUD $251.11); (b) the diminished value of the Miri X510 Router (AUD $2,725.82) rendered inoperative by Connectify's device-level blacklisting; (c) consequential losses including disruption to Plaintiff's business operations and international travel; and (d) costs of alternative equipment and services necessitated by Connectify's failures. Plaintiff is entitled to recover these damages under section 267(4) of the ACL, and to such further relief as is available under the ACL including damages for non-compliance with consumer guarantees under section 259(4) and compensation for reasonably foreseeable loss or damage resulting from Connectify's contravention of sections 18 and 29 under section 236 of the ACL.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in Plaintiff's favor and against Defendants, jointly and severally, and grant the following relief:

A.  A temporary restraining order and preliminary and permanent injunctive relief directing Defendants to

    a.  immediately cease and desist from interfering with Plaintiff's Router (serial number 00A601241115008) and immediately restore full Speedify licensing, authentication, and server access by:

        i.  reactivating Plaintiff's "Speedify Pro Router Yearly 3000GB Subscription" plan (Invoice #502472, USD $450.00) with the same subscription level, data allowance, and terms in effect prior to the unauthorized deactivation on January 27, 2026 at 14:39:55 UTC, with effective date no later than five (5) days from entry of this order; or in the alternative,

       ii.  if reactivation of the original plan is technically infeasible, issue Plaintiff a new Speedify router subscription plan with specifications no less favorable than the original plan (minimum 3000 GB monthly data allowance, Redundant Mode capability, and geographic routing suitable for multi-WAN bonding), with effective date no later than five (5) days from entry of this order,

    b.  cease maintaining and remove any device-level blacklist, serial-number disablement, or other restriction preventing activation of Plaintiff's Router through a paid subscription, and

    c.  cease and desist from further suspending, terminating, disabling, refunding, or otherwise interfering with Plaintiff's paid access and the Router's functionality absent further order of this Court;

B.  A declaration pursuant to 28 U.S.C. § 2201 consistent with the relief sought in Count 9;

C.  An award of compensatory damages in an amount to be determined at trial for Counts 1 (Breach of Contract), 2 (Breach of Implied Covenant), 3 (Trespass to Chattels), 4 (Fraud), 10 (Conversion), 11 (Unjust Enrichment), 12 (Breach of Implied Warranty of Fitness), and 13 (Breach of Implied Warranty of Merchantability), and 14 (Violation of Australian Consumer Law), including loss of the benefit of the bargain, loss-of-use damages measured by the reasonable market rental value of equivalent multi-WAN bonding equipment and services for the period of deprivation, lost profits and business disruption damages, consequential business losses, out-of-pocket losses, mitigation costs, and all damages flowing from Defendants' wrongful conduct, in an amount to be proven at trial and in any event sufficient to establish that the amount in controversy exceeds $75,000;

D. An award of restitution and/or disgorgement:

    a. under California Business and Professions Code § 17200 (Unfair Competition Law), restitution of all monies paid for services not delivered as represented, including subscription payments (USD $450.00 for Router Plan and AUD $251.11 for Families Plan) plus disgorgement of revenue Defendants retained from Plaintiff's Router purchase (AUD $2,725.82) by rendering that device permanently unusable through device-level blacklisting;

    b. under California Business and Professions Code § 17500 (False Advertising Law), restitution of all monies paid in reliance on false representations; and

    c. under California Civil Code § 1780(a) (Consumers Legal Remedies Act), actual damages, statutory damages, and restitution as authorized by statute, and, upon expiration of the thirty-day cure period prescribed by California Civil Code § 1782(a) without adequate corrective action by Defendants, punitive damages pursuant to § 1780(a)(4) for Defendants' willful, oppressive, and fraudulent violations of the CLRA (Plaintiff reserves the right to amend this Complaint to add such claims upon expiration of the cure period);

E. An award of up to three (3) times the actual damages sustained by Plaintiff under the Pennsylvania Unfair Trade Practices and Consumer Protection Law (73 P.S. § 201-9.2(a)), together with reasonable costs and expenses of this action including reasonable attorneys' fees as authorized by § 201-9.2(a), for Defendants' knowing and willful violations, specifically:

    a. knowingly making false performance representations regarding Flawless Failover and redundancy while possessing internal knowledge of tunnel-reset failure modes;

b. knowingly terminating Plaintiff's paid service and falsely attributing the termination to a "cancellation request" that Plaintiff expressly rejected in writing; and

c. knowingly implementing device-level blacklisting in retaliation for Plaintiff's exercise of legal rights, as evidenced by the temporal nexus between Plaintiff's IP challenge filing (January 27, 2026) and Defendants' escalation to device-level blacklisting (January 28, 2026);

F. An award of punitive damages under Pennsylvania common law for Defendants' willful and malicious fraud (Count 4), trespass to chattels (Count 3), and conversion (Count 10), and under California Civil Code § 1780(a)(4) for Defendants' CLRA violations (Count 8), in such amount as the trier of fact deems just and proper to punish Defendants' oppressive, fraudulent, and retaliatory conduct and to deter similar conduct, supported by clear and convincing evidence of Defendants' scienter and malice;

G. An award of damages for conversion of Plaintiff's Router, including the full value of the Router (AUD $2,725.82), loss-of-use damages measured by the reasonable market rental value of equivalent multi-WAN bonding equipment for the period of deprivation from January 27, 2026 to the date of judgment, and consequential damages resulting from the deprivation of Plaintiff's property;

H. An award of damages for breach of the implied warranty of fitness for a particular purpose, including the cost of replacement equipment and services;

I. Restitution for unjust enrichment, in the alternative, to the extent the Court determines that an enforceable contract does not govern the dispute;

J. An equitable order requiring Defendants to produce a verified accounting of all device-level blacklists, serial-number disablements, and licensing/authentication restrictions

applied to Plaintiff's Router (serial number 00A601241115008) and to Plaintiff's accounts, including the dates, methods, and authorization for each such restriction, to enable Plaintiff to ascertain the full scope of Defendants' conversion and interference with Plaintiff's property;

K. Pre-judgment and post-judgment interest as allowed by law;

L. Plaintiff's costs of suit and, to the extent Plaintiff retains counsel, reasonable attorneys' fees as authorized by statute, including under 73 P.S. § 201-9.2(a) (Pennsylvania UTPCPL), California Civil Code § 1780(e) (CLRA, mandatory for prevailing plaintiff), and 15 U.S.C. § 2310(d)(2) (Magnuson-Moss Warranty Act, to the extent applicable to Plaintiff's warranty claims); and

M. An award of damages under section 267(4) of the *Australian Consumer Law* (Schedule 2 to the *Competition and Consumer Act 2010* (Cth)) for Connectify's failure to comply with the consumer guarantees of acceptable quality (section 54), fitness for a disclosed purpose (section 55), and correspondence with description (section 56), and for Connectify's misleading or deceptive conduct (section 18) and false representations (section 29), including compensation for all loss and damage suffered by Plaintiff as a result of such contraventions under section 236 of the ACL, and such further orders as are appropriate under section 243 of the ACL including restitution of all amounts paid to Defendants and compensation for the diminished value of Plaintiff's Router rendered inoperative by Defendants' conduct;

N. Such other and further relief as the Court deems just and proper.

### VIII. DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all issues so triable.

Dated: February 6, 2026

---

February 6, 2026

Respectfully submitted,

MICHAEL WILLIAMS, Pro Se
Suite 1524, 50-58 Macleay Street
Elizabeth Bay NSW 2011
Australia
Telephone: +1 701 484 1337
Email: Michael.Williams@glexia.com

/s/*Michael Williams*

Michael Williams

February 6, 2026

**VERIFICATION**

I, Michael Williams, declare under penalty of perjury under the laws of the United States of America, pursuant to 28 U.S.C. § 1746(1), that:

1. I am the Plaintiff in this action and am competent to testify to the matters set forth herein.

2. I have read the foregoing Verified Complaint and know its contents.

3. The factual allegations contained therein are true and correct to the best of my personal knowledge, information, and belief.


Executed on February 6, 2026, in Puerto Escondido, Oaxaca, Mexico.

/s/*Michael Williams*

Michael Williams

February 6, 2026

## CERTIFICATE OF SERVICE

I, Michael Williams, hereby certify that on February 6, 2026, I transmitted a true and correct copy of the foregoing Verified Complaint and all attachments by email to the parties listed below for purposes of providing notice (including under Fed. R. Civ. P. 65(b)(1)). Formal service of process will be effected separately in accordance with Fed. R. Civ. P. 4.

**Connectify, Inc. (d/b/a Speedify)**, 601 Spring Garden Street, 3rd Floor, Philadelphia, Pennsylvania 19123, and registered agent at 251 Little Falls Drive, Wilmington, Delaware 19808 — via email to agizis@connectify.me, support@speedify.com, uspto@connectify.me, AsheryESQ@gmail.com, lashery@connectify.me, and kamran.emdadi@gmail.com.

**Alexander C. Gizis**, 430 Pine Street, Philadelphia, Pennsylvania 19106 — via email to agizis@connectify.me.

Plaintiff certifies that he has made diligent efforts to provide notice of this action and of the intended application for a temporary restraining order to all Defendants, consistent with Fed. R. Civ. P. 65(b)(1), including through more than thirty (30) written communications sent between January 25 and February 5, 2026, as set forth in the Verified Complaint. Plaintiff will effect formal service of the summons and complaint in accordance with Fed. R. Civ. P. 4 promptly upon filing, including by arranging service through a professional process server and, if authorized by the Court, through the U.S. Marshals Service, at Connectify, Inc.'s principal place of business at 601 Spring Garden Street, 3rd Floor, Philadelphia, Pennsylvania 19123 and at Defendant Gizis's residence at 430 Pine Street, Philadelphia, Pennsylvania 19106.

Dated: February 6, 2026

*/s/ Michael Williams*

Michael Williams, Pro Se